DSS:EMN/AH/DAL/SPN/MKM/PT/KDE/TH/BDM
F.#2015R00747

FILED
CLERK

2015 NOV 25  PM 3: 26

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

ALFREDO HAWIT,
ARIEL ALVARADO,
RAFAEL CALLEJAS,
BRAYAN JIMÉNEZ,
EDUARDO LI,
JULIO ROCHA,
RAFAEL SALGUERO,
COSTAS TAKKAS,
HÉCTOR TRUJILLO,
REYNALDO VASQUEZ,
JACK WARNER,
JUAN ÁNGEL NAPOUT,
MANUEL BURGA,
CARLOS CHÁVEZ,
LUÍS CHIRIBOGA,
MARCO POLO DEL NERO,
EDUARDO DELUCA,
RAFAEL ESQUIVEL,
EUGENIO FIGUEREDO,
NICOLÁS LEOZ,
JOSÉ MARIA MARIN,
JOSÉ LUÍS MEISZNER,
ROMER OSUNA,
RICARDO TEIXEIRA,
AARON DAVIDSON,
HUGO JINKIS, and
MARIANO JINKIS,

        Defendants.

- - - - - - - - - - - - - - - - - - -X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 15-252 (S-1) (RJD)
(T. 8, U.S.C., § 1451(e);
T. 18, U.S.C., §§
981(a)(1)(C), 982(a)(1),
982(a)(6), 982(b), 1343,
1349, 1425(a), 1512(c)(2),
1512(k), 1956(a)(2)(A),
1956(a)(2)(B)(i), 1956(h),
1957(a), 1957(b),
1957(d)(1), 1962(d), 1963,
1963(a), 1963(m), 2, and
3551 et seq.; T. 21,
U.S.C., § 853(p); T. 26,
U.S.C., § 7206(2); T. 28,
U.S.C., § 2461(c))

A TRUE COPY
ATTEST
DATE November 25, 20 15
DOUGLAS C. PALMER
BY R. Tarons
CLERK
DEPUTY CLERK

CONTENTS

INTRODUCTION TO ALL COUNTS ................................... 1

   I.   The Enterprise.................................... 1

      A.   FIFA ......................................... 2
      B.   The Continental Confederations ...................... 9
      C.   The Regional Federations and National Associations .. 13
      D.   The Sports Marketing Companies ..................... 14

  II.  The Defendants.................................... 15

      A.   CONCACAF Region Officials ......................... 15
      B.   CONMEBOL Region Officials ......................... 20
      C.   Sports Marketing Executives ....................... 25

 III. The Defendants' Co-Conspirators..................... 27

      A.   Named Co-Conspirators ............................. 27
      B.   Unnamed Co-Conspirators ........................... 32

  IV.  The Conspirators' Corruption of the Enterprise........ 37

   V.   Overview of the Racketeering Conspiracy............... 39

      A.   The Initial Corruption of the Enterprise ........... 41
      B.   The Growth of the Sports Marketing Companies ....... 45
      C.   Embezzlement and Misappropriation ................. 50
      D.   The Centrality of the U.S. Financial System ........ 50
      E.   Scandals and Resignations ......................... 52
      F.   The Continued Corruption of the Enterprise ......... 53
          i.   Pre-Indictment Period...................... 54
         ii.  Post-Indictment Period...................... 59
      G.   Obstruction of Justice ............................ 61

  VI.  The Criminal Schemes................................ 62

      A.   CONMEBOL Copa América Scheme ...................... 62
      B.   CONCACAF Gold Cup Scheme .......................... 69
      C.   CONMEBOL Copa Libertadores Scheme #1 .............. 71
      D.   CONMEBOL Copa Libertadores Scheme #2 .............. 75
      E.   CBF Copa do Brasil Scheme ......................... 80
      F.   CBF Sponsorship Scheme ............................ 83
      G.   CFU World Cup Qualifiers Scheme #1 ................. 86
      H.   2010 FIFA World Cup Vote Scheme ................... 90

I.     UNCAF Region World Cup Qualifiers Schemes ........... 96
       i.   FEDEFUT (Costa Rica) ........................... 100
       ii.  FENIFUT (Nicaragua) ............................ 103
       iii. FENAFUTH (Honduras) ............................ 105
       iv.  FESFUT (El Salvador) ........................... 107
       v.   FENAFUTG (Guatemala) ........................... 109
       vi.  FEPAFUT (Panama) ............................... 112
J.     UNCAF Region Friendlies Schemes .................... 114
       i.   FESFUT (El Salvador) ........................... 115
       ii.  FENAFUTG (Guatemala) ........................... 118
       iii. FEDEFUT (Costa Rica) ........................... 119
K.     2011 FIFA Presidential Election Scheme ............. 120
L.     CONCACAF Media and Marketing Rights Scheme ......... 124
M.     CFU World Cup Qualifiers Scheme #2 ................. 131
N.     CONCACAF Gold Cup/Champions League Scheme .......... 137
O.     CONMEBOL/CONCACAF Copa América Centenario Scheme ... 140

CRIMINAL COUNTS ........................................... 149

CRIMINAL FORFEITURE ALLEGATIONS ........................... 225

THE GRAND JURY CHARGES:

## INTRODUCTION TO ALL COUNTS

At all times relevant to this Superseding Indictment (the "Indictment"), unless otherwise indicated:

I.    The Enterprise

1.    The Fédération Internationale de Football Association ("FIFA") and its six constituent continental confederations – the Confederation of North, Central American and Caribbean Association Football ("CONCACAF"), the Confederación Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations Européennes de Football ("UEFA"), the Confédération Africaine de Football ("CAF"), the Asian Football Confederation ("AFC"), and the Oceania Football Confederation ("OFC") – together with affiliated regional federations, national member associations, and sports marketing companies, collectively constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of legal entities associated in fact (hereinafter the "enterprise").  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The enterprise was engaged in, and its activities affected, interstate and foreign commerce.

1

2.    The principal purpose of the enterprise was to regulate and promote the sport of soccer worldwide.  The members of the enterprise carried out this purpose by using a variety of methods and means, including creating and enforcing uniform standards and rules, organizing international competitions, and commercializing the media and marketing rights associated with the sport.  The members of the enterprise, as well as individuals and entities employed by and associated with the enterprise, frequently engaged in banking and investment activities with United States financial institutions.

3.    The enterprise operated in the Eastern District of New York and elsewhere, including overseas.

A.    FIFA

4.    FIFA was the international body governing organized soccer, commonly known outside the United States as football.  FIFA was an entity registered under Swiss law and headquartered in Zurich, Switzerland.  FIFA was composed of as many as 209 member associations, each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories.  The United States first became affiliated with FIFA in 1914; Puerto Rico first became affiliated with FIFA in 1960, with Guam, American Samoa, and the United States Virgin Islands following suit in the

2

1990s.  At various times relevant to the Indictment, FIFA maintained offices both in Zurich, Switzerland and elsewhere in the world, including in the United States, where FIFA maintained a development office since at least 2011.

5.  Each of FIFA's member associations also was a member of one of the six continental confederations recognized by FIFA: CONCACAF, CONMEBOL, UEFA, CAF, AFC, and OFC.  Since at least 1996, under FIFA's statutes, no national soccer association could become a member of FIFA without first joining one of the six continental confederations.  Since at least 2004, member associations were required to pay to FIFA annual dues, known as subscriptions.

6.  FIFA was governed by: a congress composed of its member associations, which acted as the association's highest legislative body; an executive committee, which acted as the executive body; and a general secretariat, which acted as the administrative body.  FIFA also had a president, who represented the association worldwide and was responsible for the implementation of decisions.  FIFA also operated several standing committees, including a committee that organized Olympic soccer qualifying tournaments, whose members included soccer officials from various national member associations. FIFA also operated through a number of subsidiaries, including

3

subsidiaries that assisted with FIFA's media and marketing activities.

7.    The FIFA congress was composed of delegates from each of its member associations as well as observers appointed by each of the confederations. Among other things, the congress was responsible for amending FIFA's statutes and electing the FIFA president. The congress convened in ordinary sessions biennially or annually, and at other times in extraordinary sessions in various countries around the world, including the United States.

8.    The FIFA executive committee, often referred to as the "ExCo," was composed of the FIFA president and a number of ordinary members, some of whom also held the title of vice president. The president was elected by the FIFA congress. The vice presidents and ordinary members were appointed by the confederations. Each confederation was entitled to appoint a specific number of vice presidents and ordinary members, as set forth in the FIFA statutes. Since at least 1996, the executive committee was required by FIFA statutes to meet at least twice per year. The executive committee held meetings at FIFA's headquarters in Zurich, Switzerland, as well as in various countries around the world, including the United States.

4

9.     Among other duties, the executive committee was responsible for selecting the host nations of FIFA tournaments, including, among others, the World Cup, the Women's World Cup, the Confederations Cup, the Under-20 World Cup, the Under-20 Women's World Cup, the Under-17 World Cup, the Under-17 Women's World Cup, and the Club World Cup.

10.     The World Cup, the sport's premier event, was a quadrennial international tournament involving the senior national men's teams of 24 and, beginning in 1998, 32 nations. In selecting the host nation for the World Cup, the executive committee typically followed a process in which bid committees for the competing nations campaigned for votes among the members of the executive committee.  Following this process, and at least six years prior to each World Cup, the executive committee typically held a vote in which its members cast their votes via secret ballot.  The winners, or host nations, for the World Cups from 1990 to 2022, as well as the other bidding nations that maintained their bids to the end of the process, are reflected in the table below:

**TABLE 1:** World Cup Host Selection

| World Cup | Date Selected by the ExCo | Winning Nation | Other Bidding Nation/Nations |
|---|---|---|---|
| 1990 | May 19, 1984 | Italy | Soviet Union |
| 1994 | July 4, 1988 | United States | Morocco Brazil |
| 1998 | July 2, 1992 | France | Morocco |
| 2002 | May 31, 1996 | Japan/South Korea | Mexico |
| 2006 | July 6, 2000 | Germany | South Africa England Morocco |
| 2010 | May 15, 2004 | South Africa | Morocco Egypt |
| 2014 | October 30, 2007 | Brazil | - |
| 2018 | December 2, 2010 | Russia | Spain/Portugal Netherlands/Belgium England |
| 2022 | December 2, 2010 | Qatar | United States South Korea Japan Australia |

The U.S. men's national team qualified for each edition of the World Cup from 1990 to 2014.

11.  Since at least 1996, under FIFA's statutes, the six continental confederations had certain rights and obligations, including, among other things, that they comply with and enforce FIFA's statutes, regulations, and decisions and work closely with FIFA to further FIFA's objectives and organize international soccer competitions.

6

12.    FIFA's purpose was, among other things, to develop and promote the game of soccer globally by organizing international competitions and by creating and enforcing rules that govern the confederations and member associations.    FIFA financed its efforts in significant part by commercializing the media and marketing rights associated with the World Cup.

- According to its published income statement for the 2007-2010 financial period, FIFA had total revenues of $4.189 billion, 83% of which ($3.480 billion) was attributable to the sale of television and marketing rights to the 2010 World Cup.  FIFA's profits during this same period were $631 million.

- According to its published income statement for the 2011-2014 financial period, FIFA had total revenues of $5.718 billion, 70% of which ($4.008 billion) was attributable to the sale of television and marketing rights to the 2014 World Cup.  FIFA's profits during this same period were $338 million.

- According to the same 2011-2014 income statement, well over one third of FIFA's revenue from the sale of marketing rights to the 2014 World Cup was attributable to a class of six sponsors known as the FIFA Partners, which included two major U.S.-based companies.  The second largest source of marketing revenue was a class of eight sponsors known as FIFA World Cup Sponsors, which included three U.S.-based companies.  Together, the FIFA Partners and FIFA World Cup Sponsors provided FIFA with more than $300 million in marketing revenue in connection with the 2014 World Cup.

In a sign of the enormous value of the commercial rights to the World Cup, several major broadcasters had already reached

7

agreements with FIFA and downstream parties for the broadcast and commercialization of the 2026 World Cup and 2030 World Cup, notwithstanding that the host sites for those events – an important factor in the ultimate value of the rights – had yet to be selected.

13.    FIFA helped finance the confederations and their member associations, including by providing funds through the Financial Assistance Program ("FAP") and the Goal Program, which were established in the late 1990s to support the development of youth academies, soccer fields, technical centers, and other infrastructure projects.  According to its published income statement for the 2011-2014 financial period, FIFA spent $1.052 billion on development projects, including $538 million for the FAP program.

14.    FIFA first instituted a written code of ethics in October 2004, which code was revised in 2006, again in 2009, and most recently in 2012 (generally, the "code of ethics").  The code of ethics governed the conduct of soccer "officials," which expressly included, among others, various individuals with responsibilities within FIFA, the confederations, member associations, leagues, and clubs. Among other things, the code of ethics provided that soccer officials were prohibited from accepting bribes or cash gifts and from otherwise abusing their

positions for personal gain.  The code of ethics further provided, from its inception, that soccer officials owed certain duties to FIFA and its confederations and member associations, including a duty of absolute loyalty.  By 2009, the code of ethics explicitly recognized that FIFA officials stand in a fiduciary relationship to FIFA and its constituent confederations, member associations, leagues, and clubs.

B.    The Continental Confederations

15.  In addition to providing representatives who helped to govern FIFA, the six continental confederations worked closely with FIFA and one another to organize international soccer competitions and carry out FIFA directives on a regional basis.  The leaders and representatives of the confederations conducted business with one another, as well as with the leaders and associates of FIFA, throughout the year at locations around the world, including in the United States.  Each confederation was governed by its own congress, general secretariat, executive committee and standing committees.  From time to time, some of the confederations, like FIFA, also operated through subsidiaries, including subsidiaries that assisted with media and marketing activities.

16.  CONCACAF was a continental soccer confederation incorporated, since 1994, as a non-profit corporation in Nassau,

Bahamas.  CONCACAF comprised as many as 41 member associations, representing organized soccer in North America, Central America, the Caribbean, and three South American countries.  The United States and two of its overseas territories, Puerto Rico and the United States Virgin Islands, were members of CONCACAF.  From approximately 1990 to 2012, CONCACAF's principal administrative office was located in New York, New York, where the former general secretary was based (until the end of 2011) and where CONCACAF regularly conducted business.  Beginning in 2012, CONCACAF's principal administrative office was located in Miami, Florida, where the new general secretary was based.  CONCACAF also conducted business at various times throughout the United States, including in the Eastern District of New York, as well as in foreign countries within and outside the confederation. Among other tournaments, CONCACAF organized the Gold Cup, featuring the men's national teams from CONCACAF and, from time to time, other confederations, as well as a tournament featuring the top men's professional league – or club - teams.  In June 2014, CONCACAF adopted a code of ethics that, among other things, prohibited bribery and corruption.

17.  CONMEBOL was a continental soccer confederation domiciled in Paraguay and headquartered in Asunción, Paraguay and, later, Luque, Paraguay.  CONMEBOL comprised as many as 10

10

member associations, representing organized soccer in South America. Among other tournaments, CONMEBOL organized the Copa América, featuring the men's national teams of its 10 members and two non-CONMEBOL national teams that were invited to participate, as well as tournaments featuring the top men's club teams. Since 1993, the United States has participated in the Copa América as an invitee three times, and in 2016 the United States will host and participate in a special edition of the tournament, the Copa América Centenario, to commemorate its centennial.

18. UEFA was a continental soccer confederation registered as a legal entity under the laws of Switzerland and headquartered in Nyon, Switzerland. UEFA comprised as many as 54 member associations, representing organized soccer in Europe and certain nations in the Middle East and Central Asia. Among other tournaments, UEFA organized the European Championship, featuring the top men's national teams, as well as tournaments featuring the top men's club teams.

19. CAF was a continental soccer confederation headquartered in Cairo, Egypt. CAF comprised as many as 56 member associations, representing organized soccer in Africa. Among other tournaments, CAF organized the Africa Cup of

11

Nations, featuring the top men's national teams, as well as a tournament featuring the top men's club teams.

20. AFC was a continental soccer confederation registered as a legal entity under the laws of Malaysia and headquartered in Kuala Lumpur, Malaysia. AFC comprised as many as 47 member associations, representing organized soccer in Asia, as well as on the island of Guam, a territory of the United States. Among other tournaments, AFC organized the Asian Cup, featuring the top men's national teams, as well as a tournament featuring the top men's club teams.

21. OFC was a continental soccer confederation incorporated under the laws of New Zealand and headquartered in Auckland, New Zealand. OFC comprised as many as 14 member associations, representing organized soccer in New Zealand and the Pacific Island countries, including American Samoa, a territory of the United States. Among other tournaments, OFC organized the Nations Cup, a tournament founded in 1996 featuring the top men's national teams, as well as a tournament featuring the top men's club teams.

22. The confederations also organized World Cup qualifying matches, using a variety of formats, and, from time to time, worked together to organize inter-confederation competitions, often with the support and approval of FIFA.

12

C.    The Regional Federations and National Associations

23.    In addition to being members of FIFA and their respective continental confederations, some of the national associations were also members of smaller, regional federations.

24.    For example, CONCACAF's member associations were organized into three smaller regional federations: the Caribbean Football Union ("CFU"), the Central American Football Union ("UNCAF"), and the North American Football Union ("NAFU").  The United States Soccer Federation ("USSF") was thus a member association of CONCACAF as well as NAFU, while Puerto Rico and the United States Virgin Islands were both members of CONCACAF and CFU.

25.    At various times, CFU was an entity headquartered in Trinidad and Tobago and Jamaica.  The CFU statutes effective May 22, 2012 provided, in pertinent part, that CFU officials "shall observe all pertinent statutes, regulations, directives and decisions" of FIFA, CONCACAF, and CFU, "including in particular . . . FIFA's Code of Ethics."

26.    The national associations promoted, organized, and governed soccer, often including club-level soccer, within individual nations.  The national association of the United States, the USSF, was based in Chicago, Illinois.

13

27.   The national associations, also often referred to as "federations," worked together to organize exhibition soccer matches between national teams, known as "friendlies," which also took place on the club level.  Friendlies took place in venues throughout the United States, including the Eastern District of New York, as well as in other venues worldwide.

D.    The Sports Marketing Companies

28.   FIFA, the continental confederations, the regional federations and the national member associations often entered into contracts with sports marketing companies to commercialize the media and marketing rights to various soccer events, including the World Cup and other tournaments, World Cup and Olympic qualifiers, friendlies, and other events, as well as other rights associated with the sport.  Often operating in coordination with affiliated consultants and intermediaries, these sports marketing companies, including multinational corporations with headquarters, offices, or affiliates located in the United States, often acquired an array of media and marketing rights, including television and radio broadcasting rights, advertising rights, sponsorship rights, licensing rights, hospitality rights, and ticketing rights.  These sports marketing companies often sold these rights to, among others,

television and radio broadcast networks, sponsors, and sub-licensees, including those located in the United States.

29.    The revenue generated by the commercialization of the media and marketing rights associated with soccer constituted an essential source of revenue for the enterprise. The United States was an increasingly important and lucrative market for the commercialization of these rights.

II.    The Defendants

A.    CONCACAF Region Officials

30.    The defendant ALFREDO HAWIT, a citizen of Honduras, was an individual employed by and associated with the enterprise. At various times relevant to the Indictment, HAWIT was a member of the CONCACAF executive committee and the general secretary, and then president, of the Federación Nacional Autonoma de Futbol de Honduras ("FENAFUTH"), the Honduran soccer federation, which was a national member association of FIFA, CONCACAF, and UNCAF. From in or about June 2011 to May 2012, HAWIT was the acting president of CONCACAF. From in or about June 2015 to the present, HAWIT was the president of CONCACAF, as well as a FIFA vice president serving on the FIFA executive committee. At various times relevant to the Indictment, HAWIT was also a member of various FIFA standing committees, including the finance committee.

31.   The defendant ARIEL ALVARADO, a citizen of Panama, was an individual employed by and associated with the enterprise.  From at least in or about 2004 to 2012, ALVARADO was the president of the Federación Panamena de Futbol ("FEPAFUT"), the Panamanian soccer federation, which was a national member association of FIFA, CONCACAF, and UNCAF.  At various times relevant to the Indictment, ALVARADO was a member of the CONCACAF executive committee and the FIFA disciplinary committee, which latter membership continued through the present.

32.   The defendant RAFAEL CALLEJAS, a citizen of Honduras, was an individual employed by and associated with the enterprise.  At various times relevant to the Indictment, CALLEJAS was the president of FENAFUTH.  At various times relevant to the Indictment, CALLEJAS was also a member of the FIFA marketing and television committee, which membership continued through the present.  From 1990 to 1994, CALLEJAS was the president of the Republic of Honduras.

33.   The defendant BRAYAN JIMÉNEZ, a citizen of Guatemala, was an individual employed by and associated with the enterprise.  From in or about 2010 to the present, JIMÉNEZ was the president of the Federación Nacional de Futbol de Guatemala ("FENAFUTG"), the Guatemalan soccer federation, which was a

16

national member association of FIFA, CONCACAF, and UNCAF.  At
various times relevant to the Indictment, JIMÉNEZ was a member
of the FIFA committee for fair play and social responsibility,
which membership continued through the present.

34.  The defendant EDUARDO LI, a citizen of Costa
Rica, was an individual employed by and associated with the
enterprise.  At various times relevant to the Indictment, LI was
the president of the Federación Costarricense de Fútbol
("FEDEFUT"), the Costa Rican soccer federation, which was a
national member association of FIFA, CONCACAF and UNCAF.  From
in or about 2013 to at least May 2015, LI was also a member of
CONCACAF's executive committee.  In April 2015, LI was elected
by the CONCACAF congress to become one of CONCACAF's three
representatives on FIFA's executive committee.  At various times
relevant to the Indictment, LI was also a member of multiple
FIFA standing committees, including the players' status
committee.  At various times relevant to the Indictment, LI
owned a residence in the United States, specifically in the
state of Florida.

35.  The defendant JULIO ROCHA, a citizen of
Nicaragua, was an individual employed by and associated with the
enterprise.  Until approximately December 2012, ROCHA was the
president of the Federación Nicaragüense de Fútbol ("FENIFUT"),

17

the Nicaraguan soccer federation, which was a national member
association of FIFA, CONCACAF and UNCAF.  From in or about 2003
to 2007, ROCHA was president of UNCAF.  From in or about January
2013 to at least May 2015, ROCHA was a FIFA development officer
based in Panama, responsible for overseeing FIFA's development
efforts in Central America.

36.  The defendant RAFAEL SALGUERO, a citizen of
Guatemala, was an individual employed by and associated with the
enterprise.  At various times relevant to the Indictment,
SALGUERO was designated by CONCACAF to serve as one of its three
representatives on the FIFA executive committee.  At various
times relevant to the Indictment, SALGUERO was also a member of
various FIFA standing committees, including the legal committee,
and was also the president of FENAFUTG, the Guatemalan soccer
federation.

37.  The defendant COSTAS TAKKAS, a citizen of the
United Kingdom, was an individual employed by and associated
with the enterprise.  At various times relevant to the
Indictment, TAKKAS was the principal of a number of businesses,
including Kosson Ventures Limited ("Kosson Ventures"), a British
Virgin Islands-registered personal holding company, and CPL
Limited, a Cayman Islands-registered personal holding company.
At various times relevant to the Indictment, TAKKAS was also the

18

general secretary of the Cayman Islands Football Association

("CIFA"), a national member association of FIFA and CONCACAF,

and was also an attaché to the CONCACAF president after Jeffrey

Webb assumed that role.

38.    The defendant HÉCTOR TRUJILLO, a citizen of

Guatemala, was an individual employed by and associated with the

enterprise.  From in or about at least 2010 to the present,

TRUJILLO was the general secretary of FENAFUTG.  At various

times relevant to the Indictment, including the present,

TRUJILLO was also a judge on the Constitutional Court of

Guatemala.

39.    The defendant REYNALDO VASQUEZ, a citizen of El

Salvador, was an individual employed by and associated with the

enterprise.  At various times relevant to the Indictment,

VASQUEZ was the president of the Federación Salvadoreña de

Futbol ("FESFUT"), the Salvadoran soccer federation, which was a

national member association of FIFA, CONCACAF, and UNCAF.

40.    The defendant JACK WARNER, a citizen of Trinidad

and Tobago and, between approximately 1993 and 2013, a legal

permanent resident of the United States, was an individual

employed by and associated with the enterprise.  From in or

about 1983 to June 2011, WARNER was a member of the FIFA

executive committee, and, beginning in 1997, was also a FIFA

19

vice president.  From in or about 1990 to June 2011, WARNER was also the president of CONCACAF and CFU, as well as a "special advisor" to the Trinidad and Tobago Football Federation, a national member association of FIFA, CONCACAF and the CFU.

      B.   CONMEBOL Region Officials

      41.  The defendant JUAN ÁNGEL NAPOUT, a citizen of Paraguay, was an individual employed by and associated with the enterprise.  On or about and between May 29, 2015 and the present, NAPOUT was a member of FIFA's executive committee and a FIFA vice president.  At various times relevant to the Indictment, NAPOUT was also a member of multiple FIFA standing committees, including the disciplinary committee and the organizing committee for the World Cup.  From in or about August 2014 to the present, NAPOUT was the CONMEBOL president; prior to that, he was one of CONMEBOL's vice presidents.  From in or about 2003 to 2013, NAPOUT was vice president and then president of the Asociación Paraguaya de Fútbol, the Paraguayan soccer federation, which was a national member association of FIFA and CONMEBOL.

      42.  The defendant MANUEL BURGA, a citizen of Peru, was an individual employed by and associated with the enterprise.  From in or about 2002 to 2014, BURGA was the president of Federación Peruana de Fútbol, the Peruvian soccer

federation, which was a national member association of FIFA and CONMEBOL. At various times relevant to the Indictment, BURGA was a member of the FIFA development committee, which membership continued through the present.

43. The defendant CARLOS CHÁVEZ, a citizen of Bolivia, was an individual employed by and associated with the enterprise. From in or about 2006 to at least August 2015, CHÁVEZ was the president of Federación Boliviana de Fútbol, the Bolivian soccer federation, which was a national member association of FIFA and CONMEBOL. At various times relevant to the Indictment, CHÁVEZ was also the treasurer of CONMEBOL.

44. The defendant LUÍS CHIRIBOGA, a citizen of Ecuador, was an individual employed by and associated with the enterprise. From in or about 1998 to the present, CHIRIBOGA was the president of Federación Ecuatoriana de Fútbol, the Ecuadorian soccer federation, which was a national member association of FIFA and CONMEBOL. At various times relevant to the Indictment, CHIRIBOGA was also a member of the CONMEBOL executive committee.

45. The defendant MARCO POLO DEL NERO, a citizen of Brazil, was an individual employed by and associated with the enterprise. In or about April 2015 to the present, DEL NERO was the president of the Confederação Brasileira de Futebol ("CBF"),

21

the Brazilian soccer federation, which was a national member association of FIFA and CONMEBOL. From in or about 2012 to the present, DEL NERO was also a member of FIFA's executive committee. At various times relevant to the Indictment, DEL NERO was also a member of multiple FIFA standing committees, including the organizing committee for the Olympic football tournaments, for which he served as chairman, and the organizing committee for the World Cup, for which he served as deputy chairman.

46. The defendant EDUARDO DELUCA, a citizen of Argentina, was an individual employed by and associated with the enterprise. In or about 1986 to 2011, DELUCA was the general secretary of CONMEBOL.

47. The defendant RAFAEL ESQUIVEL, a citizen of Venezuela, was an individual employed by and associated with the enterprise. ESQUIVEL was the president of the Federación Venezolana de Fútbol ("FVF"), the Venezuelan soccer federation, which was a national member association of FIFA and CONMEBOL. In or about 2014 to at least May 2015, ESQUIVEL was also a vice president on the CONMEBOL executive committee. At various times relevant to the Indictment, ESQUIVEL owned several pieces of residential property in the United States, specifically in the state of Florida.

22

48.   The defendant EUGENIO FIGUEREDO, a citizen of the United States and Uruguay, was an individual employed by and associated with the enterprise.   From in or about May 2013 to May 2015, FIGUEREDO was a member of FIFA's executive committee and a FIFA vice president.   At various times relevant to the Indictment, FIGUEREDO was also a member of multiple FIFA standing committees, including the finance committee and the organizing committee for the World Cup.   From in or about April 2013 to August 2014, FIGUEREDO was the CONMEBOL president; prior to that, he was one of CONMEBOL's vice presidents.   In or about 1997 to 2006, FIGUEREDO was the president of the Asociación Uruguaya de Fútbol, the Uruguayan soccer federation, which was a national member association of FIFA and CONMEBOL.   From at least in or about 2005 to the present, FIGUEREDO maintained a residence in the United States, specifically in Arcadia, California.   According to a naturalization application FIGUEREDO filed in 2005 with U.S. immigration authorities, beginning in 1997 FIGUEREDO worked in "sales" at a "decorative rock" business in Irwindale, California.   In his application, FIGUEREDO falsely affirmed under penalty of perjury that (a) he neither worked anywhere else in the previous five years nor ever had any affiliation with any organization or association in the United States or in any other place; and (b) he was exempt from the

23

required English language and civics exams because of a mental disability. Prior to obtaining his U.S. citizenship in August 2006, FIGUEREDO submitted documentation explaining his mental disability that falsely stated that he had severe dementia.

49. The defendant NICOLÁS LEOZ, a citizen of Paraguay, was an individual employed by and associated with the enterprise. In or about 1986 to April 2013, LEOZ was the president of CONMEBOL. In or about 1998 to April 2013, LEOZ was also a member of FIFA's executive committee.

50. The defendant JOSÉ MARIA MARIN, a citizen of Brazil, was an individual employed by and associated with the enterprise. In or about March 2012 to April 2015, MARIN was the president of CBF, the Brazilian soccer federation. At various times relevant to the Indictment, MARIN was also a member of multiple FIFA standing committees, including the organizing committee for the Olympic football tournaments, as well as the organizing committees for the World Cup and the Confederations Cup, as to which he was a special adviser. At various times relevant to the Indictment, MARIN maintained a residence in the United States, specifically in the state of New York.

51. The defendant JOSÉ LUÍS MEISZNER, a citizen of Argentina, was an individual employed by and associated with the enterprise. From in or about 2012 to the present, MEISZNER was

24

the general secretary of CONMEBOL. Previously, MEISZNER was the general secretary of the Asociación del Futbol Argentina ("AFA"), the Argentinian soccer federation.

52. The defendant ROMER OSUNA, a citizen of Bolivia, was an individual employed by and associated with the enterprise. From in or about 1986 to 2013, OSUNA was the treasurer of CONMEBOL. At various times relevant to the Indictment, OSUNA was a member of the FIFA audit and compliance committee, which membership continued through the present.

53. The defendant RICARDO TEIXEIRA, a citizen of Brazil, was an individual employed by and associated with the enterprise. From in or about 1989 to March 2012, TEIXEIRA was the president of CBF, the Brazilian soccer federation. In or about 1994 to March 2012, TEIXEIRA was also a member of FIFA's executive committee.

C.  Sports Marketing Executives

54. The defendant AARON DAVIDSON, a citizen of the United States, was an individual employed by and associated with the enterprise. At various times relevant to the Indictment, DAVIDSON was a high-level executive, including the president, of Traffic Sports USA, Inc. ("Traffic USA"). Traffic USA was a Florida corporation that had its headquarters and principal place of business in Miami, Florida and was involved in the

purchase and sale of media and marketing rights associated with soccer in the United States and other parts of the CONCACAF region. Traffic USA also participated in the ownership and management of the North American Soccer League ("NASL"), a division of United States men's club soccer sanctioned by the USSF, as well as the ownership and management of multiple clubs within the league. The NASL was headquartered in New York, New York and its teams were based in various cities in Canada and the United States, including in the Eastern District of New York. As further described below, Traffic USA was part of the Traffic Group, a multinational sports marketing conglomerate based in São Paulo, Brazil.

55. The defendant HUGO JINKIS and his son, the defendant MARIANO JINKIS, both citizens of Argentina, were individuals employed by and associated with the enterprise. At various times relevant to the Indictment, HUGO JINKIS and MARIANO JINKIS were the controlling principals of Full Play Group S.A., a sports media and marketing business with its principal offices in Argentina. HUGO JINKIS and MARIANO JINKIS also controlled subsidiaries and affiliates of Full Play Group S.A., including, among others, Cross Trading S.A. ("Cross Trading") and Yorkfields S.A. HUGO JINKIS and MARIANO JINKIS's companies are referred to collectively below as "Full Play."

26

* * * *

56. The foregoing officials of FIFA, CONCACAF, CONMEBOL, and other soccer governing bodies were bound by fiduciary duties to their respective organizations.

III. The Defendants' Co-Conspirators

    A.   Named Co-Conspirators

57. At various times relevant to the Indictment, Charles Blazer was the general secretary of CONCACAF. Blazer resided in New York, New York, where he oversaw CONCACAF's administrative headquarters and staff. From in or about February 1997 to May 2013, Blazer was also a member of FIFA's executive committee, serving as one of the three members of that body who had been appointed by CONCACAF and the only member who represented the United States. At various times relevant to the Indictment, Blazer was also a member of various FIFA standing committees, including the marketing and television committee.

58. At various times relevant to the Indictment, José Hawilla was the founder and owner of the Traffic Group, a multinational sports marketing company based in São Paulo, Brazil. The Traffic Group was comprised of, among other entities, Traffic Assessoria e Comunicações S/C Ltda. ("Traffic Brazil"), Traffic Sports International, Inc. ("Traffic International"), Traffic USA, Traffic Sports Europe B.V., and

27

Continental Sports International, Inc. (referred to collectively herein as "Traffic" or the "Traffic Group").

59.    At various times relevant to the Indictment, Traffic's operations focused on, among other things, the commercialization of soccer in South America through the purchase and sale of media and marketing rights associated with the sport.  Beginning in or about 1990, José Hawilla expanded Traffic's operations to the United States, partnering with and later acquiring a Florida company called Inter/Forever Sports, Inc., which was renamed Traffic Sports USA, Inc. (collectively referred to below as "Traffic USA") in or about 2003.  Over time, Traffic began to expand its operations even beyond the Americas, including by contracting directly with FIFA in the late 1990s and early 2000s to acquire the rights to the first editions of the Club World Championship.  Hawilla funded Traffic through various mechanisms, including revenues generated by the downstream sale of television and other rights obtained from media and marketing contracts and direct and frequent infusions of capital from Continental Sports International, Inc. ("Continental Sports"), a Cayman Islands company that Hawilla controlled and that maintained an account at Citi Private Bank in New York, New York.  Between 2006 and 2013, Continental Sports wire transferred tens of millions of dollars to Traffic

28

International's account at Delta Bank in Miami, Florida and tens of millions of dollars more to Traffic Brazil's accounts overseas.

60. At various times relevant to the Indictment, José Margulies was a controlling principal of Valente Corp. ("Valente") and Somerton Ltd ("Somerton"), South American companies registered in Panama and Turks and Caicos, respectively, that were involved in the broadcasting of soccer matches. Valente and Somerton and their affiliates are referred to collectively below as the "Margulies Intermediaries."

61. At various times relevant to the Indictment, Fabio Tordin was employed in the finance department of Traffic Brazil, working out of the São Paulo office, and, later, served as the chief executive officer of Traffic USA in Miami, Florida. In or about 2007 to 2010, while remaining based in Miami, Tordin was self-employed, including as a consultant in the field of soccer and media marketing rights. In or about 2011 to the present, Tordin worked as an executive of Media World, LLC (together with its successor entities, "Media World"), a sports marketing company based in Miami identified further in section B below.

62. At various times relevant to the Indictment, Roger Huguet was a high-ranking executive and part owner of

29

Media World and its parent company Media Company A, identified further in section B below.

63. At various times relevant to the Indictment, Zorana Danis was the controlling principal of International Soccer Marketing, Inc. ("ISM"), a company engaged in the purchase and sale of sponsorship and other commercial rights to soccer events. ISM was incorporated in Delaware and headquartered in Jersey City, New Jersey. Danis resided in the United States.

64. At various times relevant to the Indictment, Alejandro Burzaco was a principal of Torneos y Competencias S.A. (together with its affiliates, "TyC"), a sports media and marketing business headquartered in Argentina. Burzaco was also a principal of a number of subsidiaries and affiliates of TyC, including FPT Sports S.A. (together with its affiliates, "FPT Sports") and Productora de Eventos S.A. Burzaco's companies are referred to collectively below as "Torneos."

65. At various times relevant to the Indictment, Jeffrey Webb was the president of CIFA, a member of the CFU executive committee, the chairman of CFU's normalization committee, the president of CONCACAF, and a FIFA vice president and executive committee member. Webb also served on multiple FIFA standing committees, including the finance committee and

30

the organizing committee for the World Cup.  Outside of soccer, Webb worked at various times as an executive of a bank in the Cayman Islands.  Since approximately 2013, Webb owned a residence in the United States, specifically in Loganville, Georgia.  Webb also owned other pieces of residential property in the United States, specifically in Stone Mountain, Georgia and Conyers, Georgia.

66.  At various times relevant to the Indictment, Luis Bedoya was a high-ranking official of FIFA, CONMEBOL, and Federación Colombiana de Fútbol, the Colombian soccer federation, one of FIFA's national member associations.

67.  At various times relevant to the Indictment, Sergio Jadue was a high-ranking official of CONMEBOL and Asociación Nacional de Fútbol Profesional de Chile, the Chilean soccer federation, one of FIFA's national member associations, and a member of FIFA's associations committee.

68.  At various times relevant to the Indictment, Daryan Warner, a relative of the defendant JACK WARNER, was a businessman involved in, among other things, a number of soccer-related ventures.

31

B.    Unnamed Co-Conspirators

69.   The identities of the following individuals and business entities are known to the Grand Jury:

70.   At various times relevant to the Indictment, Co-Conspirator #1 was a high-ranking official of FIFA, CONMEBOL and AFA, the Argentinian soccer federation, which was a national member association of FIFA and CONMEBOL.

71.   At various times relevant to the Indictment, Co-Conspirator #2 was an owner and high-level executive of Inter/Forever Sports, Inc., a Miami-based sports marketing company that subsequently became Traffic USA.  Co-Conspirator #2 was later self-employed as a sports marketing consultant, who, among other things, assisted in the negotiation of contracts for media and marketing rights to soccer matches.

72.   At various times relevant to the Indictment, Co-Conspirator #3 was employed as a high-ranking executive of Traffic USA.  In or about July 2012 to June 2015, Co-Conspirator #3 left Traffic USA to become the general secretary of CONCACAF. In the latter role, Co-Conspirator #3 oversaw the transition of CONCACAF's administrative headquarters from New York, New York, where the prior general secretary (Charles Blazer) resided, to Miami, Florida, where it remained located up through the present.  In addition to his duties as CONCACAF general

32

secretary, Co-Conspirator #3 was also the general secretary of the Copa América Centenario executive committee, a joint CONCACAF/CONMEBOL body that was created in 2014 to oversee the 2016 Copa América Centenario, further described below.

73.  At various times relevant to the Indictment, Co-Conspirator #4 was an executive of Traffic USA in Miami, Florida.

74.  At various times relevant to the Indictment, Co-Conspirator #5 was a part owner of Media Company A and a high-ranking executive and part owner of Media Company B.  Media World, discussed in section A above, was a subsidiary of Media Company A, which engaged in a variety of media activities primarily in the United States and Latin America, including television production.  Media Company A, which was also based in Miami, Florida, was affiliated with Media Company B, a multinational media conglomerate based in Europe.

75.  At various times relevant to the Indictment, Co-Conspirator #6 was an employee of Traffic USA and then a consultant, residing in South Florida, specializing in negotiating soccer media and marketing rights, principally with certain CONCACAF member associations.  In addition to working as a consultant, from time to time Co-Conspirator #6 was involved in sports marketing ventures on his own behalf.  Co-Conspirator

33

#6 was the controlling principal of a number of small companies, including Consulting Company A, Consulting Company B, and Consulting Company C, which he used in connection with his consulting and sports marketing work.

76. At various times relevant to the Indictment, Co-Conspirator #7 was a senior executive of Traffic Brazil and, later, of a group of companies under common ownership and control that were engaged in the commercialization of media rights associated with soccer. The latter group of companies is referred to individually and collectively below as Sports Marketing Company A.

77. At various times relevant to the Indictment, Co-Conspirator #8 was a high-ranking official of FIFA and AFC, the regional confederation representing much of Asia.

78. At various times relevant to the Indictment, Co-Conspirator #9 was employed as a high-ranking executive of Traffic Brazil and Traffic USA.

79. At various times relevant to the Indictment, Co-Conspirator #10 was an intermediary who operated, among other businesses, a consulting firm based in Latin America.

80. At various times relevant to the Indictment, Co-Conspirator #11 was a co-founder and principal of Torneos.

34

81.    At various times relevant to the Indictment, Co-Conspirator #12 was a high-ranking Torneos executive.

82.    At various times relevant to the Indictment, Co-Conspirator #13 was a high-ranking official of the 2006 South Africa World Cup bid committee and the 2010 South Africa World Cup bid committee and local organizing committee.

83.    At various times relevant to the Indictment, Co-Conspirator #14 was a high-ranking official of FIFA.

84.    At various times relevant to the Indictment, Co-Conspirator #15 was a high-ranking official of the 2006 South Africa World Cup bid committee and the 2010 South Africa World Cup bid committee and local organizing committee, as well as a high-ranking official of the South African Football Association, one of FIFA's national member associations.

85.    At various times relevant to the Indictment, Co-Conspirator #16 was a high-ranking official of CONMEBOL and a member of the FIFA executive committee.

86.    At various times relevant to the Indictment, Co-Conspirator #17 was a high-ranking FIFA official.

87.    At various times relevant to the Indictment, Co-Conspirator #18 was a high-ranking official of FESFUT, the Salvadoran soccer federation.

35

88.    At various times relevant to the Indictment, Co-Conspirator #19 was a high-ranking official of FENAFUTG, the Guatemalan soccer federation.

89.    At various times relevant to the Indictment, Co-Conspirator #20 was a high-ranking official of FESFUT, the Salvadoran soccer federation.

90.    At various times relevant to the Indictment, Co-Conspirator #21 was a FIFA official.

91.    At various times relevant to the Indictment, Co-Conspirator #22 was an official of FESFUT, the Salvadoran soccer federation.

92.    At various times relevant to the Indictment, Co-Conspirator #23 was the beneficial owner of Front Company A.

93.    At various times relevant to the Indictment, Co-Conspirator #24 was a high-ranking official of one of FIFA's national member associations, an official of FIFA and CFU, and a businessman.

* * * *

94.    The foregoing officials of FIFA, CONCACAF, CONMEBOL, and other soccer governing bodies were bound by fiduciary duties to each of their respective organizations.

36

## IV. The Conspirators' Corruption of the Enterprise

95. Certain individuals and entities employed by and associated with the enterprise, including the defendants ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL CALLEJAS, BRAYAN JIMÉNEZ, EDUARDO LI, JULIO ROCHA, RAFAEL SALGUERO, COSTAS TAKKAS, HÉCTOR TRUJILLO, REYNALDO VASQUEZ, JACK WARNER, JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, RAFAEL ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS LEOZ, JOSÉ MARIA MARIN, JOSÉ LUÍS MEISZNER, ROMER OSUNA, RICARDO TEIXEIRA, AARON DAVIDSON, HUGO JINKIS, and MARIANO JINKIS, together with others, conspired with one another to use their positions within the enterprise to engage in schemes involving the solicitation, offer, acceptance, payment, and receipt of undisclosed and illegal payments, bribes, and kickbacks. Although they also helped pursue the principal purpose of the enterprise, the defendants and their co-conspirators corrupted the enterprise by engaging in various criminal activities, including fraud, bribery, and money laundering, in pursuit of personal and commercial gain. The defendants also participated in the corruption of the enterprise by conspiring with and aiding and abetting their co-conspirators in the abuse of their positions of trust and the violation of their fiduciary duties.

37

96. To further their corrupt ends, the defendants and their co-conspirators provided one another with mutual aid and protection. The conspirators engaged in conduct designed to prevent the detection of their illegal activities, to conceal the location and ownership of proceeds of those activities, and to promote the carrying on of those activities. The conduct engaged in by various members of the conspiracy included, among other things: the use of "consulting services" agreements and other similar types of contracts to create an appearance of legitimacy for illicit payments; the use of various mechanisms, including trusted intermediaries, bankers, financial advisors, and currency dealers, to make and facilitate the making of illicit payments; the creation and use of shell companies, nominees, and numbered bank accounts in tax havens and other secretive banking jurisdictions; the active concealment of foreign bank accounts; the structuring of financial transactions to avoid currency reporting requirements; bulk cash smuggling; the purchase of real property and other physical assets; the use of safe deposit boxes; income tax evasion; and obstruction of justice. Within the United States, such conduct took place within the Eastern District of New York and elsewhere.

97. The damage inflicted by the defendants and their co-conspirators was far-reaching. By conspiring to enrich

38

themselves through bribery and kickback schemes relating to media and marketing rights, among other schemes, the defendants deprived FIFA, the confederations, and their constituent organizations - and, therefore, the national member associations, national teams, youth leagues, and development programs that relied on financial support from their parent organizations - of the full value of those rights. In addition, the schemes had powerful anti-competitive effects, distorting the market for the commercial rights associated with soccer and undermining the ability of other sports marketing companies to compete for such rights on terms more favorable to the rights-holders. Finally, the schemes deprived FIFA, the confederations, and their constituent organizations of their right to the honest and loyal services of the soccer officials involved. Over time, and in the aggregate, such deprivations inflicted significant reputational harm on the victimized institutions, damaging their prospects for attracting conscientious members and leaders and limiting their ability to operate effectively and carry out their core missions.

V.    Overview of the Racketeering Conspiracy

98. Over a period of approximately 25 years, the defendants and their co-conspirators rose to positions of power and influence in the world of organized soccer. During that

same period, sometimes with the assistance of the defendants and their co-conspirators, a network of marketing companies developed to capitalize on the expanding media market for the sport, particularly in the United States. Over time, the organizations formed to promote and govern soccer in regions and localities throughout the world, including the United States, became increasingly intertwined with one another and with the sports marketing companies that enabled them to generate unprecedented profits through the sale of media rights to soccer matches. The corruption of the enterprise arose and flourished in this context.

99. The corruption of the enterprise became endemic. Certain defendants and their co-conspirators rose to power, unlawfully amassed significant personal fortunes by defrauding the organizations they were chosen to serve, and were exposed and then either expelled from those organizations or forced to resign. Other defendants and their co-conspirators came to power in the wake of scandal, promising reform. Rather than repair the harm done to the sport and its institutions, however, these defendants and their co-conspirators quickly engaged in the same unlawful practices that had enriched their predecessors. In some instances, these practices continued even after the original indictment returned by the Grand Jury in this

40

case was unsealed on May 27, 2015 and most of the defendants charged in that indictment were arrested.

100. Over the period of the Indictment, the defendants and their co-conspirators were involved in criminal schemes involving the agreement to pay and receive well over $200 million in bribes and kickbacks.

A.    The Initial Corruption of the Enterprise

101. From in or about 1983 to 2011, the defendant JACK WARNER obtained power and influence over the enterprise, first in the CONCACAF region, and then worldwide, eventually becoming a FIFA vice president and member of its executive committee. In or about 1983, WARNER, who was then the secretary of the Trinidad and Tobago Football Federation ("TTFF"), became a CONCACAF vice president and was appointed to the FIFA executive committee. In or about 1990, WARNER was elected president of CFU and resigned his formal position with TTFF, becoming a special advisor. The same year, WARNER ran for CONCACAF president and, with the support of Charles Blazer, who had worked as an official in the USSF, was elected. WARNER worked closely thereafter with Blazer, whose fortunes rose with WARNER's and who was appointed to be WARNER's general secretary at CONCACAF. Following his appointment, Blazer transferred CONCACAF's administrative headquarters to New York, New York.

WARNER established the president's office in his home country of Trinidad and Tobago.

102. In Trinidad and Tobago and elsewhere, the defendant JACK WARNER established and controlled numerous bank accounts and corporate entities in which he mingled his personal assets and those of CONCACAF, CFU, and TTFF. Beginning in the early 1990s, WARNER, often with the assistance of Charles Blazer, began to leverage his influence and exploit his official positions for personal gain. Among other things, WARNER began to solicit and accept bribes in connection with his official duties, including the selection of the host nation for the World Cups held in 1998 and 2010, which he participated in as a member of the FIFA executive committee.

103. The defendant JACK WARNER also became involved in a number of other schemes, including the diversion of FIFA, CONCACAF, and CFU funds into accounts that he controlled and used for his personal benefit. Among other things, WARNER funded a 2005 purchase of a Miami, Florida condominium, held in the name of a member of his family, with money drawn from an account held in the name of a soccer facility that was ostensibly affiliated with CONCACAF and was supported in part through FAP funds.

104. During approximately the same period of the defendant JACK WARNER's rise, the defendants NICOLÁS LEOZ and RICARDO TEIXEIRA, along with Co-Conspirator #1, established themselves as powerful officials of CONMEBOL and FIFA. In or about 1986, LEOZ, who had held other positions in soccer governance, was elected president of CONMEBOL. LEOZ would serve in this position for over 25 years. The defendant RICARDO TEIXEIRA became president of the Brazilian soccer federation, known as CBF, in or about 1989, a position he held until in or about 2012. Co-Conspirator #1 became president of the Argentine soccer federation, known as AFA, in or about 1979, a position he held until his death in 2014. As presidents of the national federations of the region's two traditional soccer powers – Brazil and Argentina – TEIXEIRA and Co-Conspirator #1 joined LEOZ in wielding significant influence over CONMEBOL.

105. Like the defendant JACK WARNER, the defendants NICHOLAS LEOZ and RICARDO TEIXEIRA, along with Co-Conspirator #1, would come to use their power and influence to unlawfully enrich themselves.

106. During the defendant NICOLÁS LEOZ's presidency, CONMEBOL developed a lucrative commercial relationship with Traffic, a growing sports marketing company that had been founded a few years earlier in Brazil. In 1986, Traffic,

43

represented by José Hawilla (the company's founder and owner),
entered into a contract with CONMEBOL to acquire the worldwide
commercial rights associated with the 1987 edition of the Copa
América, CONMEBOL's men's national team tournament. Traffic
would remain the exclusive holder of these rights through the
2011 edition of the tournament.

107. Beginning in the early 1990s, as the value of the
rights associated with the Copa América increased, various
CONMEBOL officials began soliciting bribe payments from José
Hawilla in exchange for the performance of various acts,
including the renewal of the Copa América contract. Hawilla
agreed to pay. Over time, Hawilla agreed to pay and paid tens
of millions of dollars in bribes to CONMEBOL officials in
connection with, among other things, the Copa América contracts,
media and marketing rights to other South American soccer
tournaments, and sponsorship rights acquired by a United States
sportswear company.

108. José Hawilla used a number of sophisticated money
laundering techniques to pay bribes and kickbacks, often relying
on intermediaries to make and conceal bribe payments to soccer
officials, including, at times, the defendants NICOLÁS LEOZ and
RICARDO TEIXEIRA. One such intermediary was José Margulies, the
brother of a late friend of Hawilla. Margulies used accounts in

44

the names of offshore corporations that were held at United States financial institutions to make payments on Hawilla's behalf.

B.    The Growth of the Sports Marketing Companies

109. In or about 1992, José Hawilla relocated from Brazil to the United States, where he began negotiations with the defendant JACK WARNER and Charles Blazer to acquire the marketing rights to the Gold Cup, CONCACAF's men's national team tournament, for Traffic's United States affiliate, Traffic USA, which was based in Miami, Florida. Hawilla, with the assistance of Co-Conspirator #2, a U.S.-based co-conspirator, won the contract, which was subsequently amended and renewed so that Traffic acquired the rights to the five editions of the Gold Cup played between 1996 and 2003. In connection with the acquisition and renewal of those rights, Hawilla and Co-Conspirator #2 together caused bribe payments to be made to WARNER and Blazer.

110. In the late 1990s and 2000s, Traffic, through Traffic USA, continued to grow its business with CONCACAF and its regional federations and member associations. José Hawilla and several high-ranking executives working at Traffic USA engaged in a number of bribery and fraud schemes in connection with their efforts to obtain various rights from CONCACAF, CFU,

45

and various federations in the region, including the federations from Trinidad and Tobago, Costa Rica, Panama, Honduras, Guatemala, El Salvador and Nicaragua. The Traffic USA executives involved in these schemes included, among others, the defendant AARON DAVIDSON, Fabio Tordin, Co-Conspirator #3, and Co-Conspirator #4. The beneficiaries of the schemes included, among others, the defendants ARIEL ALVARADO, ALFREDO HAWIT, EDUARDO LI, JULIO ROCHA, and JACK WARNER.

111. As Traffic attempted to expand its operations and develop its ties with CONCACAF and CONMEBOL, several competing sports marketing companies sought a share of the growing profits associated with organized soccer. Frequently, those companies, like Traffic, paid bribes to soccer officials in order to win business. At times, bribes also were paid to former officials who continued to exert influence over their respective federations.

112. Within the CONCACAF region, for example, starting in the mid-2000s, Media World, based in Miami, Florida, began to compete with Traffic USA to obtain media and marketing rights for matches played by member associations in the region, in particular members of UNCAF. Like Traffic, Media World obtained these rights by paying bribes to high-ranking officials of some of those federations, and officials of FIFA, including, among

others, the defendants ALFREDO HAWIT, RAFAEL CALLEJAS, BRAYAN

JIMÉNEZ, RAFAEL SALGUERO, HÉCTOR TRUJILLO, and REYNALDO VASQUEZ.

Media World, which was owned in part by Co-Conspirator #5 and

Roger Huguet, among others, used off-shore intermediary accounts

controlled by Co-Conspirator #6 and Co-Conspirator #2 to help

effectuate the scheme by transmitting and concealing the bribe

payments.

113. ISM, a New Jersey-based company owned and

operated by Zorana Danis, was another company engaged in the

commercialization of media and marketing rights to soccer

matches.  In or about 1996, CONMEBOL designated ISM as its

marketing agent for sponsorship and title sponsorship rights

associated with the Copa Libertadores, CONMEBOL's premier club

team tournament.  Danis, either directly through ISM or

indirectly through affiliates, thereafter acted as agent in

multi-party contracts to sell certain marketing rights to the

tournament.  At various times between the late 1990s and 2012,

Danis used bank accounts in New York, New York and elsewhere to

pay bribes and kickbacks to the defendants NICOLÁS LEOZ and

EDUARDO DELUCA to maintain these rights in connection with

editions of the tournament through 2012.

114. Torneos, along with its affiliates and

subsidiaries, also was engaged in the commercialization of media

47

and marketing rights to various soccer tournaments and matches within the CONMEBOL region, including the Copa Libertadores, Copa América, and various friendly matches. For example, starting in or about 1999 and continuing to the present, Torneos and its partners held the broadcasting rights to each edition of the Copa Libertadores, among other tournaments. Alejandro Burzaco, among other co-conspirators affiliated with Torneos, secured those rights through the systematic payment of bribes and kickbacks to high-ranking CONMEBOL officials, including the defendants JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, RAFAEL ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS LEOZ, JOSÉ MARIA MARIN, JOSÉ LUÍS MEISZNER, ROMER OSUNA, and RICARDO TEIXEIRA.

115. Other sports marketing companies that competed for business in the region with Traffic and Torneos included Full Play, controlled by the defendants HUGO JINKIS and MARIANO JINKIS, and Sports Marketing Company A, controlled by Co-Conspirator #7. At times, the sports marketing companies worked in conflict with one another, each seeking to win business from soccer organizations in the CONMEBOL and CONCACAF regions. At other times, the companies worked in concert, entering into contracts to share the media rights obtained from soccer organizations. All of these sports marketing companies at

48

various times and at the direction of the defendants HUGO JINKIS and MARIANO JINKIS and Alejandro Burzaco, José Hawilla, and Co-Conspirator #7 paid bribes and kickbacks to obtain and retain media rights contracts, with José Margulies as an intermediary to facilitate and conceal these payments.

116. Over the course of the racketeering conspiracy, José Margulies used the Margulies Intermediaries' accounts at United States financial institutions to move millions of dollars among the sports marketing companies and to soccer officials who were the recipients of illicit payments. Margulies took additional steps to conceal the nature of the payments he was facilitating beyond his use of the U.S.-based accounts. For example, he used the services of currency dealers, he regularly shredded records of his activities, and he discouraged soccer officials who were receiving payments from using accounts in their own names lest they draw attention from law enforcement, though they did not always heed his advice. To take one five-year period, for example, between March 2003 and March 2008, the Margulies Intermediaries wired more than $3.5 million into accounts controlled by the defendants RAFAEL ESQUIVEL, NICOLÁS LEOZ, and EUGENIO FIGUEREDO, almost entirely through even, six-figure payments.

C.    Embezzlement and Misappropriation

117. The conspirators' corruption of the enterprise extended beyond the payment and receipt of bribes and kickbacks. FIFA's provision of money – which totaled in the hundreds of millions of dollars – to its member associations in connection with the Goal Program, Financial Assistance Program (FAP), and other programs created opportunities for officials to embezzle or otherwise fraudulently appropriate funding intended to benefit FIFA's member associations and their constituent organizations, including youth leagues.  Certain of the defendants and their co-conspirators, including the defendant JACK WARNER and Jeffrey Webb, took advantage of these opportunities and embezzled or otherwise personally appropriated funds provided by FIFA, including funds intended for natural disaster relief.

D.    The Centrality of the U.S. Financial System

118. Over the course of the 1990s and increasingly in the 2000s and 2010s, the defendants and their co-conspirators relied heavily on the United States financial system in connection with their activities with the enterprise, including the schemes set forth below.  This reliance was significant and sustained and was one of the central methods and means through which they promoted and concealed their schemes.

50

119. For example, at various times relevant to the

Indictment:

· FIFA wired billions of dollars from its accounts at a major Swiss financial institution into beneficiary accounts in the United States and throughout the world via a correspondent account at the U.S. branch of a major Swiss financial institution;

· CONCACAF and CONMEBOL conducted business using accounts at the Florida and New York branches of major U.S. and Swiss financial institutions;

· CFU and two South American soccer federations, Federación Venezolana de Fútbol (FVF) and Asociación del Futbol Argentina (AFA), conducted business using the New York and Florida branches of multiple major and regional U.S. and foreign financial institutions;

· Continental Sports, a Traffic Group holding company, provided tens of millions of dollars in capital to support the operations of the Traffic Group using its account at the New York branch of a major U.S. financial institution;

· Traffic USA and Traffic International, two subsidiaries of the Traffic Group, conducted business using their accounts at the Florida branches of a major U.S. financial institution and a small U.S. financial institution that specialized in providing private banking services to clients from Latin America, respectively;

· Media World conducted business using its accounts at a Miami branch of a major U.S. financial institution;

· Full Play, Torneos, ISM, and Sports Marketing Company A conducted business using New York branches of major U.S., Swiss, and Brazilian financial institutions;

51

· Somerton and Valente, the intermediaries controlled by José Margulies, conducted business using accounts at the New York and Florida branches of major U.S. and European financial institutions;

· Various defendants and co-conspirators maintained and controlled bank accounts in the United States into which they received or from which they sent bribe and kickback payments in connection with the charged schemes, including accounts at branches of major U.S. and Swiss financial institutions in New York and Miami; and

· The defendant NICOLÁS LEOZ used a New York-based investment advisor registered with the U.S. Securities and Exchange Commission to manage a $40 million portfolio (as of 2012) of his worldwide investments.

In addition to the use of the particular financial institutions and wire facilities identified above, the conspirators also relied on the broader strength and stability of the U.S. financial system, including access to the private equity markets.

E.    Scandals and Resignations

120. In 2011, 2012, and 2013, public revelation of corruption scandals involving the defendants JACK WARNER, RICARDO TEIXEIRA, and NICOLÁS LEOZ forced all three men to resign from their positions in the enterprise.

121. In May 2011, the defendant JACK WARNER facilitated the payment of bribes by Co-Conspirator #8, who was

52

running for the FIFA presidency, to members of CFU. The following month, after the scheme came to light and FIFA commenced an investigation into the matter, WARNER resigned from his positions with FIFA, CONCACAF, CFU, and TTFF. By the end of 2011, after the revelation of other financial irregularities at CONCACAF began to come to light, Charles Blazer resigned from his position as general secretary of CONCACAF.

122. In March 2012, the defendant RICARDO TEIXEIRA resigned from his position as CBF president and a member of the FIFA executive committee amid allegations of corruption.

123. In April 2013, the defendant NICOLÁS LEOZ resigned from his positions as president of CONMEBOL and a member of the FIFA executive committee. LEOZ's resignation followed the conclusion of an investigation by the FIFA ethics committee into payments made in the late 1980s and early 2000s to LEOZ and two other soccer officials from a Swiss sports marketing company in connection with the purchase of FIFA media and marketing rights. The FIFA ethics committee found that the payments to LEOZ and the other officials, including the defendant RICARDO TEIXEIRA, were bribes.

F.    The Continued Corruption of the Enterprise

124. The change in administration at CONCACAF and CONMEBOL between 2011 and 2013 did not usher in an era of reform

at those organizations.  Instead, the new leadership continued
to engage in criminal schemes in violation of their fiduciary
duties, both in the period that ended with the unsealing of the
original indictment on May 27, 2015 and in the period that
followed.

i.    Pre-Indictment Period

125. Following WARNER's resignation, the defendant
ALFREDO HAWIT was selected to serve as acting president of
CONCACAF until a new president was elected.  HAWIT held that
role in or about June 2011 to May 2012.  During this period,
HAWIT, the defendant ARIEL ALVARADO, who was then president of
the Panamanian soccer federation and a member of the CONCACAF
executive committee, and the defendant RAFAEL SALGUERO, who was
then serving as one of CONCACAF's three representatives on the
FIFA executive committee, agreed to accept, and did accept,
$450,000 in bribes from the defendants HUGO JINKIS and MARIANO
JINKIS, who were seeking to expand the operations of Full Play
further into the CONCACAF region.  In return for these bribes,
HAWIT, ALVARADO, and SALGUERO agreed to seek to cause CONCACAF
to award media and marketing rights owned by CONCACAF, including
rights to the Gold Cup, to Full Play.

126. In early 2012, Jeffrey Webb, who had long been
the president of CIFA, the Cayman Islands soccer federation,

54

emerged as a candidate to succeed the defendant JACK WARNER as the next CONCACAF president. During the course of his campaign, Webb, with the defendant COSTAS TAKKAS's aid and assistance, used his growing influence to solicit a bribe from Traffic USA in connection with its efforts to acquire from CFU the commercial rights of its members to the qualifier matches to be played in advance of the 2018 and 2022 World Cups.

127. In May 2012, Jeffrey Webb was elected to be president of CONCACAF. Like the defendant JACK WARNER, Webb thereafter became a FIFA vice president and member of its executive committee. Co-Conspirator #3 was appointed to be CONCACAF's general secretary and left his position at Traffic USA to oversee CONCACAF's operations under Webb. Upon assuming their respective positions, Webb and Co-Conspirator #3 made public pronouncements about reforming CONCACAF. Almost immediately after taking office, however, both men resumed their involvement in criminal schemes.

128. For example, weeks after beginning work as general secretary, Co-Conspirator #3 began negotiations with the defendant AARON DAVIDSON, under whom he previously worked at Traffic USA, regarding the media rights to the Gold Cup and the CONCACAF Champions League, CONCACAF's club tournament. Upon direction by and on behalf of Jeffrey Webb, Co-Conspirator #3

negotiated a bribe payment for Webb.  In or about November 2012, CONCACAF awarded the contract for the rights to the 2013 Gold Cup and the next two seasons of the CONCACAF Champions League to Traffic USA.

129. Approximately one year later, Co-Conspirator #3 negotiated a second bribe from Traffic USA to Jeffrey Webb in connection with the renewal of the Gold Cup and Champions League contract.  In the interim, Co-Conspirator #3 had begun to benefit personally from Webb's bribe schemes, obtaining an expensive painting from an art gallery in New York that was paid for by the defendant COSTAS TAKKAS, who, having previously served under Webb as general secretary at CIFA, obtained the new title of attaché to the CONCACAF president.

130. In or about April 2013, following the defendant NICOLÁS LEOZ's resignation, the defendant EUGENIO FIGUEREDO – a dual citizen of the United States and Uruguay, who maintained a residence in California – assumed the CONMEBOL presidency and LEOZ's place as a vice president on the FIFA executive committee.  Shortly after the elevation of FIGUEREDO to these positions, CONMEBOL, CONCACAF, and the sports marketing companies controlled by José Hawilla, Alejandro Burzaco, and the defendants HUGO JINKIS and MARIANO JINKIS consummated a scheme to obtain a suite of valuable rights from CONCACAF and CONMEBOL

56

officials in exchange for an agreement to pay tens of millions of dollars in bribes.

131. As part of the scheme, José Hawilla, Alejandro Burzaco, and the defendants HUGO JINKIS and MARIANO JINKIS caused their respective companies to join together and form a new entity known as Datisa. Following the creation of this entity, Datisa entered into a $317.5 million contract with CONMEBOL to obtain the exclusive worldwide rights to the 2015, 2019, and 2023 editions of the Copa América and the 2016 Copa América Centenario, a tournament to celebrate the 100th anniversary of the first edition of the Copa América. Following negotiations between CONMEBOL and CONCACAF, it was determined that the men's national teams of six CONCACAF member associations, including the U.S. federation, would participate in the Copa América Centenario with the 10 CONMEBOL men's national teams. It was further determined that the tournament would be hosted by the United States in recognition of the growth of the market for soccer in North America.

132. Datisa subsequently entered into a $35 million contract with CONCACAF, in its capacity as the co-organizer of the Copa América Centenario, to acquire CONCACAF's media rights to the tournament.

133. In connection with the acquisition of the media rights to the Copa América and Centenario tournaments from CONMEBOL and CONCACAF, Datisa agreed to pay tens of millions of dollars in bribes to the defendants RAFAEL ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS LEOZ, and JOSÉ MARIA MARIN, Jeffrey Webb and several other soccer officials. Datisa agreed to make these payments at various times over the life of the contracts.

134. On May 1, 2014, CONCACAF and CONMEBOL held a press conference in Miami, Florida to officially announce and promote the Copa América Centenario. Datisa representatives, including the defendants HUGO JINKIS and MARIANO JINKIS, José Hawilla, and Alejandro Burzaco attended the press conference. A press release issued in connection with the announcement trumpeted the growing unity of organized soccer in the Americas. In the release, the defendant EUGENIO FIGUEREDO stated, "We are proud to play a leading role in the celebration of the centennial of a tournament born to unite all America. . . . Now, CONCACAF and the United States will play host to the world's oldest national team competition." The event's promotional materials bore the logo of Datisa's trade name – wematch – alongside the logos of CONCACAF and CONMEBOL, superimposed over a map of the western hemisphere.

135. The Copa América Centenario was scheduled to be played in June 2016 in cities located throughout the United States.

ii.  Post-Indictment Period

136. In the months following the unsealing of the original indictment on May 27, 2015, several of the co-conspirators of the defendants who were charged in the original indictment sought to harness the disruptive effects of the charges to their own advantage, in some cases by seeking or moving to maintain or solidify their hold on positions of power.

137. For example, in June 2015, the defendant ALFREDO HAWIT became president of CONCACAF and a vice president and executive committee member of FIFA, moving to fill the void left by the indictment of former CONCACAF president Jeffrey Webb. The defendant JUAN ÁNGEL NAPOUT, the CONMEBOL president and, like HAWIT, a FIFA vice president and executive committee member, sought to portray himself as an agent of reform, notwithstanding his own long-standing involvement in the solicitation and receipt of bribe and kickback payments in exchange for his influence as a CONMEBOL and FIFA official.  The defendant RAFAEL SALGUERO, who in April 2015 lost his seat on the FIFA executive committee – the "Central American" seat – to the defendant EDUARDO LI, sought support from CONCACAF

59

federations and others for his possible return to the FIFA executive committee. And the defendant ROMER OSUNA, who solicited and received millions of dollars in bribe payments during his years as treasurer of CONMEBOL, maintained his position as a member of FIFA's audit and compliance committee, a committee in charge of, among other things, developing proposals for organizational reform.

138. In some instances, the conspirators' criminal conduct continued even after the unsealing of the original indictment. For example, on or about May 31, 2015 and June 5, 2015, the Salvadoran national soccer team played friendly matches in Washington, DC and Chile, respectively. Prior to the May 27, 2015 unsealing of the original indictment, Fabio Tordin and Co-Conspirator #6 had agreed to pay a $5,000 bribe to a Salvadoran federation official in exchange for that official's agreement to have his team participate in each match. After the indictment was unsealed, Tordin did not pay the bribe. In response, the Salvadoran official and others associated with him repeatedly pressured Tordin to make the payment, through telephone calls and letters and by traveling to the United States from El Salvador to meet with Tordin.

139. As set forth below, the conspirators' criminal conduct also included obstruction of justice.

60

G.    Obstruction of Justice

140. Beginning in or about 2012 and continuing through the present, as their awareness of law enforcement scrutiny began to increase, many conspirators engaged in additional conduct designed to prevent detection of their own illegal activities and to provide one another with mutual aid and protection.  At times, such conduct constituted obstruction of justice.

141. The following are four examples of acts of obstruction engaged in by the conspirators.  First, upon learning that a co-conspirator was being interviewed by federal law enforcement agents, another co-conspirator attempted to persuade the co-conspirator being interviewed not to disclose to agents everything he or she knew.  Second, conspirators, including the defendant AARON DAVIDSON, alerted co-conspirators to the possibility that they would be recorded making admissions of their crimes.  Third, a co-conspirator destroyed evidence of bribe payments.  Fourth, after the initial indictment in this case was unsealed on May 27, 2015, the defendant ALFREDO HAWIT directed a co-conspirator to create sham contracts for the purpose of concealing bribe payments and to make false statements about these bribe payments to federal law enforcement agents.

61

VI.   The Criminal Schemes

        142. Set forth below are further details regarding certain criminal schemes in which the defendants and their co-conspirators agreed to engage in connection with their activities with the enterprise.

        A.   CONMEBOL Copa América Scheme

        143. In 1916, CONMEBOL organized the first edition of the Copa América, a tournament featuring the men's national teams of its members.  According to CONMEBOL, the tournament, which continues to be played today, is the longest continuously running such tournament in the world.

        144. Beginning with the 1987 edition and continuing thereafter through 2011, Traffic held the exclusive worldwide commercial rights for each edition of the Copa América tournament, which rights were secured through a series of contracts between Traffic and CONMEBOL.  On or about January 23, 1991, at a signing ceremony for one such contract held at CONMEBOL headquarters in Asunción, Paraguay, José Hawilla signed the contract on behalf of Traffic, as did two CONMEBOL officials on behalf of the confederation.  The defendant NICOLÁS LEOZ, then the president of CONMEBOL, declined to sign the contract. In a private meeting, LEOZ told Hawilla, in sum and substance, that Hawilla would make a lot of money from the rights he was

acquiring and LEOZ did not think it was fair that he (LEOZ) did not also make money.  LEOZ told Hawilla that he would only sign the contract if Hawilla agreed to pay him a bribe.  After Hawilla agreed to make the payment, LEOZ signed the contract.  Hawilla caused the payment – a six-figure U.S. dollar payment – to be made to an account designated by LEOZ.

145. In approximately 1993 or 1995, the defendant NICOLÁS LEOZ began demanding additional bribe payments around the time each edition of the tournament was played.  José Hawilla agreed to make these payments and caused them to be made.  The defendant NICOLÁS LEOZ solicited and received bribe payments from Hawilla in connection with every Copa América edition until 2011.  The payments increased over time, and ultimately reached the seven figures.

146. The defendant RAFAEL ESQUIVEL also solicited and received bribe and kickback payments in connection with the Copa América tournament.  Over the course of the 2007 and 2011 editions of the tournament, held in Venezuela and Argentina, respectively, ESQUIVEL solicited and received bribe and kickback payments totaling in the seven figures from, variously, José Hawilla and another senior Traffic executive, Co-Conspirator #9.  Hawilla agreed to make the bribe payments to ESQUIVEL, who at the time was the president of FVF, the Venezuelan soccer

63

federation, and a member of the CONMEBOL executive committee, in exchange for ESQUIVEL's continued official support of Traffic's position as exclusive holder of the marketing rights to the Copa América and of Traffic's ability to commercialize the rights.

147. For example, in 2011, ESQUIVEL solicited a $1 million bribe and kickback payment from José Hawilla in light of the substantial profits Hawilla had earned in connection with the 2007 tournament. After discussing the matter with Co-Conspirator #9, Hawilla agreed to the payment and caused it to be made, in part because he hoped to secure ESQUIVEL's official support for Traffic in a dispute between Traffic and Full Play (see CONMEBOL/CONCACAF Copa América Centenario Scheme, below) concerning which company would hold the commercial rights to the Copa América going forward.

148. José Hawilla caused the $1,000,000 bribe to be paid to the defendant RAFAEL ESQUIVEL in a manner designed to conceal the source and nature of the payment. On or about July 22, 2011, at the direction of Traffic executives, approximately $1,000,000 was wired from an account held in the name of Co-Conspirator #10, an intermediary, at Banco Itaú in Brazil, to an account held in the name of Co-Conspirator #10's investment company ("Investment Company A"), the identity of which is known to the Grand Jury, at Banco Itaú in Miami, Florida. That same

day, the funds were wired from the latter account to an account

at UBS in Miami held in the name of an entity controlled by

ESQUIVEL.

149. José Hawilla made personal payments to other

CONMEBOL officials over the course of his and Traffic's

involvement as holder of the rights to Copa América. For

example, Hawilla made periodic six-figure payments to the

defendants EDUARDO DELUCA, EUGENIO FIGUEREDO, and ROMER OSUNA in

connection with multiple editions of the tournament through in

or about 2007, during which time DELUCA, FIGUEREDO, and OSUNA,

were the general secretary, vice president, and treasurer of

CONMEBOL, respectively.

150. Starting in or about the 1990s, José Hawilla

agreed on behalf of Traffic International to pay AFA, the

Argentinian soccer federation, millions of dollars per edition

of the Copa América so that AFA would field its best players.

At times, Hawilla was directed to send the payments not to AFA,

but to a travel agency used to facilitate payments to Co-

Conspirator #1 personally. Hawilla then sent the payments as

directed. Hawilla also agreed to make payments to CBF, the

Brazilian soccer federation, to ensure that CBF would field its

best players for the Copa América editions played in or about

and between 2001 to 2011. At times, the defendant RICARDO

TEIXEIRA directed Hawilla to make the payments to accounts that were unknown to Hawilla, and that a Traffic financial officer informed Hawilla were not CBF accounts.

151. The defendants and their co-conspirators understood that accepting bribes was improper and thus sought to conceal the nature of the payments received from José Hawilla. Accordingly, they used a number of sophisticated money laundering techniques, including the use of a numbered account at a Swiss bank, currency dealers, and trusted intermediaries, to effect bribe payments in a manner that obscured their true source and nature and promoted the corrupt schemes. Hawilla was particularly reliant on intermediaries, including José Margulies, to make the bribe payments to the defendant NICOLÁS LEOZ in connection with the Copa América. Margulies, with whom the defendant RAFAEL ESQUIVEL was close, also conveyed at least one solicitation to Traffic from ESQUIVEL.

152. As described above, José Margulies and his family controlled the Margulies Intermediaries, using accounts held in the names of offshore corporations at United States financial institutions to make payments to the defendants on José Hawilla's behalf. Margulies used the accounts of the Margulies Intermediaries to mask the sources and beneficiaries of bribe and kickback payments.

153. In the course of the scheme, and as far back as 1997, the defendants and their co-conspirators frequently used wire facilities and financial institutions located in the United States to make and receive payments related to the Copa América contracts. In particular, Traffic International, which held the rights on behalf of Traffic beginning with the 1999 edition, maintained bank accounts in the United States and used the wire facilities of the United States to transfer payments in connection with Traffic's exploitation of the media and marketing rights associated with the Copa América. For example, Traffic International used the wire facilities of the United States to transfer funds from its account at Delta National Bank & Trust Co. in Miami, Florida in satisfaction of contract payments due to CONMEBOL for the rights associated with the editions of the Copa América played from 2004 through 2011.

154. The revenue generated by the commercialization of media and marketing rights associated with the Copa América increased dramatically over the course of the tournament editions covered by the Copa América Contract signed in 1991 and Traffic's subsequent renewals, all of which José Hawilla obtained through bribery. Over time, these increases in revenue, and associated increases in profits, arose in significant part from Hawilla and Traffic's successful promotion

67

and commercialization of the Copa América in the United States, including through contractual relationships with an array of broadcasters and advertisers based in the United States.

155. For example, the 2001 Copa América was quite profitable for Traffic, owing in part to the sale of broadcast and advertising rights to broadcast networks and beverage companies based in the United States. To take another example, the 2007 Copa América was even more profitable for Traffic than the 2001 edition. Traffic's television broadcasting revenues from the United States/Canadian market were its highest from any market worldwide, and its revenues from radio broadcasting and mobile telephone/Internet services in the United States market were similarly its highest worldwide.

156. The value of the sponsorship rights owned by Traffic also increased over time, owing in part to increased interest in the tournament in the United States. For example, for the 2011 edition of the Copa América, Traffic sold sponsorship rights to 10 official sponsors, up from seven official sponsorships sold for the 2007 edition. The official sponsors included major beverage companies based in the United States. Sponsorship fees more than tripled between 2007 and 2011.

157. Traffic used its presence in the United States to assist it in exploiting the United States market. For example, Traffic International assigned to Traffic USA, Traffic's Miami-based subsidiary, a portion of the rights it held under the 2001 Copa América Contract. Traffic USA exploited those rights in the United States by contracting directly with television and radio networks based in the United States and serving as an agent for Traffic in connection with the sale of global sponsorship rights.

158. In or about 2010, however, CONMEBOL terminated its long-standing relationship with Traffic and sold the rights to future editions of the tournament to Full Play, owned by the defendants HUGO JINKIS and MARIANO JINKIS.

B.  CONCACAF Gold Cup Scheme

159. A few years after José Hawilla entered into a bribe scheme with CONMEBOL officials in connection with the Copa América, Hawilla entered into a similar scheme with CONCACAF officials in connection with CONCACAF's analogue to the Copa América: the Gold Cup.

160. In or about 1991, CONCACAF began organizing and promoting the Gold Cup, a tournament featuring member associations of CONCACAF and, in later years, those of other confederations.

161. In or about 1992, José Hawilla relocated to the United States in part to seek additional business opportunities for Traffic USA in the period leading up to the 1994 World Cup, which was to be hosted by the United States. During this period, Hawilla and Co-Conspirator #2, then a Traffic USA executive based in Miami, Florida variously began negotiations with high-ranking CONCACAF officials, including the defendant JACK WARNER and Charles Blazer, for Traffic USA to purchase the media and marketing rights associated with the Gold Cup. Negotiations regarding the rights took place in the United States.

162. José Hawilla's pitch to CONCACAF, in sum and substance, was that Traffic could replicate the commercial and sporting success it had had with the Copa América and make the Gold Cup a similar success. On or about October 3, 1994, Traffic USA entered into a contract with CONCACAF for $9.75 million for the commercial rights associated with the 1996, 1998, and 2000 editions of the Gold Cup. Beginning with the 1996 Gold Cup and continuing for four subsequent editions of the tournament (1998, 2000, 2002, and 2003), pursuant to the contract with Traffic USA (as subsequently amended and renewed following additional negotiations), CONCACAF granted to Traffic USA the exclusive worldwide commercial rights to the Gold Cup.

70

163. During this period, Traffic caused hundreds of thousands of dollars in bribe payments to be made to the defendant JACK WARNER and Charles Blazer, including payments that were made from or through banks based in the United States.

164. For example, on or about March 29, 1999, Traffic caused $200,000 to be wired to a correspondent account at Barclays Bank in New York, New York, for credit to an account held in the name of an entity controlled by Charles Blazer at Barclays Bank in the Cayman Islands. Approximately three weeks later, on April 23, 1999, $100,000 – half of the amount paid to Blazer – was transferred from Blazer's Cayman account to an account at First Citizens Bank in Trinidad and Tobago, held in the name of the defendant JACK WARNER. As it had done in connection with the Copa América scheme, Traffic used an intermediary to make the payment to Blazer in order to conceal the source and nature of the payment.

165. In or about 2003, CONCACAF terminated its contract with Traffic for Gold Cup media rights.

C.    CONMEBOL Copa Libertadores Scheme #1

166. In connection with its efforts to promote the sport of soccer in South America, CONMEBOL organized and funded a variety of international soccer tournaments to showcase the region's best teams. Among other tournaments, CONMEBOL

71

organized the Copa Libertadores, an annual tournament featuring the top men's club teams. The first edition of the Copa Libertadores was held in 1960 with seven teams. Over the following decades, the tournament evolved into a major competition featuring 38 teams from approximately 10 countries.

167. As the tournament developed and gained popularity, CONMEBOL entered into contracts with sports marketing companies to commercialize the marketing rights to the tournament. The marketing rights sold by CONMEBOL in connection with the Copa Libertadores included an array of broadcasting rights, sponsorship rights, and, starting in 1997, title sponsorship rights. As the popularity and reach of the Copa Libertadores grew, so, too, did the value of the sponsorship rights to the tournament sold by CONMEBOL. The United States was an important and lucrative market for the commercialization of these rights.

168. Starting in or about 1996 and continuing thereafter, Zorana Danis – operating through ISM, a New Jersey-based sports marketing company that Danis founded and owned – was the exclusive marketing agent for the worldwide sponsorship rights to the Copa Libertadores. As marketing agent, Danis identified potential tournament sponsors and negotiated contracts for the commercialization of the sponsorship rights to

72

the tournament, including with major international businesses based or with offices in the United States, all in exchange for commission payments.

169. Starting in or about 1997 and continuing to the present, ISM, CONMEBOL, various sponsors, and, at times, an entity affiliated with ISM ("ISM Affiliate A"), the identity of which is known to the Grand Jury, entered into a series of contracts pursuant to which ISM and/or ISM Affiliate A acquired the sponsorship rights to the Copa Libertadores. Several of the contracts, including contracts pursuant to which Toyota Motor Corporation became the first title sponsor of the Copa Libertadores, starting in 1998, and Grupo Santander became the second title sponsor, from 2008 through 2012, were signed by the defendants NICOLÁS LEOZ and EDUARDO DELUCA on behalf of CONMEBOL.

170. Beginning in or about the early 2000s, the defendant NICOLÁS LEOZ at various times solicited bribe and kickback payments from Zorana Danis in exchange for LEOZ's support, as CONMEBOL's president and a member of its executive committee, of Danis and her company as the exclusive marketing agent for the sponsorship rights to the Copa Libertadores. LEOZ specified various means for Danis to make the payments, including direct payments into bank accounts controlled by LEOZ,

73

diversion of funds owed to CONMEBOL into LEOZ's personal bank accounts, and transfers of extra-contractual payments into a CONMEBOL bank account.

171. In or about 2008, after ISM, CONMEBOL, and Grupo Santander entered into a $40 million title sponsorship contract, the defendant EDUARDO DELUCA solicited bribe and kickback payments from Zorana Danis in the amount of $400,000 per year. Danis agreed to make these payments and made the payments, periodically until 2012, from ISM's U.S.-based bank accounts to a Merrill Lynch account in the name of Fleetwood Properties S.A. ("Fleetwood Properties") in Uruguay and to a brokerage account opened in the United States in the name of Gemini Global Trading Ltd. ("Gemini Global Trading") that was cleared through Pershing, LLC, a subsidiary of Bank of New York, Mellon, based in Jersey City, New Jersey.  Fleetwood Properties and Gemini Global Trading were companies controlled by DELUCA.

172. Zorana Danis agreed to make and did make bribe payments to the defendants NICOLÁS LEOZ and EDUARDO DELUCA in order to, among other things, obtain and/or retain, for ISM and for ISM Affiliate A, contracts for the sponsorship rights associated with the Copa Libertadores, the ability to commercialize those rights, and the potential to secure

74

contracts for sponsorship rights to additional CONMEBOL tournaments.

173. The defendants NICOLÁS LEOZ and EDUARDO DELUCA and Zorana Danis, directly or through personal assistants, frequently used the wire facilities of the United States to communicate by email in furtherance of the criminal scheme and to effect the transfer of payments in furtherance of the scheme.

D.    CONMEBOL Copa Libertadores Scheme #2

174. Television broadcasts of the Copa Libertadores reached millions of viewers in markets across the globe, including the United States. According to CONMEBOL, the Copa Libertadores was among the most widely watched sporting events in the world. The tournament was broadcast in more than 135 countries and, in 2009 and 2010, drew more than one billion viewers. By one estimate, the United States accounted for 16% of the audience share in 2010, behind only Brazil, Mexico, and Argentina. Notably, two of the top four markets were in the CONCACAF region.

175. CONMEBOL's efforts to promote two less popular club team events – a tournament called the Copa Sudamericana and a competition between the Copa Libertadores and Copa Sudamericana winners called the Recopa Sudamericana – also relied, in part, on the growing U.S. market for soccer. For

75

example, in 2005 and again in 2007, a club team from Major League Soccer, another division, along with the NASL, of United States men's club soccer sanctioned by the USSF, participated in the Copa Sudamericana.  The Recopa Sudamericana has been played in the United States on several occasions, including in Los Angeles, California in 2003, and in Fort Lauderdale, Florida in 2004.

176. Prior to 1999, the television broadcasting rights to the Copa Libertadores were held by the individual teams that competed in the tournament.  In or about 1999, CONMEBOL acquired and consolidated the broadcasting rights to the tournament in order to maximize the collective value of the rights, ostensibly for the benefit of both CONMEBOL and the competing teams.

177. Beginning in or about 1999 and continuing through 2015, T&T Sports Marketing Ltd ("T&T"), a Torneos affiliate domiciled in the Cayman Islands, acquired the exclusive worldwide broadcasting rights to each edition of the Copa Libertadores, and eventually to the Copa Sudamericana and Recopa Sudamericana, through a series of contracts between T&T and CONMEBOL.  T&T was owned in part by Torneos y Competencias S.A. and in part by partners in the venture, including, for a brief period, Traffic, and, later, a group of investors that included

an affiliate of a major broadcasting company headquartered in the United States whose identity is known to the Grand Jury.

178. Beginning in or about 2000, the defendants EDUARDO DELUCA, EUGENIO FIGUEREDO, NICOLÁS LEOZ, and ROMER OSUNA, among other conspirators, solicited annual bribe payments from Co-Conspirator #11, one of the co-founders of Torneos, in exchange for the officials' support of T&T as the holder of the broadcasting rights to the Copa Libertadores. Co-Conspirator #11 agreed to pay and did pay annual bribes in the amount of $1 million to LEOZ and $600,000 each to OSUNA, DELUCA, and FIGUEREDO for approximately the next 10 years.

179. In or about 2005, Alejandro Burzaco acquired a minority ownership interest in Torneos and began to manage the day-to-day operations of the company in partnership with Co-Conspirator #11. Burzaco learned from Co-Conspirator #11 of Torneos's practice of making annual bribe payments to defendants NICOLÁS LEOZ, ROMER OSUNA, EDUARDO DELUCA, and EUGENIO FIGUEREDO, among others, and helped to continue the practice. With the assistance of Co-Conspirator #12, a high-ranking executive at Torneos, among other co-conspirators affiliated with Torneos, Burzaco continued to arrange for annual six-figure bribe payments to DELUCA until in or about 2011, to OSUNA until in or about 2012, and to FIGUEREDO, whose payments increased to

$1 million in or about 2012, until in or about 2014.  Burzaco arranged for LEOZ to receive $1 million bribe payments each year from in or about 2004 through in or about 2012, the year before LEOZ resigned the presidency of CONMEBOL.

180.  CONMEBOL and T&T entered into a number of contracts during the years after Alejandro Burzaco became an owner of Torneos through which T&T retained the broadcasting rights to subsequent editions of the Copa Libertadores, Copa Sudamericana, and Recopa Sudamericana.  Each of those contracts required the support of CONMEBOL officials who were receiving bribes from Burzaco and other co-conspirators affiliated with T&T.

181.  In or about 2009, a group of six presidents of the traditionally less-powerful member associations of CONMEBOL formed a bloc to obtain greater control over decisions relating to the governance of CONMEBOL and the sale of CONMEBOL's commercial properties, which decisions previously had been dominated by the representatives of soccer powers Argentina and Brazil.  This bloc was led by the defendants LUÍS CHIRIBOGA and RAFAEL ESQUIVEL and Luis Bedoya.  The other members of the bloc, at its inception, were the defendants JUAN ÁNGEL NAPOUT, MANUEL BURGA, and CARLOS CHÁVEZ.

182. Starting in or about 2009, the members of the "Group of Six," as the members of the bloc were known by some, demanded that they, too, receive annual bribe payments in exchange for their support of T&T as the holder of broadcasting rights to the Copa Libertadores, among other tournaments. Alejandro Burzaco agreed to pay and did pay annual six-figure bribe payments to the defendants JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, and RAFAEL ESQUIVEL and to Luis Bedoya starting in or about 2010, and also to Sergio Jadue, starting in or about 2012, to secure their support.

183. At various times, the defendants MARCO POLO DEL NERO, JOSÉ MARIA MARIN, JOSÉ LUÍS MEISZNER, and RICARDO TEIXEIRA also solicited and received bribe and kickback payments from Alejandro Burzaco and Co-Conspirator #12 in exchange for their support of T&T as holder of the rights to the Copa Libertadores, among other tournaments.

184. Alejandro Burzaco and Co-Conspirator #12 at times relied on the defendants HUGO JINKIS and MARIANO JINKIS and on José Margulies and the Margulies Intermediaries to facilitate the payment of bribes and kickbacks to CONMEBOL officials in connection with the Copa Libertadores and other tournaments.

185. In the course of the scheme, various of the defendants and their co-conspirators used wire facilities and

79

financial institutions located in the United States, among other countries, to make and receive bribe payments and to transfer payments related to contracts secured through bribery; relied on the growing U.S. market for soccer to generate profits from the scheme; and conducted meetings in the United States in furtherance of the scheme.

      E.    CBF Copa do Brasil Scheme

      186. Between in or about 1990 and 2009, Traffic entered into a series of contracts with CBF, the Brazilian soccer federation, to acquire the commercial rights associated with the Copa do Brasil, an annual tournament for Brazil's top club teams.  During the course of this period, the defendant RICARDO TEIXEIRA - the long-time president of CBF and member of the FIFA executive committee - solicited and received bribes from José Hawilla in connection with the sale of the Copa do Brasil media rights.

      187. As a result of an agreement reached between CBF and Traffic on or about January 22, 2009, Traffic Brazil owned the rights to each edition of the Copa do Brasil to be played from 2009 through 2014.

      188. On or about December 8, 2011, Sports Marketing Company A, a Traffic competitor owned by Co-Conspirator #7, entered into a contract with CBF to purchase the commercial

rights for all editions of the Copa do Brasil between 2015 and 2022.

189. In order to obtain the contract from CBF, Co-Conspirator #7 agreed to pay an annual bribe to the defendant RICARDO TEIXEIRA, as José Hawilla had done in the past. During the course of their negotiations, Co-Conspirator #7 traveled to the United States to discuss the matter with TEIXEIRA.

190. The signing of the foregoing contract between Sports Marketing Company A and CBF led to a dispute between Co-Conspirator #7 and José Hawilla, who perceived Co-Conspirator #7 - a former employee of his from Traffic Brazil - as stealing Traffic's business with CBF.

191. On or about August 15, 2012, to resolve this dispute, Traffic Brazil and Sports Marketing Company A entered into a contract to pool their marketing rights for future editions of the Copa do Brasil, from 2013 to 2022, and to share equally in the profits. As part of the contract, Traffic Brazil also agreed to pay 12 million Brazilian reais to Sports Marketing Company A over the course of the contract. As of August 15, 2012, 12 million reais equated to approximately $5.9 million.

192. Co-Conspirator #7 advised José Hawilla of the bribe payments he had agreed to make to the defendant RICARDO

TEIXEIRA. Co-Conspirator #7 further advised Hawilla that the bribe payment he had originally negotiated with the defendant RICARDO TEIXEIRA had increased when other CBF officials, the defendants JOSÉ MARIA MARIN (who became the president of CBF in or about 2012) and MARCO POLO DEL NERO (who was elected by CBF in 2014 to take over as MARIN's successor in 2015), requested bribe payments as well. Hawilla agreed to pay half the cost of the bribe payments, which totaled 2 million Brazilian reais per year, to be distributed among TEIXEIRA, MARIN, and DEL NERO. As of August 15, 2012, 2 million reais equated to approximately $988,000.

193. José Hawilla and Co-Conspirator #7 used the wire facilities of the United States in furtherance of the Copa do Brasil bribery scheme, including in connection with the following domestic and international wire transfers:

| DATE | WIRE COMMUNICATION |
|------|--------------------|
| December 5, 2013 | Wire transfer of $500,000 from Sports Marketing Company A's account at Itaú Unibanco in New York, New York, to a JP Morgan Chase correspondent account in New York, New York, for credit to the account of a luxury yacht manufacturer at HSBC bank in London, England. |
| December 23, 2013 | Wire transfer of $450,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco Itaú |

account in New York, New York in the name of Sports Marketing Company B.

194. In or about April 2014, the defendant JOSÉ MARIA MARIN traveled to Miami, Florida to attend a press conference announcing the Copa América Centenario, a joint CONCACAF-CONMEBOL tournament discussed further in section O below. MARIN had a meeting with José Hawilla during the trip in which MARIN discussed the status of the payments due to him and the defendant MARCO POLO DEL NERO in connection with the Copa do Brasil scheme. At one point, when Hawilla asked whether it was really necessary to continue to pay bribes to the defendant RICARDO TEIXEIRA, MARIN's predecessor as CBF president, MARIN stated, "[I]t's about time to – to have it coming our way. True or not?" Hawilla agreed, stating, "Of course, of course, of course. That money had to be given to you." MARIN agreed: "That's it, that's right."

F.    CBF Sponsorship Scheme

195. The Brazilian national team won the 1994 World Cup, which was hosted by the United States in June and July of that year. Around the same time, a representative of a multinational sportswear company headquartered in the United States (together with its affiliates, "Sportswear Company A"), the identity of which is known to the Grand Jury, approached CBF

83

to determine whether CBF was interested in being sponsored by Sportswear Company A. At the time, CBF already had a sponsorship agreement with another American sportswear company ("Sportswear Company B"), the identity of which is known to the Grand Jury. Thereafter the defendant RICARDO TEIXEIRA, then the president of CBF, and José Hawilla, on behalf of Traffic Brazil, which at the time served as CBF's marketing agent, began negotiations with representatives of Sportswear Company A.

196. The negotiations lasted into 1996. The parties ultimately agreed to a 10-year deal, which required, among other things, that Sportswear Company A compensate Sportswear Company B, which agreed to terminate its existing contract with CBF. As part of the basic agreement, Sportswear Company A agreed to spend $200 million.

197. The parties met in New York, New York for the closing. The sponsorship agreement, dated July 11, 1996, was signed by the defendant RICARDO TEIXEIRA on behalf of CBF, José Hawilla on behalf of Traffic Brazil, and four representatives of Sportswear Company A. Among other terms, the contract, a 44-page Sponsorship and Endorsement Agreement (the "Agreement"), required Sportswear Company A to pay CBF $160 million over 10 years for the right to be one of CBF's co-sponsors and to be CBF's exclusive footwear, apparel, accessories, and equipment

supplier.  CBF remitted a percentage of the value of the payments it received under the Agreement to Traffic Brazil.

198. Additional financial terms, including the agency fee owed to Traffic, were not reflected in the Agreement. Sportswear Company A agreed to pay a Traffic affiliate with a Swiss bank account an additional $40 million in base compensation on top of the $160 million it was obligated to pay to CBF pursuant to the Agreement.  At the closing, a representative of Sportswear Company A and a representative of Traffic Brazil (José Hawilla) signed a one-page letter agreement dated July 14, 1996 acknowledging as follows: "CBF has authorized Traffic, or its designated banking agent, to invoice [Sportswear Company A] directly for marketing fees earned upon successful negotiation and performance of the ... [Agreement]."

199. Between 1996 and 1999, Wabern Corp. ("Wabern"), the Traffic affiliate with the Swiss bank account, invoiced Sportswear Company A directly for $40 million in payments. Sportswear Company A – including the U.S. parent company itself – made the payments to Wabern's account in Switzerland.

200. José Hawilla agreed to pay and did pay the defendant RICARDO TEIXEIRA half of the money he made from the sponsorship deal, totaling in the millions of dollars, as a bribe and kickback.

201. On or about January 25, 2002, the parties agreed to terminate the Agreement before the end of the 10-year term, ending any further obligations thereunder between Sportswear Company A and CBF, and between Sportswear Company A and Traffic Brazil.

G.    CFU World Cup Qualifiers Scheme #1

202. Since at least in or about 1998, the media rights to matches played by nations seeking to qualify for the World Cup have been owned by the home team for each qualifier match. In negotiating the sale of these rights, CFU member associations agreed to pool their "home team" rights.  The value of such rights was dependent in significant part on the market size of the opponent of the CFU member association, with Mexico and the United States generally being the largest markets – and thus the most "valuable" opponents to play - in the CONCACAF region.  By pooling their rights and selling them prior to the draw for the next round of World Cup qualifier matches, CFU member associations sought to maximize leverage and increase profitability to all the members.

203. From at least in or about 1998 until in or about May 2011, the defendant JACK WARNER, as president of CFU, was responsible for negotiating the sale of the CFU member associations' rights with sports marketing companies, including

with Traffic USA.   During the same period, WARNER was also a special advisor to TTFF, the Trinidadian federation.

204. Beginning in 1998, CFU entered into contracts with Traffic USA for the sale of its members' rights to their home World Cup qualifier matches.   The first such contract, dated October 10, 1998, concerned the rights to qualifier matches to be played in advance of the 2002 World Cup (the "2002 World Cup qualifiers contract").   The second contract, dated July 17, 2000, concerned the rights to qualifier matches to be played in advance of the 2006 World Cup (the "2006 World Cup qualifiers contract").   The third contract, dated August 13, 2005, concerned the rights to qualifier matches to be played in advance of the 2010 World Cup (the "2010 World Cup qualifiers contract").   The fourth contract, dated July 3, 2009, and then subsequently revised on December 9, 2010, concerned the rights to qualifier matches to be played in advance of the 2014 World Cup (the "2014 World Cup qualifiers contract").   CFU's negotiations regarding each of these contracts were controlled by the defendant JACK WARNER, and WARNER signed each of these contracts on behalf of CFU.

205. Beginning with at least the 2006 World Cup qualifiers contract, the contracts stated that they included the

87

sale of media rights owned by all CFU member associations, including TTFF.

206. Separately, however, at the defendant JACK WARNER's request, Traffic USA executives, including Co-Conspirator #3, Co-Conspirator #9, and Fabio Tordin, created another document purporting to be a contract with TTFF for the same rights Traffic USA had purchased as part of its deal with CFU.  WARNER signed these contracts, which were typically negotiated at the same time as the CFU contracts, as "special advisor" to TTFF.

207. Rather than paying the full value of CFU's contract to CFU and its member associations, Traffic USA executives, including Co-Conspirator #3, with the knowledge and consent of Fabio Tordin, at the defendant JACK WARNER's request, diverted a substantial portion of that value to an account controlled by WARNER, purportedly as payment on Traffic USA's contract with TTFF.

208. For example, the 2006 World Cup qualifiers contract provided that Traffic USA was to pay CFU a base price of $900,000 for the media rights covered by the contract, which included the media rights owned by TTFF.  At the same time, Traffic USA entered into a contract with TTFF providing that

Traffic USA would pay TTFF $800,000 for the same TTFF rights it had purchased as part of its contract with CFU.

209. Upon the defendant JACK WARNER's request, Traffic USA executives subsequently wired payments on the TTFF contract to an account at a bank in Trinidad and Tobago that WARNER controlled.

210. For example, on or about April 19, 2004, Traffic wired $40,000 from an account at Citibank in Miami, Florida to a correspondent account at Wachovia Bank, for credit to an account held in the name of "LOC Germany 2006 Limited" at First Citizens Bank in Trinidad and Tobago.

211. Approximately 11 days prior to the transfer, the defendant JACK WARNER sent an email to First Citizens Bank, requesting that the bank transfer $60,000 from the LOC Germany 2006 Limited account to his "personal checking account."  In the same email, WARNER advised that he expected a $40,000 deposit into the account the following week.

212. Similarly, the 2010 World Cup qualifiers contract provided that Traffic USA was to pay CFU $2.2 million for the media rights covered by the contract, which included the media rights owned by TTFF.  At the same time, Traffic USA entered into a contract with TTFF providing that Traffic USA would pay

TTFF $800,000 for the same TTFF rights it had purchased as part of its contract with CFU.

213. Upon the defendant JACK WARNER's request and as payment on the TTFF contract, on or about June 1, 2005, Traffic USA executives wired $40,000 from an account at Citibank in Miami, Florida to a correspondent account at Wachovia Bank, for credit to the LOC Germany 2006 Limited account at First Citizens Bank in Trinidad and Tobago.

214. Five days later, on or about June 6, 2005, the defendant JACK WARNER transferred $40,000 from the LOC Germany 2006 Limited account to another bank account held in his name.

215. As part of this scheme and in order to ensure that TTFF would continue to receive payments from Traffic USA related to the TTFF contracts, the defendant JACK WARNER concealed the existence of the TTFF contracts from the CFU member associations.

H.    2010 FIFA World Cup Vote Scheme

216. In or about 2004, the FIFA executive committee considered bids from Morocco, South Africa and Egypt, as well as other nations that withdrew before the vote, to host the 2010 World Cup.

217. Previously, the defendant JACK WARNER and his family had cultivated ties with South African soccer officials

in connection with and subsequent to a failed bid by South Africa to host the 2006 World Cup.  In the early 2000s, Daryan Warner, a member of WARNER's family, had used WARNER's contacts in South Africa to organize friendly matches for CONCACAF teams to play in South Africa.  At one point, WARNER also directed Daryan Warner to fly to Paris, France and accept a briefcase containing bundles of U.S. currency in $10,000 stacks in a hotel room from Co-Conspirator #13, a high-ranking South African bid committee official.  Hours after arriving in Paris, Daryan Warner boarded a return flight and carried the briefcase back to Trinidad and Tobago, where Daryan Warner provided it to WARNER.

218. In the months before the selection of the host nation for the 2010 World Cup, which was scheduled to take place in May 2004, the defendant JACK WARNER and Charles Blazer traveled to Morocco as they had done in 1992, in advance of the voting for the 1998 World Cup host.  While in Morocco during the 2004 trip, a representative of the Moroccan bid committee offered to pay $1 million to WARNER in exchange for his agreement to cast his secret ballot on the FIFA executive committee for Morocco to host the 2010 World Cup.

219. Subsequently, Charles Blazer learned from the defendant JACK WARNER that high-ranking officials of FIFA, including Co-Conspirator #14, the South African bid committee,

including Co-Conspirator #15, and the South African government were prepared to arrange for the government of South Africa to pay $10 million to CFU to "support the African diaspora." Blazer understood the offer to be in exchange for the agreement of WARNER, Blazer, and Co-Conspirator #16 to all vote for South Africa, rather than Morocco, to host the 2010 World Cup. At the time, Co-Conspirator #16, like WARNER and Blazer, was a FIFA executive committee member. WARNER indicated that he had accepted the offer and told Blazer that he would give a $1 million portion of the $10 million payment to Blazer.

220. In FIFA's executive committee vote held on May 15, 2004, South Africa was selected over Morocco and Egypt to host the 2010 World Cup. The defendant JACK WARNER, Charles Blazer, and Co-Conspirator #16 indicated that they voted for South Africa.

221. In the months and years after the vote, Charles Blazer periodically asked WARNER about the status of the $10 million payment.

222. At one point, Charles Blazer learned that the South Africans were unable to arrange for the payment to be made directly from government funds. Arrangements were thereafter made with FIFA officials to instead have the $10 million sent

from FIFA – using funds that would otherwise have gone from FIFA to South Africa to support the World Cup – to CFU.

223. In fact, on January 2, 2008, January 31, 2008 and March 7, 2008, a high-ranking FIFA official, Co-Conspirator #17, caused payments of $616,000, $1,600,000, and $7,784,000 – totaling $10 million – to be wired from a FIFA account in Switzerland to a Bank of America correspondent account in New York, New York, for credit to accounts held in the names of CFU and CONCACAF, but controlled by the defendant JACK WARNER, at Republic Bank in Trinidad and Tobago.

224. Soon after receiving these wire transfers, the defendant JACK WARNER caused a substantial portion of the funds to be diverted for his personal use. For example, on January 9, 2008, WARNER directed Republic Bank officials to apply $200,000 of the $616,000 that had been transferred into a CFU account from FIFA one week earlier toward a personal loan account held in his name.

225. The defendant JACK WARNER also diverted a portion of the funds into his personal accounts by laundering the funds through intermediaries. For example, in or about and between February 13, 2008 and October 3, 2008, WARNER caused over $4 million of the funds received from FIFA to be transferred to Individual #1, a Trinidadian businessman whose identity is known

93

to the Grand Jury, Trinidadian Company A, a large supermarket chain in Trinidad and Tobago controlled by Individual #1, and Trinidadian Company B, a real estate and investment company also controlled by Individual #1.  During approximately the same period, funds equating to at least $1 million were transferred from these same accounts into a bank account held in the name of WARNER and a family member at First Citizens Bank in Trinidad and Tobago.  The identities of Trinidadian Company A and Trinidadian Company B are known to the Grand Jury.

226. During the three years following WARNER's receipt of the $10 million from FIFA, WARNER made three payments to Charles Blazer, totaling over $750,000, in partial payment of the $1 million that WARNER had earlier promised Blazer as part of the bribe scheme.

227. The first payment, in the amount of $298,500, was made by wire transfer sent on or about December 19, 2008 from an account held in the name of CFU at Republic Bank in Trinidad and Tobago, to a Bank of America correspondent account in New York, New York, for credit to an account controlled by Charles Blazer at a bank in the Cayman Islands.

228. The second payment, in the amount of $205,000, was made by check drawn on an account held in the name of CFU at Republic Bank in Trinidad and Tobago.  On or about September 27,

94

2010, Charles Blazer caused the check to be deposited into his Merrill Lynch brokerage account in New York, New York. Approximately one month earlier, on or about August 23, 2010, WARNER sent an email to Blazer to advise him that the payment was forthcoming.

229. The third payment, in the amount of $250,000, was made by check drawn on an account held in the name of CFU at Republic Bank in Trinidad and Tobago. The check was delivered to Charles Blazer by another individual who traveled by airplane from Trinidad and Tobago to JFK International Airport in Queens, New York, and then to CONCACAF's headquarters in New York, New York, where he delivered the check to Blazer. A representative of FirstCaribbean International Bank in the Bahamas, where Blazer held another account, subsequently traveled by airplane to New York, landing at Kennedy Airport. After arriving, the bank representative traveled to New York, New York, where he took custody of the check. He subsequently traveled to the Bahamas and, on or about May 3, 2011, deposited the check into Blazer's account. Approximately two months earlier, on or about March 13, 2011, WARNER sent an email to Blazer to advise him that the payment was forthcoming.

230. Charles Blazer never received the balance of the promised $1 million payment.

I.    UNCAF Region World Cup Qualifiers Schemes

231. UNCAF was a regional federation within CONCACAF that included as members the soccer federations of the Central American nations.  Like CFU members, UNCAF members sought to sell the media rights they owned to home team matches played to qualify for the World Cup.  Unlike CFU, the UNCAF members did not pool their rights; instead, the UNCAF member federations negotiated separately with prospective purchasers of the rights, which included Traffic USA and Media World.

232. From in or about the late 1990s to 2006, Traffic USA obtained contracts for the rights to the World Cup qualifier matches held by most or all of the UNCAF federations.  From in or about 2004 to 2006, Co-Conspirator #3, supervised by Fabio Tordin, was the Traffic USA executive responsible for negotiating with the UNCAF federations for the purchase of media rights to World Cup qualifier matches.  In or about 2006, Tordin left Traffic USA.  Co-Conspirator #3 continued to work at Traffic USA until his departure in or about July 2012.

233. Beginning in approximately 2005, Media World began to compete with Traffic USA for these rights.  Initially, Media World's efforts in this regard were overseen by Roger Huguet, a part owner of the company, with the assistance of Co-Conspirator #6, a sports marketing consultant who had previously

96

worked for Traffic USA.  Subsequently, Huguet, on behalf of Media World, entered into a consulting agreement with Co-Conspirator #2 and Fabio Tordin, both of whom had by then left Traffic USA, in which Co-Conspirator #2 and Tordin agreed to help Media World obtain media and marketing rights to UNCAF federations' home World Cup qualifier matches.  In or about 2011, Huguet hired Tordin to work as an executive of Media World.

234. Co-Conspirator #5 was a part owner of both Media World's parent company Media Company A and Media Company A's affiliated global media conglomerate Media Company B.  In that capacity, Co-Conspirator #5 regularly traveled to Miami, Florida to meet with Roger Huguet and receive updates on Media World's operations, including its efforts to obtain media and marketing rights to World Cup qualifier matches owned by the UNCAF federations.

235. In or about the spring of 2012, Media World and Traffic USA, which until that time had been competitors in this market, agreed to pool their resources and share both costs expended and revenue earned from the purchase of rights to World Cup qualifier matches played by all CONCACAF member associations, including those in UNCAF.

236. Throughout this period – both while Traffic USA and Media World were competitors and after they entered into a revenue-sharing agreement – representatives of the two companies agreed to pay, and did pay, bribes to numerous UNCAF federation officials and former UNCAF federation officials who retained influence over those federations in order to obtain contracts for World Cup qualifier rights. The sports marketing executives and consultants who participated in these schemes included, among others, Co-Conspirator #2, Co-Conspirator #3, Co-Conspirator #4, Fabio Tordin, Co-Conspirator #5, Roger Huguet, and Co-Conspirator #6. The contracts obtained through bribes included, at a minimum, the contracts for rights relating to the World Cup qualifier cycles described in the table below.

**TABLE 2:** UNCAF Federation Contracts Obtained Through Bribery

| Federation | World Cup Qualifiers Cycle |
|---|---|
| FEDEFUT (Costa Rica) | 2010, 2018, 2022 |
| FENIFUT (Nicaragua) | 2018 |
| FENAFUTH (Honduras) | 2014, 2018, 2022 |
| FESFUT (El Salvador) | 2014, 2018 |
| FENAFUTG (Guatemala) | 2010, 2014, 2018, 2022 |
| FEPAFUT (Panama) | 2014, 2018 |

237. Roger Huguet regularly apprised Co-Conspirator #5 of the bribes paid on behalf of Media World to officials of

98

UNCAF federations in order to secure the rights to these federations' World Cup qualifier matches. Huguet and Co-Conspirator #5 also discussed the fact that Media World had taken steps to conceal the true nature and purpose of bribe payments made in furtherance of the scheme, including by disguising those payments as fees payable pursuant to certain "consulting" contracts. Co-Conspirator #5 approved of Media World's participation in this scheme.

238. The officials who agreed to accept, and did accept, bribes paid in connection with these schemes included, among others, the defendants ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL CALLEJAS, BRAYAN JIMÉNEZ, EDUARDO LI, JULIO ROCHA, RAFAEL SALGUERO, HÉCTOR TRUJILLO, and REYNALDO VASQUEZ, as well as Co-Conspirator #18, Co-Conspirator #19, and Co-Conspirator #20.

239. During the course of this scheme, bribe payments were made by Traffic USA and Media World from bank accounts located in the United States, utilizing the wires of the United States. Moreover, in all cases, periodic payments pursuant to the terms of the rights contracts obtained through this scheme were made by wire transfer from bank accounts controlled by Traffic USA and Media World in the United States to bank accounts controlled by the UNCAF federations located outside the United States.

99

240. Set forth below are examples of bribe payments made during the course of this scheme to officials of six of the UNCAF federations.

i.    FEDEFUT (Costa Rica)

241. In or about 2009, the defendant EDUARDO LI was the president of FEDEFUT, the Costa Rican soccer federation. During that time, Co-Conspirator #3, while employed at Traffic USA, began negotiating with LI to renew with Traffic USA the contract for the exclusive worldwide commercial rights to that federation's home qualifier matches to be played in advance of the 2018 World Cup.

242. At approximately the same time, the defendant EDUARDO LI and Co-Conspirator #21 met in Miami, Florida with Fabio Tordin, who had left Traffic USA and was then representing Media World as a consultant. During this meeting, LI, the FEDEFUT president, asked Tordin for a six-figure bribe to sell the same commercial rights to Media World. Media World did not ultimately pay the bribe or obtain the contract.

243. Instead, on or about September 4, 2009, Traffic USA and FEDEFUT entered into a contract for these commercial rights, which was signed by the defendant EDUARDO LI and Co-Conspirator #3. During the negotiations, LI asked Co-Conspirator #3 for a six-figure bribe in exchange for his

100

agreement to award the contract to Traffic USA.  After obtaining
approval within Traffic, Co-Conspirator #3 agreed to the payment
and caused it to be made.

244. In or about July 2012, Co-Conspirator #3 left
Traffic USA to become general secretary of CONCACAF.  Traffic
USA subsequently hired Individual #2, an individual whose
identity is known to the Grand Jury, to oversee negotiations for
the purchase of media and marketing rights from CONCACAF member
associations, including from FEDEFUT.

245. In or about July 2014, Individual #2 entered into
negotiations with the defendant EDUARDO LI to obtain for Traffic
USA the media and marketing rights owned by FEDEFUT to home
qualifier matches to be played in advance of the 2022 World Cup.
LI, on behalf of FEDEFUT, signed a letter of intent indicating
that FEDEFUT would enter into a contract with Traffic USA for
these rights.

246. On multiple occasions during this approximate
period, including during meetings held in Miami, Florida, the
defendant EDUARDO LI asked Individual #2 to divert to LI tens of
thousands of dollars that Traffic USA owed FEDEFUT on the
contract for FEDEFUT's rights to qualifier matches that had been
played in advance of the 2014 World Cup.  Individual #2 refused
to divert these funds to LI.  LI thereafter declined to sign the

101

contract for Costa Rica's 2022 World Cup qualifying matches with Traffic USA.

247. Subsequently, Fabio Tordin, then an executive of Media World, learned that the defendant EDUARDO LI was considering selling FEDEFUT's 2022 World Cup qualifier rights to another sports marketing company rather than to Traffic USA or to Media World. As noted, pursuant to its 2012 revenue-sharing agreement with Traffic USA, Media World stood to benefit from any contracts for World Cup qualifier rights between Traffic USA and any CONCACAF member association, including FEDEFUT. Accordingly, following negotiations with LI and without informing Individual #2, Tordin and Roger Huguet agreed to pay LI a bribe of approximately $600,000 to cause LI to enter into a contract with Traffic USA for FEDEFUT's rights to its 2022 World Cup qualifier matches. On or about February 9, 2015, Traffic USA and FEDEFUT entered into a contract for these rights.

248. Media World subsequently paid at least $300,000 to the defendant EDUARDO LI towards the promised bribe. In order to conceal the source and nature of the payment, the conspirators paid the bribe to LI using an intermediary account in Panama controlled by Co-Conspirator #6, at the time a consultant engaged by Media World.

102

249. In furtherance of this scheme, on or about February 27, 2015 and April 20, 2015, Roger Huguet and Fabio Tordin caused payments of $200,000 and $150,000, respectively, to be wired from Media World's account at Bank of America in Miami, Florida to an account at Multibank in Panama controlled by Co-Conspirator #6. Thereafter, on or about March 2, 2015 and April 28, 2015, respectively, Co-Conspirator #6 caused payments totaling $300,000 to be wired from the same Panamanian Multibank account to a correspondent account at Bank of America in New York, New York, for credit to an account at Citibank in Miami held in the name of Warrior Holdings, S.A., a company located in Costa Rica.

ii.  **FENIFUT (Nicaragua)**

250. In or about 2011, the defendant JULIO ROCHA was the president of FENIFUT, the Nicaraguan soccer federation. During that time, ROCHA began negotiating with Co-Conspirator #3, then still with Traffic USA, to renew the exclusive worldwide commercial rights to exploit FENIFUT's rights to home qualifier matches to be played in advance of the 2018 World Cup. On or about April 26, 2011, Traffic USA and FENIFUT entered into a contract for these rights. The contract was signed by Co-Conspirator #3 on behalf of Traffic USA and by ROCHA on behalf of FENIFUT.

103

251. During the negotiations, the defendant JULIO ROCHA asked Co-Conspirator #3 for a six-figure bribe in exchange for his agreement to award the contract to Traffic USA. Co-Conspirator #21, a FIFA official who was involved in facilitating the negotiations, also asked for a payment for himself and was aware of the payment to ROCHA. After obtaining approval within Traffic, Co-Conspirator #3 agreed to the payments and caused them to be made.

252. The bribe payment was sent to the defendant JULIO ROCHA in a manner designed to conceal the source and nature of the payment. On or about May 26, 2011, at the direction of Traffic executives, $150,000 was wired from an account held in the name of Co-Conspirator #10, an intermediary, at Banco Itaú in Brazil, to an account held in the name of Investment Company A at Banco Itaú in Miami, Florida. The following day, the funds were wired from the latter account to an account at BankInter in Madrid, Spain that was held in ROCHA's name. According to ROCHA, his portion of the payment was $100,000, and $50,000 was for Co-Conspirator #10.

253. In or about 2012, the defendant JULIO ROCHA stepped down as president of FENIFUT. Nonetheless, he continued to solicit bribe payments in connection with the sale of FENIFUT's future World Cup qualifier rights.

104

254. On or about February 25, 2014, the defendant JULIO ROCHA met with Co-Conspirator #3 in Miami, Florida. At the time, ROCHA was employed by FIFA as a development officer, and Co-Conspirator #3 was the general secretary of CONCACAF. During the meeting, ROCHA asked Co-Conspirator #3 to speak with his successor at Traffic USA about whether ROCHA could receive a payment in connection with the sale of FENIFUT's rights to their qualifier matches to be played in advance of the 2022 World Cup.

### iii. FENAFUTH (Honduras)

255. In or about 2012, the defendants RAFAEL CALLEJAS and ALFREDO HAWIT were, respectively, the president and general secretary of FENAFUTH, the Honduran soccer federation. On or about December 3, 2012, Media World entered into a contract with FENAFUTH for the media and marketing rights to qualifier matches to be played in advance of the 2022 World Cup. The contract was signed by Roger Huguet on behalf of Media World and by CALLEJAS on behalf of FENAFUTH.

256. To obtain this contract, Media World agreed to pay, and did pay, approximately $600,000 in bribes to the defendants RAFAEL CALLEJAS and ALFREDO HAWIT. In furtherance of this scheme, on or about December 13, 2012, Roger Huguet and Fabio Tordin caused $500,000 to be wired from Media World's account at Bank of America in Miami, Florida to an account at

105

Citibank in Panama City, Panama controlled by Co-Conspirator #6, intending that a portion of those funds be paid as bribes to obtain the FENAFUTH contract. Approximately one week later, on or about December 21, 2012, Co-Conspirator #6 caused $234,970 to be wired from an account he controlled at Banco Cuscatlan in Panama City, Panama to an account at Banco Ficohsa in Tegucigalpa, Honduras to which the funds were directed by CALLEJAS. In furtherance of the scheme, on or about December 26, 2012 and again on or about December 31, 2012, Co-Conspirator #6 twice caused $50,000 to be wired from the same Panamanian account at Banco Cuscatlan to an account at Banco Ficohsa in Panama City, Panama in the name of HAWIT's wife.

257. On or about January 7, 2013, Roger Huguet and Fabio Tordin caused $500,000 to be wired from Media World's account at Bank of America in Miami, Florida to an account at Citibank in Panama City, Panama controlled by Co-Conspirator #6, intending that a portion of those funds be paid as bribes to obtain the FENAFUTH contract. Approximately two weeks later, on or about January 22, 2013, Co-Conspirator #6 caused $263,720 to be wired from the same Citibank account in Panama to the same account at Banco Ficohsa in Panama City, Panama held in the name of the defendant ALFREDO HAWIT's wife.

106

258. Media World also paid bribes to obtain rights owned by FENAFUTH to its 2014 and 2018 World Cup qualifier matches to the defendants RAFAEL CALLEJAS and ALFREDO HAWIT, then the general secretary and president of FENAFUTH, respectively.  In both cases, the bribes were paid by wire transfer from Media World's Bank of America account in Miami, Florida to Panamanian accounts of companies controlled by Co-Conspirator #6, who in turn transmitted the funds to Honduran accounts designated by CALLEJAS and HAWIT.

iv.  FESFUT (El Salvador)

259. In or about 2009, the defendant REYNALDO VASQUEZ was the president of FESFUT, the Salvadoran soccer federation. During that time, FESFUT entered into negotiations to sell to Media World the media and marketing rights it owned to World Cup qualifier matches to be played in advance of the 2014 World Cup. On or about September 25, 2009, Media World entered into a contract with FESFUT for the media and marketing rights owned by FESFUT to its 2014 World Cup qualifier matches.  The contract was signed by Roger Huguet on behalf of Media World and by VASQUEZ on behalf of FESFUT.

260. To obtain this contract, Media World agreed to pay, and did pay, a six-figure bribe to the defendant REYNALDO VASQUEZ and to Co-Conspirator #18, a former high-ranking

official of FESFUT who retained influence over the federation.
In order to conceal the source and purpose of the payments, the
conspirators used an intermediary account controlled by Co-
Conspirator #2 - the former Traffic USA executive who at the
time worked as a sports marketing consultant – at FPB Bank in
Panama City, Panama to make the payments, among other means and
methods.

261. In furtherance of the scheme, on or about
November 4, 2011, Media World wired $100,000 from its account at
Bank of America in Miami, Florida to an account in the name of
FESFUT at Banco Cuscatlan in El Salvador pursuant to the
contract for the 2014 World Cup qualifier matches.

262. In or about 2012, Media World again paid a six-
figure bribe to obtain rights owned by FESFUT to its 2018 World
Cup qualifier matches.  These bribes were paid by wire transfer
from Media World's Bank of America account in Miami, Florida to
the Panamanian account of a company controlled by Co-Conspirator
#6, who in turn transmitted the funds to a Panamanian account in
the name of the defendant REYNALDO VASQUEZ.  VASQUEZ, who by
this time was the former president of FESFUT but nevertheless
retained influence over current federation officials, kept some
of the funds himself and also provided a portion to Fabio

Tordin, who delivered it to Co-Conspirator #20, a high-ranking official of FESFUT, as VASQUEZ instructed.

v.    FENAFUTG (Guatemala)

263. In or about 2010, the defendants BRAYAN JIMÉNEZ and HÉCTOR TRUJILLO were the president and general secretary, respectively, of FENAFUTG, the Guatemalan soccer federation.  On or about March 16, 2010, Media World entered into a contract with FENAFUTG for the media and marketing rights it owned for qualifier matches to be played in advance of the 2018 World Cup. The contract was signed by Roger Huguet on behalf of Media World and by JIMÉNEZ on behalf of FENAFUTG.

264. In the course of negotiating the contract, Fabio Tordin met in Miami, Florida with the defendants BRAYAN JIMÉNEZ, HÉCTOR TRUJILLO, and RAFAEL SALGUERO.  At the time, SALGUERO, the former FENAFUTG president, was one of three members on the FIFA executive committee representing the CONCACAF region and retained influence over FENAFUTG.  During the meeting, the conspirators agreed that Media World would pay a six-figure bribe, to be split among JIMÉNEZ, TRUJILLO, and SALGUERO, in order to obtain FENAFUTG's rights to its 2018 World Cup qualifier matches.

265. The bribe was subsequently paid by wire transfers from Media World's account at Bank of America in Miami, Florida.

In order to conceal the source and purpose of the payments, the conspirators used the same intermediary account controlled by Co-Conspirator #2 at FPB Bank in Panama City, Panama to make the payments, among other means and methods. In addition, on or about March 31, 2011, Fabio Tordin caused $20,000 to be wired from Media World's account at Bank of America in Miami, Florida, to a correspondent account at Citibank in New York, New York, for credit to a Guatemalan bank account designated by the defendant RAFAEL SALGUERO in the name of a travel agency. SALGUERO caused a sham invoice for this payment to be sent to Media World.

266. On or about February 28, 2014, Media World entered into a contract with FENAFUTG for the media and marketing rights owned by the federation to its qualifier matches to be played in advance of the 2022 World Cup. The contract was again signed by Roger Huguet on behalf of Media World and by the defendant BRAYAN JIMÉNEZ on behalf of FENAFUTG.

267. In the course of negotiating the contract, Fabio Tordin met in Miami, Florida with the defendants BRAYAN JIMÉNEZ and HÉCTOR TRUJILLO. They agreed that Media World would pay JIMÉNEZ and TRUJILLO a bribe in order to obtain these rights. Tordin arranged to pay a $200,000 bribe to TRUJILLO, which TRUJILLO would split with JIMÉNEZ. Tordin also agreed to pay an

110

additional $200,000 to JIMÉNEZ, which Tordin agreed to not disclose to TRUJILLO.

268. In furtherance of the scheme, on or about March 28, 2014, Fabio Tordin caused $200,000 to be wired from Media World's account at Bank of America in Miami, Florida, to an account at Chase Bank in Seattle, Washington, held in the name of Construction Company A, the identity of which is known to the Grand Jury, which had been designated by the defendant HÉCTOR TRUJILLO to receive the portion of the bribe TRUJILLO was to share with the defendant BRAYAN JIMÉNEZ. At JIMÉNEZ's direction, in order to receive the portion of the bribe he hid from TRUJILLO, on or about July 22, 2014, September 28, 2014, January 20, 2015, and February 6, 2015, Tordin caused funds totaling approximately $200,000 to be wired to accounts at Banco G&T in Guatemala City, Guatemala held in the name of Co-Conspirator #19, a former high-ranking official of FENAFUTG.

269. On or about July 9, 2015, Fabio Tordin met with the defendants BRAYAN JIMÉNEZ and HÉCTOR TRUJILLO in Chicago, Illinois. During the meeting, the men discussed the manner in which they had received the bribe payments described above for the 2022 World Cup qualifying matches. At the outset of the conversation, JIMÉNEZ stated, "Nothing should be said over the telephone. Nothing!... Nothing! Nothing!"

270. During the same meeting, the defendant HÉCTOR TRUJILLO stated, in sum and substance, that the most recent bribe he received had been paid to an account held in the name of a construction company controlled by a third party, and that the third party had paid TRUJILLO from that account. TRUJILLO further stated that he did not think the payment would appear suspicious, as a sham contract had been created, and the payment had been made after the contract between Media World and FENAFUTG had been signed.

vi. FEPAFUT (Panama)

271. In or about 2009, the defendant ARIEL ALVARADO was the president of FEPAFUT, the Panamanian soccer federation. On or about June 9, 2009, Traffic USA entered into a contract with FEPAFUT for the media and marketing rights owned by the federation to qualifier matches to be played in advance of the 2014 World Cup. The contract was signed by Co-Conspirator #3 on behalf of Traffic USA and by ALVARADO on behalf of FEPAFUT.

272. During the course of the negotiations, the conspirators agreed that Traffic USA would pay a bribe of $70,000 to the defendant ARIEL ALVARADO in order to obtain FEPAFUT's rights to the 2014 World Cup qualifier matches.

273. The bribe was paid by wire transfer from Traffic USA's account at Citibank in Miami, Florida. In order to

conceal the purpose of the payment, it was agreed that the payment would be made to an account in Panama held in the name of a Panamanian attorney designated by the defendant ARIEL ALVARADO.  To further conceal the nature of the payment, the conspirators created a sham contract between Traffic USA and the attorney's law firm, which ALVARADO emailed to Co-Conspirator #3 on or about June 29, 2010, as well as a sham invoice.

274.  In furtherance of the scheme, on or about July 20, 2010, Co-Conspirator #3 and Co-Conspirator #4 caused $70,000 to be wired from Traffic USA's account at Citibank in Miami, Florida to a bank account in Panama held in the name of the Panamanian attorney designated by the defendant ARIEL ALVARADO.

275.  In furtherance of the scheme, on or about December 13, 2013, Traffic USA wired $15,000 from its account at Citibank in Miami, Florida to an account held in the name of FEPAFUT at Banco General in Panama City, Panama pursuant to the contract for the 2014 World Cup qualifier matches.

276.  Traffic USA also paid a $60,000 bribe to the defendant ARIEL ALVARADO to obtain rights owned by FEPAFUT to its 2010 World Cup qualifier matches.  As with the 2014 World Cup qualifier cycle bribe described above, the bribe in connection with the 2010 cycle was paid by two wire transfers from Traffic USA's Citibank account in Miami, Florida to a

113

Panamanian account held by the same Panamanian attorney's law firm, as designated by ALVARADO. Also similarly, the conspirators created a sham contract between Traffic USA and the law firm to mask the true nature and purpose of the bribe payment.

J.    UNCAF Region Friendlies Schemes

277. From in or about 2009 to 2015, Fabio Tordin and Co-Conspirator #6 operated a business venture to organize and promote friendly matches involving the men's national soccer teams of Costa Rica, El Salvador, and Guatemala, as well as friendly matches involving other FIFA member associations. The matches were frequently played at venues in the United States. In order to obtain the agreement of the Costa Rican, Salvadoran, and Guatemalan federations to participate in these friendly matches, Tordin and Co-Conspirator #6 agreed to pay, and did pay, bribes to high-ranking current and former FEDEFUT, FESFUT, and FENAFUTG officials, including the defendants EDUARDO LI, REYNALDO VASQUEZ, and BRAYAN JIMÉNEZ.

278. At times, these bribes were paid in cash in the United States. At other times, they were paid by wire transfer sent from and through bank accounts in the United States to bank accounts outside the United States. The conspirators used the

wires of the United States to communicate between the United States and foreign countries regarding the schemes.

i.   FESFUT (El Salvador)

279. From in or about 2012 to 2015, Fabio Tordin and Co-Conspirator #6 organized and promoted friendly matches between the Salvadoran men's national team and the teams of other FIFA member associations.  In order to induce FESFUT, the Salvadoran soccer federation, to participate in these matches, Tordin and Co-Conspirator #6 agreed to pay, and did pay, bribes to the defendant REYNALDO VASQUEZ, a former FESFUT federation president who retained influence over FESFUT affairs, as well as to Co-Conspirator #20 and Co-Conspirator #22, two then current FESFUT officials.

280. In or about May and June of 2012, the Salvadoran team played friendly matches in Houston, Texas; Dallas, Texas; and Washington, D.C.  To induce FESFUT to participate in these matches, Fabio Tordin and Co-Conspirator #6 agreed to pay, and did pay, approximately $60,000 in bribes to Co-Conspirator #20, a high-ranking official of FESFUT.  In furtherance of this scheme, Tordin paid a portion of the bribes to Co-Conspirator #20 in United States currency while they were in the Washington, D.C. area.

281. On or about October 10, 2014 and October 14, 2014, the Salvadoran team played friendly matches in Harrison, New Jersey, just outside of New York City. To induce FESFUT to participate in these matches, Fabio Tordin and Co-Conspirator #6 agreed to pay, and did pay, a $10,000 bribe to Co-Conspirator #22, an official of FESFUT. The conspirators agreed this bribe would, in the first instance, be wired to an account controlled by the defendant REYNALDO VASQUEZ, and then distributed by VASQUEZ to Co-Conspirator #22. On or about October 17, 2014, the payment was wired from a Bank of America account in Wellington, Florida controlled by Co-Conspirator #6 and held in the name of Consulting Company C, a company whose identity is known to the grand jury, to an account at Banco Promerica in El Salvador held by a retail business controlled by VASQUEZ. VASQUEZ sent Tordin a sham invoice to mask the true nature of the payment.

282. On or about March 28, 2015 and March 31, 2015, the Salvadoran national team played friendly matches in Fort Lauderdale, Florida and Carson, California. To induce FESFUT to participate in these matches, Fabio Tordin and Co-Conspirator #6 agreed to pay, and did pay, a $10,000 bribe to Co-Conspirator #22.

283. On or about May 31, 2015 and June 5, 2015, the Salvadoran national team played friendly matches in Washington, D.C. and Rancagua, Chile. To induce FESFUT to participate in these matches, Fabio Tordin and Co-Conspirator #6 agreed to pay a $10,000 bribe to Co-Conspirator #22. The bribe was never paid, though VASQUEZ and Co-Conspirator #22 continued to seek its payment.

284. For instance, on or about September 2, 2015, Fabio Tordin met with Co-Conspirator #22 in Miami, Florida. During the meeting, Co-Conspirator #22 asked Tordin about the bribe. Tordin said, in sum and substance, that he thought he was not sure he could obtain approval for the payment.

285. Thereafter, on or about September 23, 2015, Fabio Tordin received a letter in Miami, Florida, via common carrier sent from a return address in El Salvador and dated September 16, 2015. The letter, which was unsigned, scolded Tordin for paying "little attention" to their "mutual friend" at their recent meeting, and stated that their "mutual friend," who had "taken care of your interests," was "very disappointed and frustrated."

286. The same day, Fabio Tordin, while still in Miami, Florida, spoke with the defendant REYNALDO VASQUEZ, who was in El Salvador, by telephone. During the conversation, VASQUEZ

117

acknowledged that he had written the above-referenced letter and suggested that Co-Conspirator #22 might block negotiations to renew Media World's contract with FESFUT for 2022 World Cup qualifier rights if Tordin did not pay the bribe.

### ii.  FENAFUTG (Guatemala)

287. From in or about 2014 to 2015, Fabio Tordin and Co-Conspirator #6 organized and promoted friendly matches between the Guatemalan men's national team and the teams of other FIFA member associations.  In order to induce FENAFUTG, the Guatemalan soccer federation, to participate in these matches, Tordin and Co-Conspirator #6 agreed to pay, and did pay, bribes to the defendant BRAYAN JIMÉNEZ, the president of FENAFUTG.

288. On or about October 14, 2014, the Guatemalan national team played a friendly match in Lima, Peru.  To induce FENAFUTG to participate in the match, Fabio Tordin and Co-Conspirator #6 agreed to pay, and did pay, a $10,000 bribe to the defendant BRAYAN JIMÉNEZ.  Tordin used the wire facilities of the United States to communicate with JIMÉNEZ regarding the scheme while JIMÉNEZ was in Guatemala.  Tordin paid the bribe in United States currency to JIMÉNEZ while they were in Miami, Florida.

289. On or about March 31, 2015, the Guatemalan national team played a friendly match in Carson, California. To induce FENAFUTG to participate in the match, Fabio Tordin and Co-Conspirator #6 agreed to pay a $10,000 bribe to the defendant BRAYAN JIMÉNEZ. Tordin met with JIMÉNEZ in Miami, Florida in order to provide him with $10,000 in United States currency, but JIMÉNEZ told Tordin to keep the funds as a kickback for previously agreeing to pay bribes to JIMÉNEZ in connection with the sale of FENAFUTG's rights to qualifier matches for the 2022 World Cup, the scheme described above in paragraphs 266 through 270. Tordin used the wire facilities of the United States to communicate with JIMÉNEZ regarding the scheme while JIMÉNEZ was in Guatemala.

### iii. FEDEFUT (Costa Rica)

290. From in or about 2013 to 2014, Co-Conspirator #6 arranged and promoted friendly matches played by the Costa Rican men's national soccer team. In order to induce FEDEFUT, the Costa Rican soccer federation, to play these matches, Co-Conspirator #6 paid bribes to the defendant EDUARDO LI, the president of FEDEFUT.

291. In or about October 2014, the Costa Rican national team played friendly matches in South Korea and Oman against the national teams of those countries. To induce

119

FEDEFUT to participate in the matches, Co-Conspirator #6 agreed to pay a $40,000 bribe to the defendant EDUARDO LI.  In furtherance of the scheme, on or about October 20, 2014 and November 28, 2014, Co-Conspirator #6 caused payments totaling $40,000 to be wired from an account he controlled at Bank of America in Wellington, Florida and held in the name of Consulting Company C to an account at BCT Bank in Panama held in LI's name.

K.    2011 FIFA Presidential Election Scheme

292. In or about March 2011, Co-Conspirator #8 declared his candidacy for the FIFA presidential election scheduled for June 1, 2011.  At the time, Co-Conspirator #8 was a high-ranking official of FIFA and AFC.  In accordance with the FIFA statues, the president of FIFA was elected by the FIFA congress, which was composed of representatives from each of the 200+ FIFA member associations.

293. On or about April 1, 2011, Co-Conspirator #8 sent an email to the defendant JACK WARNER's America Online email account and asked WARNER to organize an extraordinary congress of the CONCACAF member associations, so that Co-Conspirator #8 could address them regarding his candidacy.  WARNER subsequently sent emails to CONCACAF officials, including to officials based in New York, New York, for the purpose of organizing the

requested meeting. For a time, before he was denied a visa, Co-Conspirator #8 was to have addressed the entire CONCACAF congress in the first week of May.

294. Following further correspondence, the defendant JACK WARNER agreed to organize a special meeting of the CFU member associations, rather than the entire CONCACAF membership. It was further agreed that Co-Conspirator #8 would pay the costs associated with organizing the meeting.

295. On or about April 28, 2011, $363,537.98 was wired from an account controlled by Co-Conspirator #8 to an account held in the name of CFU and controlled by the defendant JACK WARNER at Republic Bank in Trinidad and Tobago. The funds were transmitted to Trinidad and Tobago through an account at Bank of America in New York, New York.

296. Upon direction by the defendant JACK WARNER, CFU officials sent emails to representatives of CFU member associations, including two member associations based in United States territories, inviting them to the meeting with Co-Conspirator #8. The CFU meeting took place on May 10 and May 11, 2011 at the Hyatt Regency Hotel in Trinidad and Tobago. The meeting was attended by the presidents and other officials representing the CFU member associations, including high-ranking officials of the Puerto Rico Football Federation and the U.S.

Virgin Islands Football Federation, whose identities are known to the Grand Jury.

297. On May 10, 2011, Co-Conspirator #8 addressed the member associations regarding his candidacy, stating, among other things, that he was seeking their support in the June 1, 2011 FIFA presidential election. Following Co-Conspirator #8's address, the defendant JACK WARNER advised the CFU officials that they could pick up a "gift" that afternoon at a conference room in the hotel.

298. During the afternoon of May 10, 2011, certain CFU officials, including an official of one of the member associations of a United States territory ("Official #1"), went to the appointed conference room, as directed by the defendant JACK WARNER. The officials were instructed by CFU staff members in the room to enter the room one at a time. Inside the room, CFU staff handed each official an envelope bearing the name of the member association that he represented. Inside each envelope was $40,000 in United States currency.

299. Prior to entering the conference room, Official #1 was advised that he must enter alone, and could not be accompanied by any other officials from his delegation. Upon receiving his envelope, Official #1 was directed by CFU staff to

open it while in the conference room.  Official #1 was further instructed not to discuss the payment with anyone.

300. The following day, May 11, 2011, the defendant JACK WARNER convened a meeting of the CFU officials prior to the scheduled start time.  At the meeting WARNER stated that the U.S. currency the members had received was from Co-Conspirator #8, and that WARNER had advised Co-Conspirator #8 to allow CFU staff to distribute the money so that it would not "even remotely appear that anybody has any obligation for your vote because of what gift you have given them."   WARNER further stated that a representative of one of the CFU member associations had contacted CONCACAF offices in New York to advise Charles Blazer of the payments.  WARNER was angry that the representative had done this.  WARNER stated, "There are some people here who think they are more pious than thou.  If you're pious, open a church, friends.  Our business is our business."

301. On or about May 12, 2011, Official #1 flew back home.  On or about May 13, 2011, Official #1 deposited the $40,000 into a bank account in the United States.

302. The purpose of the $40,000 payments was to induce officials of the CFU member associations, including Official #1, to vote for Co-Conspirator #8 in the June 1, 2011 FIFA

123

presidential election.  The defendant JACK WARNER participated in the scheme by organizing the CFU meeting on May 10 and May 11, 2011, and by facilitating the $40,000 payment to each of the CFU officials in attendance.

303. On or about July 14, 2011, after the scheme had been uncovered and the defendant JACK WARNER resigned from his soccer-related positions, Co-Conspirator #8 caused $1,211,980 to be wired from an account that he controlled at Doha Bank in Qatar, to a correspondent account at Citibank, for credit to an account held in WARNER's name at Intercommercial Bank in Trinidad and Tobago.  Prior to receiving the funds in this account, WARNER attempted to have them wired instead to the bank accounts of two of his family members, including Daryan Warner, and a member of his staff, but the bank where those accounts were held refused to accept the funds.

L.    CONCACAF Media and Marketing Rights Scheme

304. On or about May 10, 2011, a representative of one of the CFU member associations who had been offered one of the $40,000 cash payments described in section K above reported the payment to Charles Blazer, at the time general secretary of CONCACAF.  Blazer subsequently advised FIFA, which initiated disciplinary proceedings against the defendant JACK WARNER and Co-Conspirator #8.  In or about June 2011, WARNER agreed to

124

resign from all soccer-related positions, including as FIFA vice president and executive committee member, CONCACAF president, CFU president, and TTFF special advisor. Later that year, Blazer resigned as general secretary of CONCACAF.

305. Shortly after WARNER's resignation, the defendant ALFREDO HAWIT was appointed to be the acting president of CONCACAF.

306. In or about the fall of 2011, the defendants HUGO JINKIS and MARIANO JINKIS sought to exploit the change in leadership at CONCACAF and win business with CONCACAF, which had not historically sold media and marketing rights to the JINKISES' company, Full Play. The JINKISES asked Co-Conspirator #6, who had a close relationship with the defendant ALFREDO HAWIT, to assist them in these efforts. Co-Conspirator #6 in turn enlisted Fabio Tordin, who had extensive contacts with the CONCACAF member associations as a result of his work for Media World, to assist as well.

307. Co-Conspirator #6 and Fabio Tordin developed a plan during discussions held in Miami, Florida, and thereafter flew from Miami to Buenos Aires, Argentina, where they met with the defendants HUGO and MARIANO JINKIS. At the conclusion of the meeting, the JINKISES decided to invite the defendants ALFREDO HAWIT, ARIEL ALVARADO, and RAFAEL SALGUERO to meet with

them.  At the time, ALAVARDO was a member of the CONCACAF executive committee, and SALGUERO was one of CONCACAF's three representatives to the FIFA executive committee.

308. Subsequently, arrangements were made for the defendants ALFREDO HAWIT, ARIEL ALVARADO, and RAFAEL SALGUERO to fly to Buenos Aires, Argentina to meet with the defendants HUGO JINKIS and MARIANO JINKIS.  In November 2011, the JINKISES paid for HAWIT, ALVARADO, and SALGUERO, as well as Fabio Tordin and Co-Conspirator #6, to fly to Buenos Aires.  Prior to their departure, Co-Conspirator #6 helped make travel arrangements for HAWIT and his wife, including by sending email messages from South Florida to HAWIT in Honduras.

309. Following their arrival in Buenos Aires, Argentina the group was flown on a private jet by the defendants HUGO JINKIS and MARIANO JINKIS to the JINKISES' estate in Punta del Este, Uruguay.  During meetings held there, the defendants ALFREDO HAWIT, ARIEL ALVARADO, and RAFAEL SALGUERO agreed to use their influence to try to cause CONCACAF to sell media marketing rights for CONCACAF tournaments, including the Gold Cup, to Full Play.

310. In order to induce the defendants ALFREDO HAWIT, ARIEL ALVARADO, and RAFAEL SALGUERO to make this agreement, the defendants HUGO JINKIS and MARIANO JINKIS agreed to pay bribes

126

to each of them.  Specifically, the JINKISES agreed to pay HAWIT a bribe of approximately $250,000 and ALVARADO and SALGUERO bribes of $100,000 each.  In order to conceal the source and purpose of the payments, the conspirators used an intermediary account at Citibank in Panama City, Panama, controlled by Co-Conspirator #6 to transmit the funds to the bribe recipients.

311.  In furtherance of this scheme, on or about December 1, 2011, the defendants HUGO JINKIS and MARIANO JINKIS caused $450,000 to be wired from an account they controlled at Bank Hapoalim in Zurich, Switzerland, to a correspondent account at Citibank in the United States, for credit to a Citibank account in Panama City controlled by Co-Conspirator #6.  Over the course of the next several months, Co-Conspirator #6 caused the funds to be disbursed to the defendants ALFREDO HAWIT, ARIEL ALVARADO, and RAFAEL SALGUERO in the amounts previously agreed.

312.  The defendants ALFREDO HAWIT and ARIEL ALVARADO attempted to put the topic of awarding the rights Full Play sought on the agenda for the CONCACAF executive committee meeting held in Miami, Florida on or about January 15, 2012. For multiple reasons, including because they believed it premature to discuss the matter and because of exclusivity provisions in existing contracts with other companies, other CONCACAF officials attempted to block HAWIT and ALVARADO's

127

efforts.  In response, in an email message ALVARADO sent to CONCACAF officials on or about January 12, 2012, copying HAWIT, the topic was taken off the official agenda for the meeting, but some sports marketing companies made presentations anyway.  The defendant MARIANO JINKIS traveled to Miami for the meeting.

313.  Subsequently, on or about April 17, 2012, the defendant ARIEL ALVARADO forwarded via email to CONCACAF officials in New York, New York a draft agreement for CONCACAF to sell certain media rights to Full Play.  On or about April 18, 2012, the defendant MARIANO JINKIS flew from Argentina to John F. Kennedy International Airport in Queens, New York, in order to attend a meeting in New York City on or about April 19, 2012 with CONCACAF officials in which Full Play's efforts to obtain these rights were discussed again.  The conspirators efforts' were unsuccessful and CONCACAF did not award the rights to Full Play.  Ultimately certain of these rights were sold by CONCACAF to Traffic USA, as described in section N below.

314.  On or about July 1, 2015, Co-Conspirator #6 met with the defendant ALFREDO HAWIT and HAWIT's wife in Houston, Texas.  During the meeting, Co-Conspirator #6 expressed concern that because the defendants HUGO JINKIS and MARIANO JINKIS had been indicted and might cooperate with law enforcement, Co-Conspirator #6 might be questioned by law enforcement about the

bribe payments the JINKISES had made to HAWIT and the defendants ARIEL ALVARADO and RAFAEL SALGUERO. During the conversation, HAWIT instructed Co-Conspirator #6 to create a sham contract between Full Play and Co-Conspirator #6's company for consulting services, in order to mask the true nature of the $450,000 wire transfer Co-Conspirator #6 had received from Full Play. HAWIT also instructed Co-Conspirator #6 to make false statements to the Federal Bureau of Investigation about the true nature and purpose of the funds he had received from Full Play if asked.

315. During the same meeting, the defendant ALFREDO HAWIT and his wife also counseled Co-Conspirator #6 to create a sham land purchase contract between Co-Conspirator #6 and HAWIT's wife, so Co-Conspirator #6 and HAWIT's wife could falsely claim that the payment was made in connection with a land purchase. HAWIT and his wife also supported the idea of creating consulting contracts between Co-Conspirator #6 and the defendant ARIEL ALVARADO, and between Co-Conspirator #6 and SALGUERO, to mask the true nature of the payments that Co-Conspirator #6 had made to them.

316. On or about July 26, 2015, Fabio Tordin met with the defendant ALFREDO HAWIT in Philadelphia, Pennsylvania. During the meeting, Tordin expressed concern to HAWIT about the bribe payment from Full Play that Co-Conspirator #6 had

129

transmitted to HAWIT. HAWIT stated, in sum and substance, that he was not concerned because "[Co-Conspirator #6] did not pay me . . . . [H]e bought land in Honduras . . . from my wife." Discussing Co-Conspirator #6's payments to the defendants ARIEL ALVARADO and RAFAEL SALGUERO, HAWIT said that ALVARADO got the money in person in Panama and that he assumed that Co-Conspirator #6 sent SALGUERO's payment to SALGUERO in Guatemala.

317. On or about September 2, 2015, Fabio Tordin met with the defendant RAFAEL SALGUERO in Miami, Florida. During the meeting, SALGUERO discussed the bribe payments he and the defendant ARIEL ALVARADO had received from Co-Conspirator #6 in connection with the Full Play scheme. SALGUERO acknowledged having received his payment and that he (SALGUERO), ALVARADO, and the defendant ALFREDO HAWIT could all be in trouble because law enforcement could continue its investigation. Referring to himself, ALVARADO, and HAWIT, SALGUERO said that the three of them needed to meet in person to discuss the matter and that "the three of us are in the same shit." In the same meeting, SALGUERO indicated that he was seeking to return to his former position as a member of the FIFA executive committee and that had sought and received expressions of support from multiple CONCACAF federations.

M.    CFU World Cup Qualifiers Scheme #2

318. Prior to his appointment as CONCACAF general secretary, Co-Conspirator #3 participated, on behalf of Traffic USA, in the negotiation of a contract to acquire the media and marketing rights to the 2018 and 2022 World Cup qualifier matches from the CFU member associations. Jeffrey Webb, at the time the president of CIFA, the Cayman Islands soccer federation, and a high-level CFU official, participated in the negotiations on behalf of CFU.

319. During the negotiations, Co-Conspirator #3 met with the defendant COSTAS TAKKAS, a close associate of Jeffrey Webb, who informed Co-Conspirator #3 that Webb wanted a $3 million bribe in exchange for his agreement to cause the CFU contract to be awarded to Traffic USA. Co-Conspirator #3 agreed. When he returned to the United States, Co-Conspirator #3 advised the defendant AARON DAVIDSON, at the time the Traffic USA president, of the bribe.

320. Separately, in or about the spring of 2012, Media World and Traffic USA, which until that time had been competitors in the market, agreed to pool their resources and share revenue earned from the purchase of rights to World Cup qualifier matches played by CONCACAF member associations, which included the CFU World Cup qualifier rights. Among others, Co-

131

Conspirator #3, Fabio Tordin, Co-Conspirator #5, Roger Huguet, Co-Conspirator #4, and the defendant AARON DAVIDSON participated in the negotiations over the terms of the partnership.

321. During these negotiations, Co-Conspirator #5 learned that Traffic USA had agreed to pay a bribe to Jeffrey Webb to obtain the CFU World Cup qualifier rights. Co-Conspirator #5 agreed on behalf of Media World to split the cost of the bribe payment with Traffic USA, which meant that both companies would be obligated to pay Webb a $1.5 million bribe. Co-Conspirator #5 subsequently informed Roger Huguet of the agreement to pay the bribe and of the fact that the defendant COSTAS TAKKAS would contact Huguet about arranging the payment for Webb.

322. In or about May 2012, CONCACAF elected Jeffrey Webb to be its president. In or about July 2012, Co-Conspirator #3, who had been a vice president at Traffic USA, was appointed as CONCACAF's general secretary.

323. The agreement by Traffic USA to purchase from CFU the media and marketing rights to World Cup qualifier matches was reached prior to Co-Conspirator #3's departure from Traffic USA but was not formally executed until a few weeks after his departure. On or about August 28, 2012, the parties entered into a $23 million contract for the exclusive worldwide

commercial rights for CFU's 2018 and 2022 World Cup qualifier matches.  The defendant AARON DAVIDSON signed the contract on behalf of Traffic USA.

324.  To effectuate payment of Traffic USA's portion of the bribe, Co-Conspirator #3 put the defendant COSTAS TAKKAS into contact with Traffic executives in Brazil and also participated in meetings on the subject.  Co-Conspirator #3 participated in such meetings by telephone from Miami, Florida and also in person in Brazil.  The payment was eventually made to accounts held in the name of entities controlled by TAKKAS, the identities of which are known to the Grand Jury, and then forwarded on through an intermediary account to Jeffrey Webb.

325.  Specifically, Traffic USA's payment was transmitted to the defendant COSTAS TAKKAS in the following manner:  On or about November 13, 2012, $1.2 million was wired from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a correspondent account at HSBC bank in Buffalo, New York, for credit to an account held in the name of Front Company A, the identity of which is known to the Grand Jury, at HSBC bank in Hong Kong.  Approximately one week later, on or about November 21, 2012, two wire transfers of $750,000 and $250,000 were sent from Front Company A's account at HSBC bank in Hong Kong to a correspondent account at Standard

133

Chartered Bank in New York, New York, for credit to an account in the name of Kosson Ventures, controlled by TAKKAS, at Fidelity Bank in the Cayman Islands.  The remaining $200,000 was a fee paid to Co-Conspirator #23, the beneficial owner of Front Company A and a resident of Florida, to facilitate the payment.

326. On or about December 14, 2012, the remaining $500,000 of the $1.5 million promised to Jeffrey Webb was paid by Traffic through the account of another individual, a business associate of José Hawilla, to another account controlled by the defendant COSTAS TAKKAS at Fidelity Bank in the Cayman Islands.

327. After receiving the funds, the defendant COSTAS TAKKAS wired a portion to an account in his name at Citibank in Miami, Florida.  TAKKAS subsequently transferred the funds to an account in the name of a swimming pool builder at United Community Bank in Blairsville, Georgia, for the benefit of Jeffrey Webb, who was having a pool built at his residence in Loganville, Georgia.  TAKKAS transferred another portion of the funds directly from his Kosson Ventures account at Fidelity Bank in the Cayman Islands to SunTrust Bank in Georgia for Webb's benefit in connection with Webb's purchase of other real estate in Stone Mountain, Georgia.

328. To facilitate Media World's payment of its portion of the bribe, in or about 2012, Co-Conspirator #5

134

informed Roger Huguet that Media World's portion of the bribe payment for Jeffrey Webb would be made by Production Company A, a wholly owned subsidiary of an entity affiliated with Media Company B in Spain. Co-Conspirator #5 directed Huguet to find an intermediary to receive the payment so as to conceal its true nature and purpose. Huguet contacted Co-Conspirator #6, who agreed to use one of his companies, Consulting Company A, to receive the payment from Production Company A.

329. Thereafter, in or about 2013, Co-Conspirator #5 put Roger Huguet in contact with certain executives of Production Company A. Co-Conspirator #5 also instructed Huguet to direct Co-Conspirator #6 to send a false invoice to Production Company A purporting to be for work related to the 2013 Gold Cup, and to copy a high-ranking executive of Media Company B on the correspondence. In the course of facilitating this payment, the conspirators used various methods of communication, including email and telephone calls.

330. In April 2014, the defendant AARON DAVIDSON met with José Hawilla in New York to discuss the status of Traffic's ongoing bribe schemes, including the CFU World Cup qualifier scheme. According to DAVIDSON, Media World still had not yet found a way to pay Jeffrey Webb its portion of the bribe.

331. Roger Huguet and the defendant COSTAS TAKKAS met on several occasions in South Florida in an effort to arrange the payment from Consulting Company A to entities as directed by TAKKAS. Ultimately, payments from Media World were transmitted to TAKKAS. For example, on or about October 28, 2014, $80,000 was wired from Consulting Company A's account at Multibank in Panama, to a correspondent account at Bank of America in New York, New York, for credit to an account held in the name of Individual #3, a Caymanian attorney whose identity is known to the Grand Jury, at Citibank in Florida. Approximately five weeks later, on or about December 2, 2014, $170,000 was wired from the same Consulting Company A account, to a correspondent account at Deutsche Bank Trust Company Americas in New York, New York, to an account in the name of Kosson Ventures Inc. at Loyal Bank Limited in St. Vincent and the Grenadines, an account controlled by TAKKAS.

332. During this same approximate time period – that is, the winter of 2014-2015 – Co-Conspirator #5 informed Roger Huguet that due to information Co-Conspirator #5 had learned regarding the government's ongoing investigation of José Hawilla, Media World should not make additional payments toward the $1.5 million bribe it owed to Jeffrey Webb.

333. With respect to both Traffic USA's and Media World's bribe payments in connection with this scheme, the use of entities controlled by or associated with the defendant COSTAS TAKKAS to receive the payments, and TAKKAS's participation in the transaction as an intermediary more generally, was intended to conceal the fact that Jeffrey Webb was the beneficiary of the payments.

N.   CONCACAF Gold Cup/Champions League Scheme

334. Shortly after he was appointed to be CONCACAF's general secretary in July 2012, Co-Conspirator #3, now on behalf of CONCACAF, entered into negotiations with Traffic USA to sell the commercial rights associated with upcoming editions of the Gold Cup and Champions League, CONCACAF's club tournament. The defendant AARON DAVIDSON was involved in the negotiations on behalf of Traffic USA. Ultimately, on or about November 27, 2012, CONCACAF and Traffic USA entered into a $15.5 million contract for the exclusive worldwide commercial rights for the 2013 edition of the Gold Cup and the 2013-14 and 2014-15 seasons of the CONCACAF Champions League (the "2012 Gold Cup/Champions League Contract").

335. Jeffrey Webb directed Co-Conspirator #3 to seek a bribe payment in connection with the negotiations. Accordingly, in addition to the contract price, Co-Conspirator #3 solicited

137

from Traffic USA its agreement to pay Webb a $1.1 million bribe in exchange for Webb's agreement to award the 2012 Gold Cup/Champions League Contract to Traffic USA. The defendant AARON DAVIDSON and José Hawilla #2 agreed to the bribe payment.

336. Thereafter, Jeffrey Webb and Co-Conspirator #3 discussed the best way to effectuate the bribe payment in a manner that would conceal its nature. Ultimately, Webb decided to use an overseas company that manufactured soccer uniforms and soccer balls ("Soccer Uniform Company A"), the identity of which is known to the Grand Jury. Co-Conspirator #24, like the defendant COSTAS TAKKAS a close associate of Webb, had a connection to Soccer Uniform Company A. Webb eventually instructed Co-Conspirator #3 to submit a false invoice to Traffic USA for $1.1 million to be paid to Soccer Uniform Company A, which Co-Conspirator #3 did.

337. Traffic USA made domestic and international wire transfers to make the contract and bribe payments, respectively, in connection with the 2012 Gold Cup/Champions League Contract. For example, in 2013, five contract payments totaling $11 million were made by wire transfer from Traffic USA's account at Citibank in Miami, Florida to an account in CONCACAF's name at JP Morgan Chase bank in New York, New York. On or about December 4, 2013, the $1.1 million bribe payment for Jeffrey

138

Webb was made by wire transfer from Traffic International's account at Delta National Bank & Trust in Miami, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Soccer Uniform Company A at Capital Bank in Panama City, Panama.

338. On or about November 15, 2013, Traffic USA entered into a $60 million renewal contract for exclusive sponsorship rights associated with the 2015, 2017, 2019, and 2021 editions of the Gold Cup and the 2015-16, 2016-17, 2017-18, 2018-19, 2019-20, 2020-21, and 2021-22 seasons of the CONCACAF Champions League (the "2013 Gold Cup/Champions League Contract"). Co-Conspirator #3 led the negotiations on behalf of CONCACAF and the defendant AARON DAVIDSON led the negotiations on behalf of Traffic USA.

339. Again, Jeffrey Webb directed Co-Conspirator #3 to solicit a bribe for Webb in exchange for Webb's agreement to award the 2013 Gold Cup/Champions League Contract to Traffic USA. Though Webb wanted more, the parties eventually settled on $2 million as the size of the bribe payment. The defendant AARON DAVIDSON and José Hawilla agreed to the bribe payment.

340. In a March 2014 meeting with José Hawilla in Queens, New York to discuss the status of Traffic's ongoing bribe schemes, including the Gold Cup/Champions League schemes,

139

the defendant AARON DAVIDSON said, referring to the practice of paying bribes to obtain commercial rights: "Is it illegal?  It is illegal.  Within the big picture of things, a company that has worked in this industry for 30 years, is it bad?  It is bad."

O.    CONMEBOL/CONCACAF Copa América Centenario Scheme

341. As alleged in section A above, from in or about 1991 to 2011, Traffic entered into contracts with CONMEBOL, obtained and retained through bribery, awarding Traffic the exclusive media and marketing rights to all editions of the Copa América from 1993 to 2011.

342. In or about June 2010, CONMEBOL and Full Play entered into an agreement pursuant to which Full Play was designated CONMEBOL's exclusive agent for the commercialization of the media and marketing rights to the 2015, 2019, and 2023 editions of the Copa América, among other tournaments.  Traffic International and Traffic USA, alleging that the agreement violated a contract signed in 2001 that gave Traffic the rights to the 2015 edition of the tournament and an option to retain those rights for the subsequent three editions, sued CONMEBOL, Full Play, and others, including the defendants LUÍS CHIRIBOGA and RAFAEL ESQUIVEL and Luis Bedoya, the leaders of the Group of Six referenced in paragraphs 181 and 182 above.  The lawsuit was

filed in Florida state court by virtue of a forum selection clause in the 2001 Copa América Contract designating the courts of Florida as the forum of choice in the event FIFA declined to arbitrate, as it ultimately did.

343. The lawsuit was settled in or about June 2013.

344. In the months preceding the settlement, José Hawilla and other representatives of Traffic met with the defendants HUGO JINKIS and MARIANO JINKIS, as well as Alejandro Burzaco, to discuss a resolution of Traffic's lawsuit that would involve Full Play, Torneos, and Traffic jointly acquiring commercial rights to the Copa América in exchange for Traffic agreeing to end the lawsuit and assume its share of the costs associated with those rights. Specifically, the representatives of the three companies discussed forming a new company that would obtain and exploit the commercial rights to the 2015, 2019, and 2023 editions of the tournament, as well as to a special centennial edition of the tournament to be held in the United States in 2016.

345. By in or about March 2013, the discussions regarding the formation of the company advanced significantly. Those discussions addressed settlement of the Florida state court litigation, the percentage of shares each member would hold in the new company, and the operations of the new company.

At a meeting in Buenos Aires, Argentina in or about March 2013 among José Hawilla, Alejandro Burzaco, and the defendants HUGO JINKIS and MARIANO JINKIS, Hawilla was told that Full Play and Torneos had agreed to make bribe payments to CONMEBOL officials in connection with the Copa América rights, and had already made some of the bribe payments. Hawilla was asked to contribute $10 million toward the cost of expenses, including the bribes, to date. Hawilla agreed to make these bribe payments and subsequently caused them to be made.

346. The creation of the new company, Datisa, was formalized in a shareholders' agreement dated May 21, 2013. Among other things, the agreement provided that Traffic, Torneos, and Full Play each held a one-third interest in the company.

347. Four days later, in London, England, Datisa entered into a contract with CONMEBOL and Full Play whereby Datisa obtained from CONMEBOL the exclusive worldwide commercial rights to the 2015, 2019, and 2023 editions of the Copa América and the 2016 Copa América Centenario, and CONMEBOL and Full Play assigned to Datisa the contracts related thereto that they had already executed with third parties (the "2013 Copa América Contract"). The 2013 Copa América Contract, dated May 25, 2013 and signed by representatives of each of Datisa's three

142

shareholders and 12 CONMEBOL officials, was for $317.5 million: $75 million for the 2015 edition, $77.5 million for the 2016 edition, $80 million for the 2019 edition, and $85 million for the 2023 edition.

348. Datisa agreed to pay tens of millions of dollars in bribes to CONMEBOL officials – all of whom were also FIFA officials – in connection with the 2013 Copa América Contract, including bribe payments for contract signature and for each of the four editions of the tournament included in the contract. The agreement called for seven-figure bribe payments to be made to each of the "top" three CONMEBOL officials (the president of the confederation and the presidents of the Brazilian and Argentinian federations) and to as many as seven other CONMEBOL federation presidents in connection with the signature and each edition of the tournament, and for bribe payments reaching six figures to be made to the CONMEBOL general secretary. The officials who had solicited and/or were to receive bribes included the defendants MANUEL BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EUGENIO FIGUEREDO, RAFAEL ESQUIVEL, NICOLÁS LEOZ, RICARDO TEIXEIRA, JOSÉ LUÍS MEISZNER, JUAN ÁNGEL NAPOUT, and JOSÉ MARIA MARIN, and Co-Conspirator #1 and Luis Bedoya, among others.

349. In or about June and September 2013, José Hawilla and Traffic used financial institutions in the United States to make three payments, totaling $11.667 million, representing Traffic's contribution to the other shareholders of Datisa, who had paid and were responsible for continuing to pay bribes due to the CONMEBOL officials for the 2015 edition of the Copa América and the signing of the 2013 Copa América Contract. The three payments were made from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, and/or through Citibank and/or JP Morgan Chase correspondent accounts in New York, New York, for credit to accounts at banks in Zurich, Switzerland in the names of Cross Trading (a Full Play affiliate) and FPT Sports (a Torneos affiliate), respectively, as follows:

| DATE | WIRE COMMUNICATION |
|------|--------------------|
| June 17, 2013 | Wire transfer of $5,000,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Citibank correspondent account in New York, New York, for credit to an account in the name of Cross Trading, a Full Play affiliate, at Bank Hapoalim in Zurich, Switzerland. |
| June 17, 2013 | Wire transfer of $5,000,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a JP Morgan Chase correspondent account in New York, New York, for credit to an |

144

account in the name of FPT Sports, a Torneos affiliate, at Bank Julius Baer & Co. in Zurich, Switzerland.

September 11, 2013    Wire transfer of $1,666,667 from Datisa's account at Bank Hapoalim in Zurich, Switzerland, via Citibank and JP Morgan Chase correspondent accounts in New York, New York, for credit to an account in the name of FPT Sports at Bank Julius Baer & Co. in Zurich, Switzerland.

A fourth payment of $1.667 million – bringing the total to $13.333 million – was made by a transfer from an account in the name of Datisa at Bank Hapoalim in Zurich, Switzerland to an account in the name of Cross Trading at the same bank.

350. Bribe payments were subsequently wired from bank accounts in Switzerland controlled by Datisa and its partners, including defendants HUGO JINKIS and MARIANO JINKIS, to accounts controlled by CONMEBOL officials throughout the world, including accounts in the United States.

351. José Margulies also participated in the Datisa scheme, facilitating the payment and laundering of bribe money from and through accounts controlled by the Datisa shareholders.

352. As the bribery scheme discussed in the preceding paragraphs evolved and progressed, so, too, did CONMEBOL's and CONCACAF's efforts to organize and promote the 2016 Copa América Centenario.  In or about 2012, the defendant ALFREDO HAWIT, the

145

then-acting president of CONCACAF, informally announced that a special, Pan-America edition of the Copa América would be held in 2016, involving teams from CONMEBOL and CONCACAF, to celebrate the 100th anniversary of the first edition of the tournament.  HAWIT stated that he hoped the tournament would be hosted in the United States because "the market is in the United States, the stadiums are in the United States, [and] the people are in the United States.  The study that we have made [shows] that everything's in the United States."

353. At a press conference held in Miami, Florida on May 1, 2014, high-ranking officials of CONMEBOL and CONCACAF officially announced that CONMEBOL would celebrate the 100th anniversary of the Copa América by organizing a special edition of the tournament for the entire hemisphere – to be called the Copa América Centenario – to include all 10 CONMEBOL men's national teams and the men's national teams of six CONCACAF member associations, including the United States.  The tournament was to be played at major sporting venues in various cities in the United States in June 2016.  The defendant EUGENIO FIGUEREDO and Jeffrey Webb presided over the press conference. Datisa representatives – including José Hawilla, Alejandro Burzaco, and the defendants HUGO JINKIS and MARIANO JINKIS – attended the press conference, and the logo of Datisa's trade

146

name was included alongside the logos of CONCACAF and CONMEBOL in various promotional materials.

354. As set forth above, Datisa acquired the exclusive commercial rights to the Copa América Centenario that CONMEBOL held as part of the 2013 Copa América Contract. In addition, Datisa contracted with CONCACAF, in its capacity as the co-organizer of the tournament, to acquire CONCACAF's rights to that tournament as well. By letter agreement dated March 4, 2014 (the "2014 Centenario Contract"), Datisa agreed to pay $35 million to CONCACAF for those rights, which amount was in addition to the $77.5 million Datisa had already agreed to pay to CONMEBOL, pursuant to the 2013 Copa América Contract, for CONMEBOL's rights to the same tournament.

355. In connection with the negotiations between Datisa and CONCACAF, which involved Co-Conspirator #3, Jeffrey Webb, Alejandro Burzaco and the defendants AARON DAVIDSON, EUGENIO FIGUEREDO, HUGO JINKIS, and MARIANO JINKIS, among others, Datisa also agreed to pay Webb a bribe in exchange for Webb's agreement to cause CONCACAF to enter into the 2014 Centenario Contract.

356. In a March 2014 meeting in Queens, New York, which occurred days after the 2014 Centenario Contract was signed, the defendant AARON DAVIDSON told José Hawilla that the

147

defendant MARIANO JINKIS had called him (DAVIDSON) the prior week to get DAVIDSON's help in figuring out a way to make the payment to Jeffrey Webb. DAVIDSON said he cut JINKIS off because he did not want to talk about the subject on the phone and told JINKIS that they would talk in person when JINKIS traveled to Miami, Florida the following week.

357. On or about April 1, 2014, the first payment pursuant to the 2014 Centenario Contract of $7 million was made from Datisa's account at Bank Hapoalim in Zurich, Switzerland, to an account in CONCACAF's name at JP Morgan Chase bank in Miami, Florida.

358. In or about August 2014, the defendant JUAN ÁNGEL NAPOUT, the CONMEBOL president, stated publicly: "The Americas are one, it is man who creates frontiers. I believe in a single America in a working context with CONCACAF and we've reached something real which will go ahead in 2016."

359. On or about September 25, 2014, at a meeting of the FIFA executive committee in Zurich, Switzerland, FIFA put its imprimatur on the Copa América Centenario by placing the tournament on its official calendar.

360. Following the press conference in South Florida earlier that year to announce the Copa América Centenario, the principals of Datisa - José Hawilla, Alejandro Burzaco, and the

148

defendants HUGO JINKIS and MARIANO JINKIS – met in South Florida
and discussed the bribery scheme.  At one point, Burzaco said:
"All can get hurt because of this subject. . . . All of us go to
prison."

*   *   *   *

361. Apart from Charles Blazer's disclosure to FIFA of
the 2011 FIFA presidential election bribery scheme set forth
above, no disclosure of any of the foregoing bribery and
kickback schemes was made to FIFA, CONCACAF, or CONMEBOL,
including without limitation to their respective executive
committees, congresses, or constituent organizations.

## CRIMINAL COUNTS

### COUNT ONE
(Racketeering Conspiracy)

362. The allegations contained in paragraphs 1 through
361 are realleged and incorporated as if fully set forth in this
paragraph.

363. In or about and between 1991 and the present,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendants ALFREDO
HAWIT, ARIEL ALVARADO, RAFAEL CALLEJAS, BRAYAN JIMÉNEZ, EDUARDO
LI, JULIO ROCHA, RAFAEL SALGUERO, COSTAS TAKKAS, HÉCTOR
TRUJILLO, REYNALDO VASQUEZ, JACK WARNER, JUAN ÁNGEL NAPOUT,
MANUEL BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, MARCO POLO DEL

149

NERO, EDUARDO DELUCA, RAFAEL ESQUIVEL, EUGENIO FIGUEREDO,
NICOLÁS LEOZ, JOSÉ MARIA MARIN, JOSÉ LUÍS MEISZNER, ROMER OSUNA,
RICARDO TEIXEIRA, AARON DAVIDSON, HUGO JINKIS, and MARIANO
JINKIS, together with others, being persons employed by and
associated with the enterprise, which engaged in, and the
activities of which affected, interstate and foreign commerce,
did knowingly and intentionally conspire to violate Title 18,
United States Code, Section 1962(c), that is, to conduct and
participate, directly and indirectly, in the conduct of the
affairs of such enterprise through a pattern of racketeering
activity, as defined in Title 18, United States Code, Sections
1961(1) and 1961(5).

364. The pattern of racketeering activity through
which the defendants ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL
CALLEJAS, BRAYAN JIMÉNEZ, EDUARDO LI, JULIO ROCHA, RAFAEL
SALGUERO, COSTAS TAKKAS, HÉCTOR TRUJILLO, REYNALDO VASQUEZ, JACK
WARNER, JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUÍS
CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, RAFAEL ESQUIVEL,
EUGENIO FIGUEREDO, NICOLÁS LEOZ, JOSÉ MARIA MARIN, JOSÉ LUÍS
MEISZNER, ROMER OSUNA, RICARDO TEIXEIRA, AARON DAVIDSON, HUGO
JINKIS, and MARIANO JINKIS, together with others, agreed to
conduct and participate, directly and indirectly, in the conduct

of the affairs of the enterprise consisted of multiple acts indictable under:

    (a)  Title 18, United States Code, Section 1343 (wire fraud, including honest-services wire fraud);

    (b)  Title 18, United States Code, Sections 1956 and 1957 (money laundering and money laundering conspiracy);

    (c)  Title 18, United States Code, Section 1952 (interstate and foreign travel in-aid-of racketeering);

    (d)  Title 18, United States Code, Section 1512 (obstruction of justice and obstruction of justice conspiracy); and

multiple acts involving bribery, in violation of New York State Penal Law Sections 180.03 and 180.08 and New Jersey Statute 2C:21-10. Each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise, the last of which would occur within 10 years of a prior act of racketeering activity.

    (Title 18, United States Code, Sections 1962(d), 1963 and 3551 et seq.)

COUNT TWO

(Wire Fraud Conspiracy – CONMEBOL Copa América Scheme)

365. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

366. In or about and between January 1991 and July 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendants RAFAEL ESQUIVEL and NICOLÁS LEOZ, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

152

COUNTS THREE AND FOUR
(Wire Fraud — CONMEBOL Copa América Scheme)

367. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

368. On or about the dates set forth below, within the Southern District of New York, the defendant NICOLÁS LEOZ, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

369. For the purpose of executing such scheme and artifice, the defendant NICOLÁS LEOZ, together with others, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

153

| Count | Approx. Date | Wire Communication |
|-------|-------------|-------------------|
| THREE | November 12, 2010 | Wire transfer of $4,000,000 from Traffic International's account at Delta National Bank & Trust in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| FOUR | June 10, 2011 | Wire transfer of $9,000,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT FIVE
(Money Laundering Conspiracy – CONMEBOL Copa América Scheme)

370. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

371. In or about and between January 1991 and July 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendants RAFAEL ESQUIVEL and NICOLÁS LEOZ, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the

154

United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity, all contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT SIX
(Money Laundering — CONMEBOL Copa América Scheme)

372. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

373. In or about and between November 2010 and June 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendant NICOLÁS LEOZ,

155

together with others, did knowingly and intentionally transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

## COUNT SEVEN
(Wire Fraud Conspiracy – CONMEBOL Copa Libertadores Scheme #1)

374. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

375. In or about and between 2000 and 2012, both dates being approximate and inclusive, within the Southern District of New York, the defendants EDUARDO DELUCA and NICOLÁS LEOZ, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of

156

materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNT EIGHT
(Money Laundering Conspiracy –
CONMEBOL Copa Libertadores Scheme #1)

376. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

377. In or about and between 2000 and 2012, both dates being approximate and inclusive, within the Southern District of New York, the defendants EDUARDO DELUCA and NICOLÁS LEOZ, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to

157

Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity, all contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT NINE
(Wire Fraud Conspiracy – CONMEBOL Copa Libertadores Scheme #2)

378. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

379. In or about and between 2000 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, RAFAEL ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS LEOZ, JOSÉ MARIA MARIN, JOSÉ LUÍS MEISZNER, ROMER OSUNA, RICARDO

158

TEIXEIRA, HUGO JINKIS, and MARIANO JINKIS, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNT TEN
(Money Laundering Conspiracy –
CONMEBOL Copa Libertadores Scheme #2)

380. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

381. In or about and between 2000 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JUAN ÁNGEL NAPOUT, MANUEL

BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, MARCO POLO DEL NERO,

EDUARDO DELUCA, RAFAEL ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS

LEOZ, JOSÉ MARIA MARIN, JOSÉ LUÍS MEISZNER, ROMER OSUNA, RICARDO

TEIXEIRA, HUGO JINKIS, and MARIANO JINKIS, together with others,

did knowingly and intentionally conspire to transport, transmit

and transfer monetary instruments and funds, to wit: wire

transfers, from places in the United States to and through

places outside the United States and to places in the United

States from and through places outside the United States, with

the intent to promote the carrying on of specified unlawful

activity, to wit: wire fraud, contrary to Title 18, United

States Code, Section 1343, all contrary to Title 18, United

States Code, Section 1956(a)(2)(A).

　　　　(Title 18, United States Code, Sections 1956(h) and

3551 et seq.)


COUNT ELEVEN
(Wire Fraud Conspiracy – CBF Copa do Brasil Scheme)

　　　　382. The allegations contained in paragraphs 1 through

361 are realleged and incorporated as if fully set forth in this

paragraph.

　　　　383. In or about and between December 2011 and the

present, both dates being approximate and inclusive, within the

Eastern District of New York and elsewhere, the defendants MARCO

160

POLO DEL NERO, JOSÉ MARIA MARIN, and RICARDO TEIXEIRA, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CBF and their constituent organizations, including to deprive FIFA and CBF and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, telephone calls and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWELVE
(Money Laundering Conspiracy – CBF Copa do Brasil Scheme)

384. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

385. In or about and between December 2011 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendants MARCO POLO DEL

161

NERO, JOSÉ MARIA MARIN, and RICARDO TEIXEIRA, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity, all contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT THIRTEEN
### (Wire Fraud Conspiracy − CFU World Cup Qualifiers Scheme #1)

386. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

387. In or about and between July 2000 and June 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud CFU and its constituent organizations, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNTS FOURTEEN AND FIFTEEN
### (Wire Fraud − CFU World Cup Qualifiers Scheme #1)

388. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

163

389. On or about the dates set forth below, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally devise a scheme and artifice to defraud CFU and its constituent organizations, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

390. For the purpose of executing such scheme and artifice, the defendant JACK WARNER, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|-------------|-------------------|
| FOURTEEN | December 13, 2010 | Wire transfer of $290,000 from Traffic USA's account at Citibank in Miami, Florida to a Bank of America correspondent account in New York, New York, for credit to an account in the name of CFU at Republic Bank in Trinidad and Tobago. |
| FIFTEEN | February 2, 2011 | Wire transfer of $250,000 from Traffic USA's account at Citibank in Miami, Florida to a Bank of America correspondent account in New York, New York, for credit to an account in the name of CFU at Republic Bank in Trinidad and Tobago. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

164

COUNT SIXTEEN
(Money Laundering Conspiracy –
CFU World Cup Qualifiers Scheme #1)

391. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

392. In or about and between July 2000 and June 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT SEVENTEEN
(Money Laundering – CFU World Cup Qualifiers Scheme #1)

393. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

165

394. In or about and between December 2010 and February 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

### COUNT EIGHTEEN
(Wire Fraud Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FEDEFUT))

395. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

396. In or about and between September 2009 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant EDUARDO LI, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and

166

FEDEFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FEDEFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNTS NINETEEN THROUGH TWENTY-THREE
(Wire Fraud –
UNCAF Region World Cup Qualifiers Schemes (FEDEFUT))

397. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

398. On or about the dates set forth below, within the Southern District of New York and the Southern District of Florida, the defendant EDUARDO LI, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and FEDEFUT and their constituent

167

organizations, including to deprive FIFA, CONCACAF, and FEDEFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

399. For the purpose of executing such scheme and artifice, the defendant EDUARDO LI, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|---|---|---|
| NINETEEN | January 2, 2014 | Wire transfer of $42,708 from Traffic USA's account at Citibank in Miami, Florida, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Federación Costarricense de Futbol at Banco Lafise in Costa Rica. |
| TWENTY | February 27, 2015 | Wire transfer of $200,000 from Media World's account at Bank of America in Miami, Florida, to an account in the name of Consulting Company A at Multibank in Panama. |
| TWENTY-ONE | March 2, 2015 | Wire transfer of $150,000 from Consulting Company A's account at Multibank in Panama, to an account in the name of Warrior Holdings, S.A. at Citibank in Miami, Florida. |
| TWENTY-TWO | April 20, 2015 | Wire transfer of $150,000 from Media World's account at Bank of America in Miami, Florida, to an account in the name of Consulting Company A at Multibank in Panama. |
| TWENTY-THREE | April 28, 2015 | Wire transfer of $150,000 from Consulting Company A's account at Multibank in Panama, to an account in the name of Warrior Holdings, S.A. at Citibank in Miami, Florida. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT TWENTY-FOUR
(Money Laundering Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FEDEFUT))

400. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

401. In or about and between September 2009 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant EDUARDO LI, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

170

COUNT TWENTY-FIVE
(Money Laundering –
UNCAF Region World Cup Qualifiers Schemes (FEDEFUT))

402. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

403. In or about and between January 2014 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant EDUARDO LI, together with others, did knowingly and intentionally transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

171

COUNT TWENTY-SIX
(Wire Fraud Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FENIFUT)

404. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

405. In or about and between April 2011 and December 2012, both dates being approximate and inclusive, within the Southern District of Florida, the defendant JULIO ROCHA, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and FENIFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FENIFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

172

## COUNTS TWENTY-SEVEN AND TWENTY-EIGHT
(Wire Fraud –
UNCAF Region World Cup Qualifiers Schemes (FENIFUT))

406. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

407. On or about the dates set forth below, within the Southern District of Florida, the defendant JULIO ROCHA, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and FENIFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FENIFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

408. For the purpose of executing such scheme and artifice, the defendant JULIO ROCHA, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

173

| Count | Approx. Date | Wire Communication |
|-------|-------------|-------------------|
| TWENTY-SEVEN | April 27, 2011 | Wire transfer of $88,000 from Traffic USA's account at Citibank in Miami, Florida, to a Citibank correspondent account, for credit to an account in the name of Federación Nicaragüense de Fútbol at Banco de Credito Centroamerica in Managua, Nicaragua. |
| TWENTY-EIGHT | May 27, 2011 | Wire transfer of $150,000 from Investment Company A at Banco Itaú in Miami, Florida, to a JP Morgan Chase correspondent account, for credit to an account in the name of Julio Rocha Lopez at BankInter in Madrid, Spain. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT TWENTY-NINE
(Money Laundering Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FENIFUT))

409. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

410. In or about and between April 2011 and December 2012, both dates being approximate and inclusive, within the Southern District of Florida, the defendant JULIO ROCHA, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United

174

States, with the intent to promote the carrying on of specified

unlawful activity, to wit: wire fraud, contrary to Title 18,

United States Code, Section 1343, all contrary to Title 18,

United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and

3551 et seq.)

COUNT THIRTY
(Money Laundering –
UNCAF Region World Cup Qualifiers Schemes (FENIFUT))

411. The allegations contained in paragraphs 1 through

361 are realleged and incorporated as if fully set forth in this

paragraph.

412. In or about and between April 2011 and December

2012, both dates being approximate and inclusive, within the

Southern District of Florida, the defendant JULIO ROCHA,

together with others, did knowingly and intentionally transport,

transmit, and transfer monetary instruments and funds, to wit:

wire transfers, from places in the United States to and through

places outside the United States and to places in the United

States from and through places outside the United States, with

the intent to promote the carrying on of specified unlawful

175

activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

COUNT THIRTY-ONE
(Wire Fraud Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FENAFUTH))

413. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

414. In or about and between January 2008 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendants ALFREDO HAWIT and RAFAEL CALLEJAS, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and FENAFUTH and their constituent organizations, including to deprive FIFA, CONCACAF, and FENAFUTH and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals,

176

pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNTS THIRTY-TWO THROUGH THIRTY-FIVE
(Wire Fraud –
UNCAF Region World Cup Qualifiers Schemes (FENAFUTH))

415. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

416. On or about the dates set forth below, within the Southern District of New York and the Southern District of Florida, the defendants ALFREDO HAWIT and RAFAEL CALLEJAS, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and FENAFUTH and their constituent organizations, including to deprive FIFA, CONCACAF, and FENAFUTH and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

417. For the purpose of executing such scheme and artifice, the defendants ALFREDO HAWIT and RAFAEL CALLEJAS, together with others, did transmit and cause to be transmitted,

177

by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|---|---|---|
| THIRTY-TWO | March 23, 2011 | Wire transfer of $450,000 from Media World's account at Bank of America in Miami, Florida, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Consulting Company B at Banco Cuscatlan de Panama in Panama. |
| THIRTY-THREE | August 26, 2011 | Wire transfer of $150,000 from Media World's account at Bank of America in Miami, Florida to an account in the name of FENAFUTH at Banco Ficohsa in Tegucigalpa, Honduras. |
| THIRTY-FOUR | December 13, 2012 | Wire transfer of $500,000 from Media World's account at Bank of America in Miami, Florida, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Consulting Company B at Banco Citibank in Panama City, Panama. |
| THIRTY-FIVE | January 7, 2013 | Wire transfer of $500,000 from Media World's account at Bank of America in Miami, Florida, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Consulting Company B at Banco Citibank in Panama City, Panama. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

178

COUNT THIRTY-SIX
(Money Laundering Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FENAFUTH))

418. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

419. In or about and between January 2008 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant ALFREDO HAWIT and RAFAEL CALLEJAS, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

179

COUNT THIRTY-SEVEN
(Money Laundering –
UNCAF Region World Cup Qualifiers Schemes (FENAFUTH))

420. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

421. In or about and between March 2011 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant ALFREDO HAWIT and RAFAEL CALLEJAS, together with others, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

COUNT THIRTY-EIGHT
(Wire Fraud Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FESFUT))

422. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

180

423. In or about and between January 2009 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant REYNALDO VASQUEZ, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF and FESFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FESFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNTS THIRTY-NINE AND FORTY
(Wire Fraud –
UNCAF Region World Cup Qualifiers Schemes (FESFUT))

424. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

425. On or about the dates set forth below, within the Southern District of New York, the defendant REYNALDO VASQUEZ, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and FESFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FESFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

426. For the purpose of executing such scheme and artifice, the defendant REYNALDO VASQUEZ, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|-------------|--------------------|
| THIRTY-NINE | November 4, 2011 | Wire transfer of $100,000 from Media World's account at Bank of America in Miami, Florida, to a Citibank correspondent account in New York, New York, for credit to an account in the name of FESFUT at Banco Cuscatlan in El Salvador. |
| FORTY | October 10, 2012 | Wire transfer of $350,000 from Media World's account at Bank of America in Miami, Florida, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Consulting Company B at Banco Citibank in Panama. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

### COUNT FORTY-ONE
(Money Laundering Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FESFUT))

427. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

428. In or about and between January 2008 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant REYNALDO VASQUEZ, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in

183

the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

　　　　(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT FORTY-TWO
(Wire Fraud Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FENAFUTG))

　　　　429. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

　　　　430. In or about and between January 2009 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendants BRAYAN JIMÉNEZ, RAFAEL SALGUERO, and HÉCTOR TRUJILLO, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF and FENAFUTG and their constituent organizations, including to deprive FIFA, CONCACAF, and FENAFUTG and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and

184

promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, telephone calls and email messages, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

<u>COUNTS FORTY-THREE AND FORTY-FOUR</u>
(Wire Fraud –
UNCAF Region World Cup Qualifiers Schemes (FENAFUTG))

431. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

432. On or about the dates set forth below, within the Southern District of New York and the Southern District of Florida, the defendants BRAYAN JIMÉNEZ, RAFAEL SALGUERO, and HÉCTOR TRUJILLO, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and FENAFUTG and their constituent organizations, including to deprive FIFA, CONCACAF, and FENAFUTG and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to

185

obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

433. For the purpose of executing such scheme and artifice, the defendants BRAYAN JIMÉNEZ, RAFAEL SALGUERO, and HÉCTOR TRUJILLO, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|--------------|--------------------|
| FORTY-THREE | March 31, 2011 | Wire transfer of $20,000 from Media World's account at Bank of America in Miami, Florida, to a Citibank correspondent account in New York, New York for credit to an account held in the name of a travel agency at a bank in Guatemala. |
| FORTY-FOUR | January 24, 2014 | Wire transfer of $20,000 from Media World's account at Bank of America in Miami, Florida to an account in the name of FENAFUTG at Banco Industrial in Guatemala City, Guatemala. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNTS FORTY-FIVE AND FORTY-SIX
(Wire Fraud –
UNCAF Region World Cup Qualifiers Schemes (FENAFUTG))

434. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

186

435. On or about the dates set forth below, within the Southern District of Florida, the defendants BRAYAN JIMÉNEZ and HÉCTOR TRUJILLO, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and FENAFUTG and their constituent organizations, including to deprive FIFA, CONCACAF, and FENAFUTG and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

436. For the purpose of executing such scheme and artifice, the defendants BRAYAN JIMÉNEZ and HÉCTOR TRUJILLO, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|-------------|---------------------|
| FORTY-FIVE | March 28, 2014 | Wire transfer of $200,000 from Media World's Account at Bank of America in Miami, Florida to an account at JP Morgan Chase Bank in Seattle, Washington in the name of Construction Company A. |
| FORTY-SIX | July 22, 2014 | Wire transfer of $50,000 from Media World's account at Bank of America in Miami, Florida to an account at Banco G&T in Guatemala controlled by Co-Conspirator #19. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT FORTY-SEVEN
(Money Laundering Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FENAFUTG))

437. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

438. In or about and between January 2009 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendants BRAYAN JIMÉNEZ, RAFAEL SALGUERO, and HÉCTOR TRUJILLO, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to

188

promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT FORTY-EIGHT
(Money Laundering –
UNCAF Region World Cup Qualifiers Schemes (FENAFUTG))

439. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

440. In or about and between March 2011 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendants BRAYAN JIMÉNEZ, RAFAEL SALGUERO, and HÉCTOR TRUJILLO, together with others, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit:

wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

COUNT FORTY-NINE
(Wire Fraud Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FEPAFUT))

441. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

442. In or about and between October 2004 and February 2014, both dates being approximate and inclusive, within the Southern District of Florida, the defendant ARIEL ALVARADO, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and FEPAFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FEPAFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and

190

sounds, to wit: wire transfers, contrary to Title 18, United

States Code, Section 1343.

      (Title 18, United States Code, Sections 1349 and 3551

et seq.)

### COUNT FIFTY
(Wire Fraud –
UNCAF Region World Cup Qualifiers Schemes (FEPAFUT))

      443. The allegations contained in paragraphs 1 through

361 are realleged and incorporated as though fully set forth in

this paragraph.

      444. On or about the date set forth below, within the

Southern District of Florida, the defendant ARIEL ALVARADO,

together with others, did knowingly and intentionally devise a

scheme and artifice to defraud FIFA, CONCACAF, and FEPAFUT and

their constituent organizations, including to deprive FIFA,

CONCACAF, and FEPAFUT and their constituent organizations of

their respective rights to honest and faithful services through

bribes and kickbacks, and to obtain money and property by means

of materially false and fraudulent pretenses, representations,

and promises.

      445. For the purpose of executing such scheme and

artifice, the defendant ARIEL ALVARADO, together with others,

did transmit and cause to be transmitted, by means of wire

communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|-------------|--------------------|
| FIFTY | December 13, 2013 | Wire transfer of $15,000 from Traffic USA's account at Citibank in Miami, Florida for credit to an account in the name of Federación Panamena de Futbol at Banco General in Panama City, Panama. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

### COUNT FIFTY-ONE
(Money Laundering Conspiracy –
UNCAF Region World Cup Qualifiers Schemes (FEPAFUT))

446. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

447. In or about and between October 2004 and February 2014, both dates being approximate and inclusive, within the Southern District of Florida, the defendant ARIEL ALVARADO, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18,

United States Code, Section 1343, all contrary to Title 18,

United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and
3551 et seq.)

COUNT FIFTY-TWO
(Money Laundering –
UNCAF Region World Cup Qualifiers Schemes (FEPAFUT))

448. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

449. In or about and between April 2011 and February 2014, both dates being approximate and inclusive, within the Southern District of Florida, the defendant ARIEL ALVARADO, together with others, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful

193

activity, to wit: wire fraud, contrary to Title 18, United

States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A),

2 and 3551 et seq.)

### COUNT FIFTY-THREE
(Wire Fraud Conspiracy –
UNCAF Region Friendlies Schemes (FESFUT))

450. The allegations contained in paragraphs 1 through

361 are realleged and incorporated as if fully set forth in this

paragraph.

451. In or about and between May 2012 and the present,

both dates being approximate and inclusive, within the Southern

District of New York, the defendant REYNALDO VASQUEZ, together

with others, did knowingly and intentionally conspire to devise

a scheme and artifice to defraud FIFA, CONCACAF, and FESFUT and

their constituent organizations, including to deprive FIFA,

CONCACAF, and FESFUT and their constituent organizations of

their respective rights to honest and faithful services through

bribes and kickbacks, and to obtain money and property by means

of materially false and fraudulent pretenses, representations,

and promises, and for the purpose of executing such scheme and

artifice, to transmit and cause to be transmitted by means of

wire communication in interstate and foreign commerce, writings,

194

signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT FIFTY-FOUR
(Wire Fraud – UNCAF Region Friendlies Schemes (FESFUT))

452. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

453. On or about the date set forth below, within the Southern District of New York, the defendant REYNALDO VASQUEZ, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and FESFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FESFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

454. For the purpose of executing such scheme and artifice, the defendant REYNALDO VASQUEZ, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

195

| Count | Approx. Date | Wire Communication |
|-------|-------------|-------------------|
| FIFTY-FOUR | October 17, 2014 | Wire transfer of $10,000 from an account in the name of Consulting Company C at Bank of America in Wellington, Florida, to a Bank of America correspondent account in New York, New York, for credit to an account in the name of Mobilia, S.A. at Banco Promerica in El Salvador. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT FIFTY-FIVE
(Money Laundering Conspiracy –
UNCAF Region Friendlies Schemes (FESFUT))

455. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

456. In or about and between May 2012 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant REYNALDO VASQUEZ, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18,

196

United States Code, Section 1343, contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT FIFTY-SIX
(Money Laundering –
UNCAF Region Friendlies Schemes (FESFUT))

457. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

458. In or about and between October 2014 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant REYNALDO VASQUEZ, together with others, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

197

## COUNT FIFTY-SEVEN
### (Wire Fraud Conspiracy –
### UNCAF Region Friendlies Schemes (FENAFUTG))

459. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

460. In or about and between October 2014 and April 2015, both dates being approximate and inclusive, within the Southern District of Florida, the defendant BRAYAN JIMÉNEZ, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and FENAFUTG and their constituent organizations, including to deprive FIFA, CONCACAF, and FENAFUTG and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: telephone calls and email messages, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNT FIFTY-EIGHT
(Wire Fraud Conspiracy –
UNCAF Region Friendlies Schemes (FEDEFUT))

461.    The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

462.    In or about and between October 2014 and November 2014, both dates being approximate and inclusive, within the Southern District of New York, the defendant EDUARDO LI, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and FEDEFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FEDEFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

199

COUNTS FIFTY-NINE AND SIXTY
(Wire Fraud – UNCAF Region Friendlies Schemes (FEDEFUT))

463. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

464. On or about the dates set forth below, within the Southern District of New York, the defendant EDUARDO LI, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, FEDEFEUT and their constituent organizations, including to deprive FIFA, CONCACAF, FEDEFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

465. For the purpose of executing such scheme and artifice, the defendant EDUARDO LI, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

200

| Count | Approx. Date | Wire Communication |
|-------|--------------|--------------------|
| FIFTY-NINE | October 20, 2014 | Wire transfer of $20,000 from an account in the name of Consulting Company C at Bank of America in Wellington, Florida, to a BCT Bank correspondent account in New York, New York, for credit to an account in the name of LI at BCT Bank in Panama. |
| SIXTY | November 28, 2014 | Wire transfer of $20,000 from an account in the name of Consulting Company C at Bank of America in Wellington, Florida, to a BCT Bank correspondent account in New York, New York, for credit to an account in the name of LI at BCT Bank in Panama. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT SIXTY-ONE
(Money Laundering Conspiracy –
UNCAF Region Friendlies Schemes (FEDEFUT))

466. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

467. In or about and between October 2014 and November 2014, both dates being approximate and inclusive, within the Southern District of New York, the defendant EDUARDO LI, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in

201

the United States from and through places outside the United

States, with the intent to promote the carrying on of specified

unlawful activity, to wit: wire fraud, contrary to Title 18,

United States Code, Section 1343, all contrary to Title 18,

United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and

3551 et seq.)

### COUNT SIXTY-TWO
(Money Laundering –
UNCAF Region Friendlies Schemes (FEDEFUT))

468. The allegations contained in paragraphs 1 through

361 are realleged and incorporated as if fully set forth in this

paragraph.

469. In or about and between October 2014 and November

2014, both dates being approximate and inclusive, within the

Southern District of New York, the defendant EDUARDO LI,

together with others, did knowingly and intentionally transport,

transmit, and transfer monetary instruments and funds, to wit:

wire transfers, from places in the United States to and through

places outside the United States and to places in the United

States from and through places outside the United States, with

the intent to promote the carrying on of specified unlawful

activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

COUNT SIXTY-THREE
(Wire Fraud Conspiracy –
2011 FIFA Presidential Election Scheme)

470. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

471. In or about and between April 2011 and July 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and CFU and their constituent organizations, including to deprive FIFA, CONCACAF, and CFU and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers,

203

emails and telephone calls, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNT SIXTY-FOUR
(Money Laundering Conspiracy –
2011 FIFA Presidential Election Scheme)

472. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

473. In or about and between April 2011 and July 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: United States currency and wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

204

## COUNT SIXTY-FIVE
(Wire Fraud Conspiracy –
CONCACAF Media and Marketing Rights Scheme)

474. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

475. In or about and between November 2011 and April 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL SALGUERO, HUGO JINKIS, and MARIANO JINKIS, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONCACAF and their constituent organizations, including to deprive FIFA and CONCACAF, and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and

sounds, to wit: email messages, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

<u>COUNTS SIXTY-SIX AND SIXTY-SEVEN</u>
(Wire Fraud – CONCACAF Media and Marketing Rights Scheme)

476. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

477. On or about the dates set forth below, within the Southern District of New York, the defendants ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL SALGUERO, HUGO JINKIS, and MARIANO JINKIS, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA and CONCACAF, and their constituent organizations, including to deprive FIFA and CONCACAF, and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

478. For the purpose of executing such scheme and artifice, the defendants ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL SALGUERO, HUGO JINKIS, and MARIANO JINKIS, together with others, did transmit and cause to be transmitted, by means of wire

206

communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|-------------|--------------------|
| SIXTY-SIX | January 12, 2012 | Email message sent via interstate wire transmission by the defendant ARIEL ALVARADO to CONCACAF officials in New York, New York, and copying the defendant ALFREDO HAWIT, attaching a revised agenda for the CONCACAF executive committee meeting in Miami, Florida on January 15, 2012. |
| SIXTY-SEVEN | April 17, 2012 | Email message sent via interstate wire transmission by the defendant ARIEL ALVARADO to CONCACAF officials in New York, New York attaching proposed contract between Full Play and CONCACAF |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT SIXTY-EIGHT
(Wire Fraud Conspiracy – CFU World Cup Qualifiers Scheme #2)

479. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

480. In or about and between January 2012 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants COSTAS TAKKAS and AARON DAVIDSON, together with others, did knowingly and intentionally conspire to devise a scheme and

207

artifice to defraud FIFA, CONCACAF, and CFU and their constituent organizations, including to deprive FIFA, CONCACAF, and CFU and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNTS SIXTY-NINE THROUGH SEVENTY-TWO
(Wire Fraud – CFU World Cup Qualifiers Scheme #2)

481. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

482. On or about the dates set forth below, within the Southern and Western Districts of New York, the defendant COSTAS TAKKAS, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and CFU and their constituent organizations, including to deprive FIFA, CONCACAF, and CFU and their constituent organizations of their

208

respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

483. For the purpose of executing such scheme and artifice, the defendant COSTAS TAKKAS, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|---|---|---|
| SIXTY-NINE | November 13, 2012 | Wire transfer of $1,200,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a correspondent account at HSBC bank in Buffalo, New York, for credit to an account in the name of Front Company A at HSBC bank in Hong Kong. |
| SEVENTY | November 21, 2012 | Wire transfer of $750,000 from Front Company A's account at HSBC bank in Hong Kong, to a correspondent account at Standard Chartered Bank in New York, New York, for credit to an account in the name of Kosson Ventures at Fidelity Bank in the Cayman Islands. |

| SEVENTY-ONE | November 21, 2012 | Wire transfer of $250,000 from Front Company A's account at HSBC bank in Hong Kong, to a correspondent account at Standard Chartered Bank in New York, New York, for credit to an account in the name of Kosson Ventures at Fidelity Bank in the Cayman Islands. |
|---|---|---|
| SEVENTY-TWO | October 28, 2014 | Wire transfer of $80,000 from an account at Multibank in Panama, to a correspondent account at Bank of America in New York, New York, for credit to an account in the name of Individual #3 at Citibank in Florida. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

## COUNT SEVENTY-THREE
(Money Laundering Conspiracy –
CFU World Cup Qualifiers Scheme #2)

484. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

485. In or about and between January 2012 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants COSTAS TAKKAS and AARON DAVIDSON, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside

the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity, all contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

### COUNT SEVENTY-FOUR
(Money Laundering – CFU World Cup Qualifiers Scheme #2)

486. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

487. In or about and between November 2012 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant COSTAS TAKKAS,

211

together with others, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity.

(Title 18, United States Code, Sections 1956(a)(2)(A), 1956(a)(2)(B)(i), 2 and 3551 et seq.)

COUNT SEVENTY-FIVE
(Money Laundering Conspiracy –
CFU World Cup Qualifiers Scheme #2)

488. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

489. In or about and between July 2013 and November 2013, both dates being approximate and inclusive, within the Southern District of Florida, the defendant COSTAS TAKKAS, together with others, did knowingly and intentionally conspire to engage in monetary transactions, to wit: deposits, withdrawals and transfers of funds and monetary instruments, in and affecting interstate and foreign commerce, by, through and to one or more financial institutions, in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h), 1957(b), 1957(d)(1) and 3551 et seq.)

<u>COUNT SEVENTY-SIX</u>
(Money Laundering – CFU World Cup Qualifiers Scheme #2)

490. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

491. In or about and between July 2013 and November 2013, both dates being approximate and inclusive, within the Southern District of Florida, the defendant COSTAS TAKKAS, together with others, did knowingly and intentionally engage in monetary transactions, to wit: deposits, withdrawals and

213

transfers of funds and monetary instruments, in and affecting interstate and foreign commerce, by, through and to one or more financial institutions, in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1957(a), 1957(b), 1957(d)(1), 2, and 3551 et seq.)

COUNT SEVENTY-SEVEN
(Wire Fraud Conspiracy –
CONCACAF Gold Cup/Champions League Scheme)

492. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

493. In or about and between July 2012 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant AARON DAVIDSON, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONCACAF and their constituent organizations, including to deprive FIFA and CONCACAF and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations,

214

and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNTS SEVENTY-EIGHT THROUGH EIGHTY
(Wire Fraud – CONCACAF Gold Cup/Champions League Scheme)

494. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as though fully set forth in this paragraph.

495. On or about the dates set forth below, within the Southern District of New York, the defendant AARON DAVIDSON, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA and CONCACAF and their constituent organizations, including to deprive FIFA and CONCACAF and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

496. For the purpose of executing such scheme and artifice, the defendant AARON DAVIDSON, together with others,

215

did transmit and cause to be transmitted, by means of wire

communication in interstate and foreign commerce, writings,

signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Description |
|-------|-------------|-------------|
| SEVENTY-EIGHT | February 15, 2013 | Wire transfer of $3,000,000 from Traffic USA's account at Citibank in Miami, Florida, to CONCACAF's account at JP Morgan Chase Bank in New York, New York. |
| SEVENTY-NINE | December 4, 2013 | Wire transfer of $1,100,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Soccer Uniform Company A at Capital Bank in Panama City, Panama. |
| EIGHTY | December 20, 2013 | Wire transfer of $3,000,000 from Traffic USA's account at Citibank in Miami, Florida, to CONCACAF's account at JP Morgan Chase Bank in New York, New York. |

(Title 18, United States Code, Sections 1343, 2 and

3551 et seq.)

COUNT EIGHTY-ONE
(Money Laundering Conspiracy –
CONCACAF Gold Cup/Champions League Scheme)

497. The allegations contained in paragraphs 1 through

361 are realleged and incorporated as if fully set forth in this

paragraph.

498. In or about and between July 2012 and the

present, both dates being approximate and inclusive, within the

216

Eastern District of New York and elsewhere, the defendant AARON DAVIDSON, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity, all contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT EIGHTY-TWO
(Money Laundering – CONCACAF Gold Cup/Champions League Scheme)

499. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

500. In or about and between February 2013 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant AARON DAVIDSON, together with others, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the

ownership and the control of the proceeds of said specified

unlawful activity.

(Title 18, United States Code, Sections 1956(a)(2)(A),

1956(a)(2)(B)(i), 2 and 3551 et seq.)

COUNT EIGHTY-THREE
(Wire Fraud Conspiracy –
CONMEBOL/CONCACAF Copa América Centenario Scheme)

501. The allegations contained in paragraphs 1 through

361 are realleged and incorporated as if fully set forth in this

paragraph.

502. In or about and between April 2010 and the

present, both dates being approximate and inclusive, within the

Eastern District of New York and elsewhere, the defendants JUAN

ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, MARCO

POLO DEL NERO, RAFAEL ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS LEOZ,

JOSÉ MARIA MARIN, JOSÉ LUÍS MEISZNER, RICARDO TEIXEIRA, AARON

DAVIDSON, HUGO JINKIS, and MARIANO JINKIS, together with others,

did knowingly and intentionally conspire to devise a scheme and

artifice to defraud FIFA, CONCACAF, and CONMEBOL and their

constituent organizations, including to deprive FIFA, CONCACAF,

and CONMEBOL and their constituent organizations of their

respective rights to honest and faithful services through bribes

and kickbacks, and to obtain money and property by means of

materially false and fraudulent pretenses, representations, and

219

promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNT EIGHTY-FOUR
(Money Laundering Conspiracy –
CONMEBOL/CONCACAF Copa América Centenario Scheme)

503. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

504. In or about and between April 2010 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, RAFAEL ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS LEOZ, JOSÉ MARIA MARIN, JOSÉ LUÍS MEISZNER, RICARDO TEIXEIRA, AARON DAVIDSON, HUGO JINKIS, and MARIANO JINKIS, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United

220

States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT EIGHTY-FIVE
(Unlawful Procurement of Naturalization)

505. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

506. On or about and between March 24, 2005 and July 11, 2006, both dates being approximate and inclusive, within the Central District of California, the defendant EUGENIO FIGUEREDO, together with others, did knowingly and intentionally procure, contrary to law, his naturalization, in that the defendant did knowingly and intentionally make one or more false statements under oath, in a case, proceeding and matter relating to naturalization and citizenship, to wit: the defendant did falsely state that (1) he was only employed by Sunburst Decorative Rock in Irwindale, California and neither worked anywhere else in the previous five years nor ever had any affiliation with any organization or association in the United

221

States or in any other place; and (2) he had a medical impairment, to wit: dementia, and thus was unable to complete the required English language and civics competency exams.

(Title 18, United States Code, Sections 1425(a), 2, and 3551 et seq.; Title 8, United States Code, Section 1451(e))

### COUNTS EIGHTY-SIX THROUGH NINETY
(Aiding and Assisting in the Preparation of
False and Fraudulent Tax Returns)

507. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

508. On or about the dates set forth below, within the Central District of California, the defendant EUGENIO FIGUEREDO, together with others, did willfully aid and assist in, and procure, counsel and advise the preparation and presentation to the Internal Revenue Service under the internal revenue laws, of the defendant's U.S. Individual Income Tax Returns, Forms 1040 and attached Schedules and Forms, which were false and fraudulent as to material matters, to wit: among other things, the defendant falsely stated the amount of taxable income and failed to report his financial interest in a foreign bank account in the following years:

| Count | Tax Year | Approximate Filing Date |
|-------|----------|-------------------------|
| EIGHTY-SIX | 2009 | March 08, 2010 |
| EIGHTY-SEVEN | 2010 | March 03, 2011 |
| EIGHTY-EIGHT | 2011 | April 06, 2012 |
| EIGHTY-NINE | 2012 | March 22, 2013 |
| NINETY | 2013 | April 01, 2014 |

(Title 26, United States Code, Section 7206(2); Title 18, United States Code, Sections 2, and 3551 et seq.)

COUNT NINETY-ONE
(Obstruction of Justice - DAVIDSON)

509. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

510. In or about and between May 2013 and May 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant AARON DAVIDSON, together with others, did knowingly, intentionally and corruptly obstruct, influence and impede, and attempt to obstruct, influence and impede, an official proceeding, to wit: a Federal Grand Jury investigation in the Eastern District of New York.

(Title 18, United States Code, Sections 1512(c)(2), 2, and 3551 et seq.)

223

## COUNT NINETY-TWO
(Conspiracy to Obstruct Justice - HAWIT)

511. The allegations contained in paragraphs 1 through 361 are realleged and incorporated as if fully set forth in this paragraph.

512. In or about and between July 2015 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ALFREDO HAWIT, together with others, did knowingly and intentionally conspire to (a) corruptly obstruct, influence and impede one or more official proceedings, to wit: (i) a Federal Grand Jury investigation in the Eastern District of New York and (ii) the criminal prosecution in the United Stated District Court for the Eastern District of New York filed under the caption United States v. Jeffrey Webb et al., 15 CR 252 (RJD); and (b) corruptly persuade one or more persons with intent to (i) influence the testimony of such persons at such official proceedings, (ii) cause or induce such persons to withhold testimony from such official proceedings, and (iii) hinder, delay and prevent the communication to one or more law enforcement officers of the United States, to wit: Special Agents of the Federal Bureau of Investigation, of information relating to the commission or possible commission of one or more

federal offenses, contrary to Title 18, United States Code, Sections 1512(b)(1), 1512(b)(2)(A), 1512(b)(3) and 1512(c)(2).

(Title 18, United States Code, Sections 1512(k) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATIONS

### CRIMINAL FORFEITURE ALLEGATION AS TO COUNT ONE

513. The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 1963(a), which requires any person or entity convicted of such offense to forfeit: (a) any interest acquired or maintained in violation of Title 18, United States Code, Section 1962; (b) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendant established, operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962, and (c) any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962, including but not limited to all right, title and interest in: (a) the real property and premises located at 2116 Adel Drive, Loganville, Georgia 30052;

225

(b) the real property and premises located at 5119 Madeline Place, Stone Mountain, Georgia 30083; (c) the real property and premises located at 7222 Lake Crossing, Stone Mountain, Georgia 30087; (d) the real property and premises located at 104 Ellis Drive, Conyers, Georgia 30012; (e) the real property and premises located at 808 Brickell Key Drive, Apartment No. 1204, Miami, Florida 33131; (f) the real property and premises located at 18067 NW 74th Court, Hialeah, Florida 33015; (g) the real property and premises located at 18061 NW 74th Court, Hialeah, Florida 33015; (h) the real property and premises located at 18055 NW 74th Court, Hialeah, Florida 33015; (i) the real property and premises located at 18049 NW 74th Court, Hialeah, Florida 33015; (j) the real property and premises located at 18043 NW 74th Court, Hialeah, Florida 33015; (k) the real property and premises located at 8540 SW 149th Avenue, Apartment No. 805, Miami, Florida 33193; (l) the real property and premises located at 8660 SW 149th Avenue, Apartment No. 201, Miami, Florida 33193; (m) the real property and premises located at 8660 SW 149th Avenue, Apartment No. 209, Miami, Florida 33193; and (n) the real property and premises located at 1700 Kennedy Causeway, Condominium Unit No. 1607, North Bay Village, Florida 33141.

514. If any of the above-described forfeitable property, as a result of any act or omission of a defendant:

(a)  cannot be located upon the exercise of due diligence;

(b)  has been transferred or sold to, or deposited with, a third party;

(c)  has been placed beyond the jurisdiction of the court;

(d)  has been substantially diminished in value; or

(e)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property.

(Title 18, United States Code, Sections 1963(a) and 1963(m))

227

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS TWO THROUGH FOUR, SEVEN, NINE, ELEVEN, THIRTEEN
THROUGH FIFTEEN, EIGHTEEN THROUGH TWENTY-THREE, TWENTY-SIX
THROUGH TWENTY-EIGHT, THIRTY-ONE THROUGH THIRTY-FIVE, THIRTY-
EIGHT THROUGH FORTY, FORTY-TWO THROUGH FORTY-SIX, FORTY-NINE,
FIFTY, FIFTY-THREE, FIFTY-FOUR, FIFTY-SEVEN THROUGH SIXTY,
SIXTY-THREE, SIXTY-FIVE THROUGH SEVENTY-TWO, SEVENTY-SEVEN
THROUGH EIGHTY, AND EIGHTY-THREE

515. The United States hereby gives notice to the

defendants charged in Counts Two through Four, Seven, Nine,

Eleven, Thirteen through Fifteen, Eighteen through Twenty-Three,

Twenty-Six through Twenty-Eight, Thirty-One through Thirty-Five,

Thirty-Eight through Forty, Forty-Two through Forty-Six, Forty-

Nine, Fifty, Fifty-Three, Fifty-Four, Fifty-Seven through Sixty,

Sixty-Three, Sixty-Five through Seventy-Two, Seventy-Seven

through Eighty, and Eighty-Three, that, upon their conviction of

any of such offenses, the government will seek forfeiture in

accordance with Title 18, United States Code, Section

981(a)(1)(C) and Title 28, United States Code, Section 2461(c),

which require any person convicted of such offense to forfeit

any and all property, real or personal, which constitutes or is

derived from proceeds traceable to a violation of such offense,

including but not limited to all right, title and interest in:

(a) the real property and premises located at 2116 Adel Drive,

Loganville, Georgia 30052; (b) the real property and premises

located at 5119 Madeline Place, Stone Mountain, Georgia 30083;

(c) the real property and premises located at 7222 Lake

228

Crossing, Stone Mountain, Georgia 30087; (d) the real property and premises located at 104 Ellis Drive, Conyers, Georgia 30012; (e) the real property and premises located at 808 Brickell Key Drive, Apartment No. 1204, Miami, Florida 33131; (f) the real property and premises located at 18067 NW 74th Court, Hialeah, Florida 33015; (g) the real property and premises located at 18061 NW 74th Court, Hialeah, Florida 33015; (h) the real property and premises located at 18055 NW 74th Court, Hialeah, Florida 33015; (i) the real property and premises located at 18049 NW 74th Court, Hialeah, Florida 33015; (j) the real property and premises located at 18043 NW 74th Court, Hialeah, Florida 33015; (k) the real property and premises located at 8540 SW 149th Avenue, Apartment No. 805, Miami, Florida 33193; (l) the real property and premises located at 8660 SW 149th Avenue, Apartment No. 201, Miami, Florida 33193; (m) the real property and premises located at 8660 SW 149th Avenue, Apartment No. 209, Miami, Florida 33193; and (n) the real property and premises located at 1700 Kennedy Causeway, Condominium Unit No. 1607, North Bay Village, Florida 33141.

516. If any of the above-described forfeitable property, as a result of any act or omission of a defendant:

(a) cannot be located upon the exercise of due diligence;

229

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS FIVE, SIX, EIGHT, TEN, TWELVE, SIXTEEN, SEVENTEEN, TWENTY-FOUR, TWENTY-FIVE, TWENTY-NINE, THIRTY, THIRTY-SIX, THIRTY-SEVEN, FORTY-ONE, FORTY-SEVEN, FORTY-EIGHT, FIFTY-ONE, FIFTY-TWO, FIFTY-FIVE, FIFTY-SIX, SIXTY-ONE, SIXTY-TWO, SIXTY-FOUR, SEVENTY-THREE THROUGH SEVENTY-SIX, EIGHTY-ONE, EIGHTY-TWO, <u>AND EIGHTY-FOUR</u>

517. The United States hereby gives notice to the defendants charged in Counts Five, Six, Eight, Ten, Twelve, Sixteen, Seventeen, Twenty-Four, Twenty-Five, Twenty-Nine,

Thirty, Thirty-Six, Thirty-Seven, Forty-One, Forty-Seven, Forty-Eight, Fifty-One, Fifty-Two, Fifty-Five, Fifty-Six, Sixty-One, Sixty-Two, Sixty-Four, Seventy-Three through Seventy-Six, Eighty-One, Eighty-Two, and Eighty-Four, that, upon their conviction of any of such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any and all property, real or personal, involved in such offense, or any property traceable to such offense, including but not limited to all right, title and interest in: (a) the real property and premises located at 2116 Adel Drive, Loganville, Georgia 30052; (b) the real property and premises located at 5119 Madeline Place, Stone Mountain, Georgia 30083; (c) the real property and premises located at 7222 Lake Crossing, Stone Mountain, Georgia 30087; (d) the real property and premises located at 104 Ellis Drive, Conyers, Georgia 30012; (e) the real property and premises located at 808 Brickell Key Drive, Apartment No. 1204, Miami, Florida 33131; (f) the real property and premises located at 18067 NW 74th Court, Hialeah, Florida 33015; (g) the real property and premises located at 18061 NW 74th Court, Hialeah, Florida 33015; (h) the real property and premises located at 18055 NW 74th Court, Hialeah, Florida 33015; (i) the real property and premises located at

231

18049 NW 74th Court, Hialeah, Florida 33015; (j) the real property and premises located at 18043 NW 74th Court, Hialeah, Florida 33015; (k) the real property and premises located at 8540 SW 149th Avenue, Apartment No. 805, Miami, Florida 33193; (l) the real property and premises located at 8660 SW 149th Avenue, Apartment No. 201, Miami, Florida 33193; (m) the real property and premises located at 8660 SW 149th Avenue, Apartment No. 209, Miami, Florida 33193; and (n) the real property and premises located at 1700 Kennedy Causeway, Condominium Unit No. 1607, North Bay Village, Florida 33141.

518. If any of the above-described forfeitable property, as a result of any act or omission of a defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b); Title 21, United States Code, Section 853(p))

### CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNT EIGHTY-FIVE

519. The United States hereby gives notice to the defendant EUGENIO FIGUEREDO that, upon his conviction of the offense charged in Count Eighty-Five, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(6), which requires any person convicted of such offense to forfeit: (a) any conveyance, including any vessel, vehicle or aircraft used in the commission of such offense; and (b) any property, real or personal, that constitutes or is derived from proceeds obtained directly or indirectly from the commission of such offense, or that is used to facilitate or intended to be used to facilitate the commission of such offense.

520. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(6) and 982(b); Title 21, United States Code, Section 853(p))

### CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNTS NINETY-ONE AND NINETY-TWO

521. The United States hereby gives notice to the defendants charged in Counts Ninety-One and Ninety-Two, that, upon their conviction of either of such offenses, the government

will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of either of such offenses to forfeit any and all property, real or personal, which constitutes or is derived from proceeds traceable to a violation of such offense.

522. If any of the above-described forfeitable property, as a result of any act or omission of a defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any

other property of the defendants up to the value of the

forfeitable property described in this forfeiture allegation.

        (Title 28, United States Code, Section 2461(c); Title

18, United States Code, Section 981(a)(1)(C); Title 21, United

States Code, Section 853(p))

                                        A TRUE BILL

                                        _____
                                        FOREPERSON

_____
ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

236

F. #2015R00747
FORM DBD-34
JUN. 85

No. 15-252 (S-1) (RJD)

# UNITED STATES DISTRICT COURT

### EASTERN *District of* NEW YORK
### CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

ALFREDO HAWIT, ARIEL ALVARADO, RAFAEL CALLEJAS, BRAYAN
JIMÉNEZ, EDUARDO LI, JULIO ROCHA, RAFAEL SALGUERO, COSTAS
TAKKAS, HÉCTOR TRUJILLO, REYNALDO VASQUEZ, JACK WARNER,
JUAN ÁNGEL NAPOUT, MANUEL BURGA, CARLOS CHÁVEZ, LUÍS
CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, RAFAEL
ESQUIVEL, EUGENIO FIGUEREDO, NICOLÁS LEOZ, JOSÉ MARIA
MARIN, JOSÉ LUÍS MEISZNER, ROMER OSUNA, RICARDO TEIXEIRA,
AARON DAVIDSON, HUGO JINKIS, and MARIANO JINKIS,

Defendants.

## SUPERSEDING INDICTMENT

(T. 8, U.S.C., § 1451(e); T. 18, U.S.C., §§ 981(a)(1)(C), 982(a)(1),
982(a)(6), 982(b), 1343, 1349, 1425(a), 1512(c)(2), 1512(k),
1956(a)(2)(A), 1956(a)(2)(B)(i), 1956(h), 1957(a), 1957(b), 1957(d)(1),
1962(d), 1963, 1963(a), 1963(m), 2, and 3551 et seq.; T. 21, U.S.C., §
853(p); T. 26, U.S.C. § 7206(2); T. 28, U.S.C. § 2461(c))

*A true bill.*

*Robert Heffernan*

_____
*Foreperson*

*Filed in open court this* _____ *day.*

*of* _____ *A.D. 20* _____

_____
*Clerk*

*Bail, $* _____

*Evan M. Norris, Amanda Hector, Darren A. LaVerne, Samuel P. Nitze,*
*M. Kristin Mace, Paul Tuchmann, Keith D. Edelman, Tanya Hajjar, and*
*Brian Morris, Assistant U.S. Attorneys (718) 254-7000*